UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **ANDREA CAMPBELL**, individually and on behalf of all others similarly situated,<br><br>                        Plaintiff,<br>v.<br><br>**SI WIRELESS, LLC,** and DOES 1-25<br><br>                        Defendant. | Civil Case No.: 16-1320<br><br>Hon. Nancy J. Rosenstengel, Judge<br>Honorable Stephen C. Williams, Magistrate |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR IMPROPER VENUE OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION AND TO STAY ANDREA CAMPBELL'S CLAIM PENDING ARBITRATION**

## INTRODUCTION

Defendant, SI Wireless, LLC, seeks to enforce an arbitration clause that it attempted to amend into Plaintiff Andrea Campbell's cell phone contract, despite failing to provide reasonable notice of the amendment and, in fact, actively misleading Ms. Campbell (and its other customers) on the addition of this clause. It cannot do so.

But even if it can, the clause expressly excludes claims of the type at issue herein. Accordingly, for the reasons set forth below, Defendant's Motion should be denied in its entirety.

## BACKGROUND

On or about November 10, 2014, Plaintiff, Andrea Campbell, entered into a Service Agreement with Defendant, SI Wireless, LLC (d/b/a MobileNation) for a telephone number ending in 0510 (the number at issue in this litigation). (Declaration of Michael Beehn ("Beehn Decl."), Exhibit 1.) This agreement did not contain an arbitration clause or class action waiver. *Id.* At some point in 2015,[1] Defendant allegedly amended its Service Agreements with its customers – including Ms. Campbell – to add a paragraph entitled "ARBITRATION/ WAIVER OF CLASS ACTION." (hereinafter, the "Arbitration Clause."). (Beehn Decl., ¶¶ 4, 6.) The Arbitration Clause states, in full:

> **20. ARBITRATION/ WAIVER OF CLASS ACTIONS** Most customer concerns or disputes can be resolved through our customer service representatives. However, if either of us has an issue which cannot be resolved without third party intervention, you and we both agree to submit to binding arbitration before the American Arbitration Association. This means that **all disputes arising from or relating in any way to your Services, whether under these Terms & Conditions or not, will be resolved through arbitration, not in court or through judge or jury. Moreover, to the fullest extent allowed by law both of us agree to waive any rights to pursue a claim arising from or relating to these Terms & Conditions or the Services as a class action**; that is, you or we will not join a claim

---

[1] The actual date is unclear, notwithstanding Mr. Beehn's declaration, as discussed below.

> with the claim of any other person or entity or pursue a claim on behalf of any other person or entity. The arbitration shall take place in McCracken County, Kentucky or Madison County, Tennessee, at your option. The waivers in this section continue in force and effect after the termination of this agreement. Only actions relating to failure to timely pay billed charges, such as service charges and related fees and taxes (collection claims), may be brought in a court; provided that all such actions will be brought in small claims or another court with jurisdiction; and further provided that if any counterclaims or claims unrelated to collection are asserted in the action by any party then the case shall be transferred to arbitration.

(Beehn Decl., ¶ 6.)

To notify customers of this addition, Defendant purportedly sent the following text message on either August 24 or August 25, 2015:

> SMS: MobileNation Updated Terms and Policies – Please review by visiting http://mymobilenation.com/terms/ Thanks for being a MobileNation member.

(Beehn Decl., ¶¶ 4, 5.) Ms. Campbell does not recall ever seeing this text message or the Arbitration Clause.

At some point in 2016, Plaintiff apparently fell behind on her payments. As a result, Defendant began sending automated text messages to her phone telling her to make a payment, or risk having her service suspended. (Compl. ¶¶ 18-19.) These text messages were sent at 7:00 AM, making them more disruptive than helpful. (*Id.* at ¶ 20.) Accordingly, Defendant replied to one of the texts with the single word "stop." (*Id.* at ¶ 21.) The texts continued unabated. (*Id.* at ¶ 22.) Subsequently, Plaintiff called Defendant to ask how to stop the texts, and was told by Defendant's representative that there was no way. (*Id.* at ¶ 23.)

Thus, on December 8, 2016, Plaintiff filed a putative class action complaint against Defendant related to these unstoppable text messages. On January 5, 2017, Defendant moved to compel arbitration, on the basis of the aforementioned Arbitration Clause. Plaintiff now opposes Defendant's Motion for the reasons set forth herein.

## **LEGAL STANDARD**

"The FAA permits a federal district court to compel arbitration when there is: (1) a written agreement to arbitrate; (2) a dispute covered by or within the scope of a valid arbitration agreement; and (3) a refusal to arbitrate." *Wal-Mart Stores, Inc. v. Helferich Patent Licensing, LLC*, 51 F. Supp. 3d 713, 717 (N.D. Ill. 2014). "When the parties have signed an arbitration agreement, the only questions a court may properly decide are … (1) whether the parties are bound by a given arbitration agreement; and (2) whether an arbitration provision in a binding contract applies to a particular type of controversy." *Id.* "In contracts governed by the FAA, the threshold question of 'whether the parties have submitted a particular dispute to arbitration, *i.e.*, the *question of arbitrability*,' is generally to be decided by the court, not the arbitrator, unless the parties clearly and unmistakably provide otherwise." *Id.* at 719. Plaintiff does not dispute her refusal to arbitrate. However, she does, as set forth below, dispute that there was an agreement to arbitrate and that, if there was, the arbitration agreement discovers the dispute herein.

## **DISCUSSION**

I. **There is no Enforceable Agreement to Arbitrate.**

    a. **Contract Formation Standard and Burden**

Under both Illinois and Tennessee law,[2] "a party seeking to enforce an agreement has the burden of establishing the existence of the agreement." *Reese v. Forsythe Mergers Group*, 682 N.E. 2d 208, 213 (Ill. App. Ct. 2d Dist. 1997); *see also Randolph v. Randolph*, 937 S.W.2d 815, 821 (Tenn. 1996) ("[T]he burden of proving the existence of a valid contract is upon the person relying on the

---

[2] While Defendant does not brief choice of law, there is a valid question over which states contract laws apply. As such, differences, if any, will be noted when found and relevant.

contract."). "Formation of a contract requires mutual assent in virtually all jurisdictions[.]" *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016). Illinois and Tennessee courts take an objective approach to this question. *Id.*; *see also Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 528 (Tenn. 2012). Under this approach, "intent to manifest assent … is revealed by outward expressions such as words and acts." *Sgouros*, 817 F.3d at 1034. "Generally, a party who signs a written contract is presumed to have notice of all of the contract's terms." *Id.* However, in the internet context, application of this principle becomes trickier. *Id.*

"When it comes to newer forms of contracting [such as internet agreements] … Illinois courts have applied a two-part reasonable communicativeness test, under which they ask … whether the web pages presented to the consumer adequately communicate all the terms and conditions of the agreement, and whether the circumstances support the assumption that the purchaser receives reasonable notice of those terms." *Id.* This requirement borrows heavily from the "reasonable notice" requirement adopted for terms and conditions on cruise-ship tickets.[3] *Id.* (citing *Walker v. Carnival Cruise Lines, Inc.*, 889 N.E. 2d 687, 694 (Ill. Ct. App. 2008)). This is a fact-intensive inquiry. *Sgouros*, 817 F.3d at 1034-35. A key question is whether the party seeking to enforce its contract has made a "reasonable effort" to direct the person's attention to the contractual material furnished by the party. *Barbachym*, 713 F.2d at 219. Examples of internet agreements found to provide sufficient notice are those in which the company places "the agreement … or a clearly labeled hyperlink to the agreement, next to an 'I Accept' button that

---

[3] Plaintiff cannot find any Tennessee case law directly applying "reasonable notice" to internet agreements. However, the Sixth Circuit and Tennessee courts have adopted the same "reasonable notice" requirement for cruise-ship tickets upon which *Sgouros* relied. *See, e.g.*, *Barbachym v. Costa Line, Inc.*, 713 F.2d 216, 219 (6th Cir. 1983); *Thomas v. Costa Cruise Lines N.V.*, 892 S.W. 2d 837, 840-41 (Tenn. Ct. App. 1994).

unambiguously pertains to that agreement[.]" *Sgouros*, 817 F.3d at 1036. Courts "cannot presume that a person who clicks on a box that appears on a computer screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.)" *Id.* at 1035.

### b. Defendant Failed to Provide Reasonable Notice of the Arbitration Clause.

Not only did Defendant fail to provide reasonable notice of the addition of the Arbitration Clause, Defendant appears to have intentionally made it difficult for its customers to figure out what additions and changes were made.

#### i. Defendant Linked to the Wrong Terms in its Text Message.

Defendant chose to notify customers of its unilateral modification exclusively via a text message which generically stated:

> MobileNation Updated Terms and Policies – Please review by visiting http://mymobilenation.com/terms/ Thanks for being a MobileNation member.

Unfortunately, ***Defendant provided the wrong link*** in this text message. The link provided led to a page called "Policies & Terms," on which there were two paragraphs of terms – "Network Management" and "Surcharges" – and three hyperlinks: "Terms & Conditions," "Net Neutrality Disclosure," and "Privacy Policy."[4] Exhibit A.[5] The Arbitration Clause is found nowhere on this page.

---

[4]   This count refers only to those links in the middle of the page. The page as a whole contains at least two dozen links.

[5]   This Exhibit is an Internet Archive Wayback Machine snapshot, which "[c]ourts have taken judicial notice of … as facts that can be accurately and readily determined from sources whose accuracy cannot be questioned." *Hepp v. Ultra Green Energy Servs., LLC*, Case No. 13-cv-4692, 2016 U.S. Dist. LEXIS 34953 at *5 n.1 (N.D. Ill. Mar. 18, 2016) . The Internet Archive Wayback Machine archives pages as they appeared on certain dates in the past. Exhibit A is a

Providing the wrong link alone is enough to raise serious questions, but there are aggravating factors. The name of the page to which Defendant provided the link – "Policies & Terms" – is the closest match to what Defendant claimed in its text message to have updated – "Terms and Policies." This would be slightly less of a problem if there were no terms directly on the page – after all, if there were no terms, what could have been updated? But, as mentioned, the "Policies & Terms" page *actually contains terms* relating to network management and surcharges. Significantly, the "Surcharges" paragraph explicitly states that should the surcharges change, Defendant would notify its customers of said update.

In sum, Defendant sent a text message that "Terms and Policies" were updated and linked to a page of terms called "Policies & Terms." This suggests quite clearly that the terms contained directly on that page – rather than the terms contained in one of the sub-links on the page – were what was updated. As such, there was absolutely no reason for a customer who received Defendant's text message to look, or think to look, any further than the page to which Defendant linked.

If Defendant intended to notify customers that a different set of terms, such as the Terms and Conditions, was updated, there was absolutely no reason Defendant could not have stated "MobileNation Updated Terms and Conditions" in its text and/or provided a direct hyperlink to those Terms and Conditions -- http://www.mymobilenation.com/support/terms-and-conditions.php. Instead, Defendant chose to be vague, at best, and intentionally misleading, at

---

snapshot of http://mymobilenation.com/terms/ as of August 30, 2015, which is five days after Defendant purportedly sent the text messages. There are no earlier snapshots. However, as seen in Exhibits B and C, the "Terms and Conditions" to which the Arbitration Clause was ultimately added were always found at http://mymobilenation.com/support/terms-and-conditions.php.

worst. It is also possible that Defendant never actually sent notice of the added Arbitration Clause, and is attempting to use its August 25 notice of some other change to fix that mistake. This possibility is supported by the fact that, as discussed below, the Arbitration Clause appears to have been added no later than August 15, 2015, rather than on August 24, 2015 as Defendant now claims.

> ii. Defendant's Decision to Notify Customers Exclusively by Text Message is Unreasonable.

Even if Plaintiff or other customers had some reason to believe that Defendant's text message did *not* actually refer to the terms at the link it contained, and were inclined to search further, Defendant sent the link via text message. Because of the very nature of text messages, a recipient would be required to either read through the agreements on her cell 5" cell phone screen – give or take an inch – or access a computer and manually enter the link into a web browser, adding yet another step in the process of figuring out what Defendant added. On top of that, nothing in the documents themselves provide an overview of the changes, nor is there notice at the beginning of any of the documents mentioning the addition of an Arbitration Clause and requesting that the user review such a clause carefully, as has become the norm.[6] Thus, Defendant expected its customers to click through its links and read through its lengthy policy documents in their entirety on their cell phones, without providing any guidance as to the changes.

> iii. Defendant Failed to Provide Any Information on What was Updated, and Actively Misled its Customers who Sought to Find Out.

---

[6] See, for example, https://www.uber.com/legal/terms/us/, which contains bold text on the first page of the agreement stating "IMPORTANT: PLEASE REVIEW THE ARBITRATION SET FORTH BELOW CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES … ON AN INDIVIDUAL BASIS THROUGH FINAL AND BINDING ARBITRATION[.]"

If the above is not enough, the Terms and Conditions document – which actually contained the Arbitration Clause – does not state that it was revised on August 24, 2015, indicating either that Mr. Beehn's declaration is incorrect, or that it is correct, but is yet another way Defendant sought to obscure exactly what modifications it made. The Internet Archive Wayback Machine has two different relevant archives of Defendant's Terms and Conditions: August 23, 2015 and March 14, 2016. The August 23, 2015 Terms and Conditions state that they are current as of "8/15/2015." Exhibit B. The March 14, 2016 Terms and Conditions state that they too are current as of "8/15/2015." Exhibit C. If it is true that Defendant updated its Terms & Conditions on August 24, 2015, as stated in paragraph 4 of Beehn's Declaration, then why did Defendant fail to update the "current as of" date at the top of the document to "8/24/2015"? Alternatively, if Mr. Beehn's declaration about the date of modification is incorrect, is it similarly incorrect about the date of the purported text message? If not, why did Defendant wait ten days to send this notification?[7]

This is not just nitpicking, but instead shows another roadblock put in the way of consumers who actively sought to wade through Defendant's obfuscation. One who sees that the Terms and Conditions were updated on August 15, 2015, but who did not receive notice of an update until August 25, 2015 – especially in a real-time communication medium such as text messaging – may (justifiably) assume that the terms on the actual linked page were the ones that were changed, or

---

[7] There are other odd inconsistencies in Mr. Beehn's declaration. For example, Mr. Beehn states in paragraph 4 that the purported text message was sent out on August 24. However, in paragraph 5, it states that Ms. Campbell did not receive the message until August 25. Notwithstanding the fact Defendant has no idea if the message was actually received, the day-long gap is not explained.

that it was one of the other two policies – which contained no "current as of date" whatsoever – that was updated.

      iv. <u>Defendant Could Have Provided Reasonable Notice, but did not, and thus, the Modified Agreement Cannot be Enforced.</u>

  Defendant could have easily provided reasonable notice if it had wanted to do so. It could have provided the correct and direct link via text. It could have sent an email. It could have sent a letter. It could have done all three. It could have specified in the text/email/letter what changed, specifically noting the addition of the Arbitration Clause. It could have done that not only in the text/email/letter, but at the outset of the modified document. Instead, Defendant chose to do the bare minimum, essentially telling its customers that "something changed, but we are not going to tell you what or how or where."

  The situation here is presumably the type of situation that the *Sgouros* court had in mind when it wrote that courts "cannot presume that a person who clicks on a box that appears on a computer screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.)" 817 F.3d at 1035. Plaintiff and putative class members here had to do more than just click an additional link. They had to somehow discern the meaning of Defendant's intentionally vague and unhelpful text, divine that Defendant sent the wrong link, click through the three links contained on the page, and then compare each agreement at those links to the previous agreements in order to figure out what changed. This is unreasonable.

  Indeed, when there is "no proof whatever that [the plaintiffs] … ever had their attention called to the notices on the back of the paper," the terms cannot and should not be enforced. *The Majestic*, 166 U.S. 375, 379 (1897); *see also Silvestri v. Italia Societa Per Azioni Di Navigazione*, 388 F.2d 11, 17-18 (2d Cir. 1968) (imposing a duty on the ticket draftsman to produce a significantly

eye catching warning). While we are not dealing with tickets, there is no material difference between sending a text message about an agreement modification which contains the wrong link and no information on what changed (or the significance of those changes), and failing to produce a significantly eye-catching warning, or call attention to notices on the back of a ticket.

If we are going to permit corporations to unilaterally modify contracts to unilaterally add non-mutual arbitration clauses – a practice which is patently unfair to consumers[8] – we should at least hold those corporations to a meaningful standard when it comes to making those modifications and notifying those affected. Simply put, there was no mutual assent to Defendant's contract modification because Defendant, intentionally or otherwise, failed to properly notify customers of the addition of the Arbitration Clause. At minimum, Defendant has failed to meet its burden to show a valid contract was formed. Accordingly, there was no agreement to arbitrate.[9]

## II. Plaintiff's Claim is not Arbitrable.

Even if the Court finds that the Arbitration Clause is effective and binding on Plaintiff, Plaintiff's claims are expressly excluded from its terms. "In contracts governed by the FAA, the

---

[8] Especially when it comes to cell phone contracts, as cell phones have "moved beyond a fashionable accessory and into the realm of necessity." Pew Research Center, Americans and text messaging (Sept. 19, 2011).

[9] While Defendant does briefly mention the fact Ms. Campbell entered into a separate agreement for an additional phone number (ending in 7970), and that this agreement contained the Arbitration Clause, the relevance is unclear. While the Arbitration Clauses purport to be broad, it would be beyond broad to say that Ms. Campbell's alleged separate agreement to arbitrate disputes related to her second phone's services can somehow cover text messages sent to her first phone relating exclusively to past due payment obligations and potential service interruptions for that first phone. Neither the second phone nor its contract have anything to do with this case. Continuing with the cruise-ship ticket analogy, a claim relating to one trip on a cruise line is not going to be governed by the modified ticket terms of a subsequent trip.

threshold question of 'whether the parties have submitted a particular dispute to arbitration, *i.e.*, the *question of arbitrability*,' is generally to be decided by the court, not the arbitrator, unless the parties clearly and unmistakably provide otherwise." *Wal-Mart Stores, Inc.* 51 F. Supp. 3d at 719. The Arbitration Clause herein does not state one way or the other who should decide the question of arbitrability, and therefore, it should be decided by the Court.[10]

The Arbitration Clause expressly excludes from its terms "actions relating to failure to timely pay billed charges, such as service charges and related fees and taxes[.]" (Beehn Decl., ¶ 6.) Such actions are permitted to "be brought in small claims or another court with jurisdiction." This was presumably an effort by Defendant to avoid the mutuality of arbitration by allowing only the most common claims it may bring to be brought in court.

However, what's good for the goose is good for the gander. Defendant sent unstoppable text messages to Plaintiff's cellular telephone in an effort to make Plaintiff pay up on her allegedly past due account. Plaintiff's lawsuit arises from this effort. If we are to take a broad view of the phrase "arising from or relating" when determining the scope of the Arbitration Clause, then it is only fair to give a similarly broad interpretation to the use of the phrase "relating to" in the provision discussing which claims are to be excluded from the Arbitration Clause. If Plaintiff's

---

[10] There is some case law support for the idea that an agreement to arbitrate pursuant to the *rules* of the American Arbitration Association requires that the question of arbitration be decided by the arbitrator, because those rules require questions of arbitrability to be decided by the arbitrator. *See, e.g.*, *Fallo v. High-Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009). However, such a decision seems to stretch the meaning of "clear and unmistakable." Regardless, the Arbitration Clause at issue here does not require arbitration pursuant to the rules of the American Arbitration Association, only that the American Arbitration Association will conduct the arbitration. Whether the AAAs rules will apply in full, in part, or not at all is an open question under the agreement. This is certainly not "clear and unmistakable."

claim relates to her services, which is the only way to bring her claim under the purview of the Clause in the first place, it is only because the messages dealt with her failure to timely pay billed charges pursuant to the service agreement,[11] making it the type of claim the Arbitration Clause expressly allows to be brought in a "court with jurisdiction." To Plaintiff's knowledge, there is no dispute that this Court has jurisdiction. Accordingly, the case is properly brought and heard in this Court, regardless of the enforceability of the Arbitration Clause.[12]

## CONCLUSION

In light of the foregoing, Plaintiff respectfully requests that Defendant's Motion be denied in its entirety.

Dated: February 9, 2017

/s/ *Jeremy M. Glapion*
Jeremy M. Glapion
**THE GLAPION LAW FIRM, LLC**
1704 Maxwell Drive
Wall, New Jersey 07719
Tel: 732.455.9737
Fax: 732.709.5150
jmg@glapionlaw.com

---

[11] Imagine instead that Defendant instead chose to spam Plaintiff's cellular telephone with Justin Bieber song lyrics. It is difficult to see how this would fall under the Arbitration Clause. The content and purpose of the messages are what arguably brings Plaintiff's claim under the purview of the Clause.

[12] There remains the issue of the class action waiver, and whether Plaintiff's claim is excepted from the entirety of the Arbitration Clause (including the waiver), or only the provisions requiring arbitration, leaving the class action waiver to be separately addressed. Defendant did not brief this issue, so Plaintiff will not do so here.