# APPENDIX 2

7 FCC Rcd. 8752 (F.C.C.), 71 Rad. Reg. 2d (P & F) 445, 7 F.C.C.R. 8752, 1992 WL 690928
FCC 92–443

IN THE MATTER OF
RULES AND REGULATIONS IMPLEMENTING THE TELEPHONE CONSUMER PROTECTION ACT OF 1991

CC Docket No. 92–90
Adopted: September 17, 1992; Released: October 16, 1992

REPORT AND ORDER

**1 *8752** By the Commission: Commissioner Barrett issuing a statement.

**\*8753** I. INTRODUCTION

1. By this action, the Commission is amending its rules and regulations to establish procedures for avoiding unwanted telephone solicitations to residences, and to regulate the use of automatic telephone dialing systems, prerecorded or artificial voice messages, and telephone facsimile machines.

II. BACKGROUND

2. This proceeding was initiated by passage of the Telephone Consumer Protection Act of 1991, Public Law 102–243, December 20, 1991, which amended Title II of the Communications Act of 1934, 47 U.S.C. § 201 et seq., by adding a new section, 47 U.S.C. § 227 (TCPA). In its preamble, the TCPA recognizes the legitimacy of the telemarketing industry, but states that unrestricted telemarketing could be an intrusive invasion of privacy and, in some instances, a risk to public safety. Accordingly, the TCPA imposes restrictions on the use of automatic telephone dialing systems, the use of artificial or prerecorded voice, and on the use of telephone facsimile machines to send unsolicited advertisements. Specifically, the TCPA prohibits autodialed and prerecorded voice message calls to emergency lines, any health care facility or similar establishment, and numbers assigned to radio common carrier services or any service for which the called party is charged for the call, unless the call is made with the prior express consent of the called party or is made for emergency purposes. The TCPA also prohibits calls made without prior express consent to a residence using an artificial or prerecorded voice to deliver a message, unless it is an emergency call or is exempted by the Commission. Unsolicited advertisements may not be transmitted by telephone facsimile machines. Those using such machines or transmitting artificial or prerecorded voice messages are subject to certain identification requirements. The statute **\*8754** outlines various remedies for violations of the TCPA. Finally, the TCPA requires that the Commission consider several methods to accommodate telephone subscribers who do not wish to receive unsolicited advertisements, including live voice solicitations.

3. The TCPA notes that, "[i]ndividuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices." TCPA at Section 2(9). The preamble of the TCPA notes that the use of telemarketing is widespread, and generates more than $400 billion in commercial activity each year, through more than 30,000 businesses employing more than 300,000 people. TCPA at Section 2(2)–(4). [1] Our task in this proceeding is to implement the TCPA in a way that reasonably accommodates individuals' rights to privacy as well as the legitimate business interests of telemarketers.

APPENDIX 2

**\*\*2**  4. In accordance with the requirements of the TCPA, the Commission, on April 10, 1992, adopted a Notice of Proposed Rulemaking (NPRM) in this proceeding. [2] The NPRM proposed rules implementing provisions of the TCPA which place restrictions on the use of automatic telephone dialing systems and artificial or prerecorded messages. The NPRM requested comment on the proposed rules, and requested comment and analysis regarding several alternative methods for restricting telephone solicitations to residential subscribers. Approximately two hundred and forty parties, including 83 newspapers, 25 industry and trade associations, 6 consumer advocacy groups, and 17 common carriers submitted comments or reply comments in response to the NPRM. A list of those parties is contained in Appendix A. [3]

5. In this proceeding, we analyze the costs and benefits associated with each of the alternatives for meeting the goals of the TCPA. The rules we adopt attempt to balance the privacy concerns which the TCPA seeks to protect, and the continued viability of beneficial and useful business services. We adopt rules which protect residential telephone subscriber privacy by requiring telemarketers to place a consumer on a do-not-call list if the consumer  **\*8755**  requests not to receive further solicitations. [4] Further, we adopt, as proposed: (1) the prohibitions on calls made by automated telephone dialing systems and artificial or prerecorded voice messages (in the absence of an emergency or the prior express consent of the called party) to emergency lines, health care facilities, radio common carriers or any number for which the called party is charged for the call; (2) the prohibition on artificial or prerecorded voice message calls to residences; (3) the prohibition on the transmission of unsolicited advertisements by telephone facsimile machines; (4) the requirements that telephone facsimile machines and artificial or prerecorded voice messages identify the sender of such transmissions; (5) the requirement that artificial or prerecorded voice messages release the line of the called party within 5 seconds of notification that the called party has hung up; and (6) the prohibition on calls which simultaneously engage two or more lines of a multi-line business. We exempt from the prohibition on prerecorded or artificial voice message calls to residences those calls: not made for commercial purposes; made for commercial purposes which do not transmit an unsolicited advertisement; made to a party with whom the caller has an established business relationship; and non-commercial calls by tax-exempt nonprofit organizations.

## III. DISCUSSION

A. Definitions

6. Many commenters request clarification, or offer their own definitions, of terms which appear in the NPRM and the TCPA. Accordingly, definitions of the following terms are set forth in Section 64.1200(f) of our rules, 47 C.F.R. § 64.1200(f): [5] automatic telephone dialing system ("autodialer"); established business relationship; telephone facsimile machine; telephone solicitation, and; unsolicited advertisement. [6] We emphasize that the term autodialer does not include the transmission of an artificial or prerecorded voice. As indicated in the discussion below, we decline to adopt definitions offered by commenters where such definitions fit only a narrow set of circumstances, in favor of broad definitions which best reflect legislative intent by accommodating the full range of telephone services and telemarketing practices.

**\*\*3**  B. Procedures for Avoiding Unwanted Telephone Solicitations to Residences

**\*8756**  7. The TCPA and our rules, as adopted here, define "telephone solicitation" as the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax-exempt nonprofit organization. Definitions of the terms "prior express consent" and "established business relationship" are set forth at paras. 29–35, infra. The TCPA requires that the Commission prescribe regulations to implement procedures for protecting the privacy rights of residential telephone subscribers in an efficient, effective, and economic manner. § 227(c)(2). In determining which methods or procedures would best enable subscribers to avoid

APPENDIX 2

unwanted telephone solicitations, the Commission analyzed: the respective costs and benefits of several alternatives; which public or private entities are capable of administering the available alternatives; the impact of the various alternatives on small businesses and second class mail permit holders; and whether there is a need for additional authority from Congress to further restrict telephone solicitations. [7]

1. Live vs. Artificial or Prerecorded Voice Solicitations.

8. In the NPRM, the Commission requested comment on whether it is in the public interest to recognize an inherent difference in the nuisance factor between artificial or prerecorded voice calls as opposed to live solicitations. Further, the NPRM raised the issue of whether regulation of live solicitation is necessary to protect residential subscriber privacy rights. Most commenters do not object to some form of restriction on live solicitations, but distinguish between live solicitations, particularly those made by predictive dialers (which deliver calls to live operators), and solicitations completed by artificial or prerecorded voice messages. These commenters contend that artificial or prerecorded voice solicitations are a greater nuisance and an invasion of privacy, and cite the relatively greater number of complaints to

**\*8757** the Commission about this specific mode of solicitation to support this claim. [8] Several commenters, however, cite legislative history in asserting that Congress intended to regulate all solicitations, whether live or artificial or prerecorded voice, because both types of unwanted solicitations represent a nuisance and an invasion of privacy. [9] These commenters note that the figures on consumer complaints received by the Commission, suggesting that live solicitations are much less intrusive, do not fully reflect the volume of complaints regarding live solicitations because not all such complaints are reported directly to the Commission. [10]

**\*\*4** 9. While the commenters demonstrate that there are separate privacy concerns associated with artificial or prerecorded solicitations as opposed to live operator solicitations (e.g. calls placed by recorded message players can be more difficult for the consumer to reject or avoid), the record as a whole indicates that consumers who do not wish to receive telephone solicitations would object to either form of solicitation. We are persuaded by the comments, the numerous letters from individuals, and the legislative history that both live and artificial or prerecorded voice telephone solicitations should be subject to significant restrictions. [11] Accordingly, as discussed below, we select company-specific do-not-call lists as the most effective alternative to protect residential subscribers from unwanted live and artificial or prerecorded voice message solicitations. For the reasons discussed below, we believe that this alternative most effectively balances the privacy interests of residential subscribers who wish to avoid unwanted solicitations (whether live or by artificial or prerecorded message) against the interests of telemarketers in maintaining useful and responsible business

**\*8758** practices and of consumers who do wish to receive solicitations. [12]

2. Alternatives to Restrict Telephone Solicitation to Residences.

10. As directed by the TCPA, the Commission has considered a number of alternatives for residential telephone subscribers to avoid receiving unwanted telephone solicitations. These include a national database, network technologies, special directory markings, time of day restrictions, and industry-based or company-specific do-not-call lists. The NPRM requested comment, as well as focused cost/benefit analyses, of these and any other methods proposed for protecting the privacy of residential telephone subscribers.

11. National Database. A majority of the commenters oppose this option because a national database of consumers who do not wish to receive telemarketing calls would be costly and difficult to establish and maintain. Estimates to start and operate a national database in the first year ranged from $20 million to $80 million, with commenters agreeing that operations would cost as much as $20 million annually in succeeding years. [13] The American Express Company (AMEX) asserts that the Commission's original estimates did not include the costs of educating consumers about the database, gathering and disseminating the data, and regularly updating the database. Several commenters, noting that businesses

APPENDIX 2

participating in state do-not-call databases pay as much as $1,500 annually, contend that many small businesses simply may not be able to afford participation in a national database. [14] Commenters assert that for most small businesses, participation would require an investment in computer software and hardware if the database were to be available on floppy disk, or would require additional personnel to review lists if a paper version of the list were made available to small businesses. [15] Many commenters express concern that consumers, as well as telemarketers, would ultimately bear the costs of a national database, either through higher prices charged by telemarketers or through costs incurred by a national database administrator and not recovered through fees on telemarketers. Further, several commenters question how participation in a national database would be enforced against telemarketers. [16]

 **5  12. Numerous commenters argue that consumers would be disappointed in a national database because they would still receive unwanted calls after placing themselves in the national database, either because there will be a time lag in getting their preferences to telemarketers or because they would  *8759  still receive calls from exempted businesses or organizations. [17] See paras. 32–41, infra. They note that since nearly one-fifth of all telephone numbers change each year, any database, whether local, regional, or national, would be continuously obsolete and would require constant updates in order to remain accurate. [18] Commenters assert that quarterly or semiannual updates would not be sufficiently frequent to avoid obsolescence or to accommodate consumer expectations. [19] AT & T states that a national database would contain millions of names and addresses, and that at least 20 percent of those would change every year as people move, change telephone numbers, disconnect service, or simply decide to enter or leave the database. Commenters also oppose this option because consumers must make an all or nothing choice: either reject all telemarketing calls, even those which the consumer might wish to receive, or accept all telemarketing calls, including those which the consumer does not wish to receive. [20] Moreover, several commenters question whether the confidentiality of telephone subscriber information could be adequately protected if it were maintained on a widely accessible list, and note that such information could be misused to compile telemarketing lists. [21] Other commenters contend that a national do-not-call database would destroy the confidentiality of subscribers having unpublished or unlisted numbers. [22]

13. Commenters who support the creation of a national do-not-call database contend that it is the most efficient and effective means for avoiding unwanted telephone solicitations. Lejeune Associates and CSC contend that the do-not-call database which Lejeune currently operates in Florida could easily be expanded to form a national do-not-call database. CSC and OPUC suggest that an independent organization (such as the National Exchange Carrier Association or a telemarketing trade association) could administer a national database, perhaps under the supervision of a board of governors from government, the industry, and the public. Consumer Action envisions a system in which all telemarketers would send their calling lists to a third party administrator who would compare and remove all names which appear on the administrator's national do-not-call database. It maintains that such a system would allow participation by subscribers with unpublished numbers, and would lower the risk of breaches in subscriber confidentiality. The Independent Telecommunications Network (ITN) suggests that the Line Information Database (LIDB) currently maintained by local exchange carriers (LECs) could be used to register  *8760  subscriber do-not-call preferences nationwide, and could be accessed by telemarketers with the proper equipment for a minimal fee for each query.

 **6  14. Upon careful consideration of the costs and benefits of creating a national do-not-call database, we believe that the disadvantages of such a system outweigh any possible advantages. A national database would be costly and difficult to establish and maintain in a reasonably accurate form. As noted above, the most conservative estimates assume costs of $20 million in the first year of operation alone. The impact of the costs of retooling or hiring additional personnel for compliance would be greater on small or start-up businesses. Moreover, the greater these costs to smaller entities, the more likely that such costs would be passed on to consumers. [23] Telemarketers' only means of making up the difference, given the absence of federal involvement in the establishment, operation, or maintenance of a national

APPENDIX 2

database, would be to pass along such costs to consumers. [24] Commenters supporting a national database suggest that it be updated at least every three months. However, frequent updates would increase costs for both the database administrator and telemarketers. In addition, many commenters point out that each update would increase the potential for error in publishing or recording the telephone numbers of consumers requesting placement on the list. Regional or local telemarketers could be required to purchase a national do-not-call database even if they made no solicitations beyond their states or regions; additional rules to compensate for such varied telemarketing practices would, as with small businesses, increase the complexity and cost of implementing a national database. Additionally, commenters indicate that on-line computer databases present significantly greater technological difficulties. [25]

15. We are persuaded by the comments that a national database which **8761** includes information in addition to telephone numbers (for greater accuracy and for verification purposes) could make national database information a target for unscrupulous telemarketers, and would present problems in protecting telemarketer proprietary information. A national database would similarly risk the privacy of telephone subscribers who have paid to have unpublished or unlisted numbers. While a national database would serve those who wish to avoid all telemarketing calls, commenters point to the success of telemarketing as proof that telephone subscribers by and large would like to maintain their ability to choose among those telemarketers from whom they do and do not wish to hear. [26] In view of the many drawbacks of a national do-not-call database, and in light of the existence of an effective alternative (company-specific do-not-call lists), we conclude that this alternative is not an efficient, effective, or economic means of avoiding unwanted telephone solicitations.

16. *Network Technologies*. Most commenters oppose this option because they contend that it is not technologically feasible and is too costly. [27] The use of a special area code or telephone number prefix for telemarketers, for example, requires the called party to be provided with a means to reject telephone solicitations by using automatic number identification (ANI) or a Caller ID service to block calls from a designated telemarketer prefix. Commenters concur that the SS7 technology which facilitates call blocking is costly to deploy; that the SS7 technology is not available to all telephone subscribers in all areas of the nation; that the North American Numbering Plan (NANP) may lack sufficient numbers to set aside an entire prefix for telemarketers; and that a service blocking all telemarketer calls would force consumers to sacrifice any choice between telemarketers from which they do and do not wish to hear. [28] Even if this option were feasible, commenters argue that businesses would have to change their telephone numbers and all references to those numbers in every medium, which would be prohibitively expensive. Moreover, businesses may decide to invest in separate telephone lines for telemarketing to customers with an ongoing business relationship, an expense smaller enterprises perhaps could not afford. [29] GTE Service Corporation (GTE), SNET, and U.S. West express concern that exchange carriers would be required to finance the implementation of this option, when telemarketers alone should bear the costs of protecting subscribers from unwanted telephone solicitations. Commenters concur that any ubiquitous call blocking system would require costly switch upgrades by LECs to accommodate the SS7 technology which permits call **8762** blocking. [30] In contrast, InterVoice and ITN argue that much of the infrastructure necessary to implement call blocking network technology nationally is already in place, and that this technology is an effective means for avoiding unwanted solicitations.

**7** 17. In view of the costs and technological uncertainties associated with implementation, we reject the network technologies alternative for avoiding unwanted telephone solicitations. This alternative would ultimately place the cost of consumer privacy protection on telemarketers, local exchange carriers, and consumers alike. The more than 30,000 businesses engaged in telemarketing would be required to incur costs associated with changing their telephone numbers to numbers which carry a telemarketing prefix, and would perhaps be forced to obtain new lines for conducting operations other than solicitations. All LECs would be forced to upgrade their networks without regard to demand for technology. Moreover, it is unclear whether fees on telemarketers would be sufficient to cover the costs of making call blocking technology universally available, raising the possibility that such costs would be passed on to residential telephone

APPENDIX 2

subscribers, in violation of the TCPA. Based on the commenters' assessments of the cost and technological barriers to implementation of this alternative, we conclude that network technologies are not the best means for accomplishing the objectives of the TCPA at this time.

18. Special Directory Markings. A majority of commenters oppose this alternative because it would require telemarketers to purchase and review thousands of local telephone directories, at great cost and to little ultimate effect. Commenters note, for example, that telemarketing firms compile calling lists from many sources other than local telephone directories. [31] Hence, many telemarketers would not ordinarily discover a subscriber's do-not-call preference in the process of targeting likely prospects. Commenters argue that this alternative has many of the disadvantages of the national database option, because subscribers would have to make an all or nothing choice about receiving telemarketing calls, and subscribers would be disappointed at the time lag in entering their preference, during which they would continue to receive unwanted calls. Moreover, since directories are published only once a year, the subscriber preference information would quickly become obsolete, and telemarketers would pay enormous costs to access any computerized telephone directories. [32] Commenters also argue that special directory markings would not **8763 permit subscribers with unpublished or unlisted numbers to avoid telephone solicitations. [33] BellSouth and Consumer Action argue that this option unfairly divides responsibility for curbing unwanted calls between LECs and telemarketers, when telemarketers alone should bear any relevant costs or administrative burdens. [34] Moreover, U.S. West contends that disappointed subscribers will seek relief from the LEC rather than an offending telemarketer if preferences are not respected or are not communicated to telemarketers in a timely fashion.

19. We agree with commenters that this alternative would be too costly and burdensome for telemarketers to implement efficiently, regardless of their size, especially given the existence of an effective alternative (company-specific do-not-call lists). Such a system would rely on much obsolete information and could not be updated in a timely fashion. Significantly, implementation of special directory markings would place much of the burden of cost and implementation on LECs, which could not pass on such costs to residential telephone subscribers because the TCPA prohibits charges to consumers for privacy protection. § 227(c)(2). Unpublished and unlisted numbers could not be included in such a system. Ultimately, this option combines the disadvantages of maximum cost to all participants with minimal potential effectiveness, and therefore is not a suitable means of accomplishing the goals of the TCPA.

**8 20. Industry–Based or Company–Specific Do–Not–Call Lists. A majority of commenters support company-specific do-not-call lists as the most effective, most easily implemented, and the least costly of each of the methods proposed to curb unwanted telephone solicitations. [35] Commenters supporting this approach state that the company-specific do-not-call list alternative appropriately places the burden of compliance squarely on telemarketers. [36] These commenters view this method as less costly and less burdensome because many telemarketers already maintain company-specific do-not-call lists, and because most telemarketers can readily verify and compare subscriber information with information drawn from their own customer lists. [37] Commenters favoring this option note several reasons for implementing it: (1) it is effective in halting unwanted solicitations; (2) it accords greater recognition of consumer privacy interests than a national database or special directory **8764 markings; (3) it eliminates anticompetitive concerns in special directory markings or a national database, in which phone companies could have access to proprietary information; (4) it allows desired solicitations; (5) it places costs squarely on telemarketers, yet avoids undue costs or restrictions for telemarketers; (6) it avoids burdening Commission resources; and (7) it appropriately balances legitimate privacy expectations against legitimate uses of telemarketing. [38]

21. In response to our observation in the NPRM that telemarketers would be required to produce evidence of compliance with any requirement mandating company or industry-based do-not call lists, several commenters suggest that telemarketers be required to follow certain guidelines for maintaining such lists. For example, commenters propose that telemarketers be required to: (1) maintain a written policy implementing its do-not-call procedures; (2) inform

APPENDIX 2

and train telemarketing representatives in the existence and implementation of the company-specific do-not-call list; (3) inform subscribers of their rights to be placed on such a list; (4) place a telephone subscriber on a do-not-call list within reasonable time after the request is made (or not later than 60 days); and (5) maintain the request for a reasonable period after the request is made. [39] Commenters assert that telemarketers who can certify and demonstrate compliance with the above should be afforded a legal presumption of compliance with the rules and allowed to use such demonstration as a defense in any private or Commission enforcement action. [40] A few commenters propose that telephone subscribers be notified of Commission policy and telemarketer procedures through telemarketer mailings, local subscriber phone directories, news, bill inserts, or in a live preamble prior to solicitation. [41] Some commenters propose that residential subscribers be given the option of contacting DMA, which maintains an industry-based do-not-call list (through its Telephone Preference Service), in lieu of contacting numerous companies individually.

**\*\*9** 22. Commenters opposed to industry-based or company-specific do-not-call lists contend that existing industry-based and company-specific lists have not reduced the number of unwanted telephone solicitations, and that Congress has found such efforts ineffective. [42] Further, these commenters argue that these alternatives provide no affirmative method for the consumer to avoid or reject a telemarketer's first call in advance. Moreover, Private Citizen, Inc. (Private Citizen) contends that telemarketers do not always heed an initial do-not-call request, and may call a consumer several times before honoring a **\*8765** consumer's request not to receive further calls or solicitations.

23. The legislative history suggests that properly implemented company-specific do-not-call lists would satisfy the statutory requirements of the TCPA. [43] In light of that assertion, and upon weighing the costs and benefits of company-specific and industry-based do-not-call lists against the costs and benefits of the other alternatives presented in the record, we conclude that the company-specific do-not-call list alternative is the most effective and efficient means to permit telephone subscribers to avoid unwanted telephone solicitations. [44] Such lists are already maintained on a voluntary basis by many telemarketers and could be established swiftly by individuals, small businesses, or large companies. Mandatory company-specific do-not-call lists would allow residential subscribers to selectively halt calls from telemarketers from which they do not wish to hear. Such lists would also afford residential telephone subscribers with a means to terminate a business relationship in instances in which they are no longer interested in that company's products or services. Additionally, businesses could gain useful information about consumer preferences, and can comply with such preferences without overly burdensome costs or administrative procedures. This alternative would best protect residential subscriber confidentiality because do-not-call lists would not be universally accessible, and could be verified with a telemarketer's own customer information. Company-specific do-not-call lists would impose the costs of protecting consumer privacy squarely on telemarketers rather than telephone companies or consumers who do not wish to be called. Moreover, the costs of maintaining a do-not-call list are less likely to be passed on to residential telephone subscribers even indirectly, because they would be minimal, involving only the addition of do-not-call preferences to

**\*8766** existing calling lists. [45] Such lists are more likely to be accurate than a national database because a single party would be responsible for recording and maintaining do-not-call requests, and that party could verify a consumer's identification with its own customer information. In sum, the company-specific do-not-call list alternative represents a careful balancing of the privacy interests of residential telephone subscribers against the commercial speech rights of telemarketers and the continued viability of a valuable business service. For these reasons, we conclude that the company-specific do-not-call list is the alternative that best accomplishes the purposes of the TCPA.

**\*\*10** 24. The comments persuade us that we must mandate procedures for establishing company-specific do-not-call lists to ensure effective compliance with and enforcement of the requirements for protecting consumer privacy. [46] See § 64.1200(e). Unlike the DMA list cited by CSC at n. 42, supra, the alternative we adopt today requires the compliance of all telemarketers engaged in telephone solicitation as defined in the TCPA. Thus, any person or entity engaged in telephone solicitation is required to maintain a list of residential telephone subscribers who request not to be called by the telemarketer. [47] The requirements will help ensure that residential subscriber privacy is protected from further

APPENDIX 2

undesired solicitations and will avoid the wide dissemination of information regarding a subscriber's do-not-call request. Each person or entity making a telephone solicitation, or on whose behalf a telephone solicitation is made, will be held ultimately responsible for maintenance of its do-not-call list and will be fully accountable for any problems arising in the maintenance and accuracy of the list.[48] Telemarketers are required to maintain do-not-call lists on a permanent basis, so that consumers will not be burdened with periodic calls to renew a do-not-call **8767** request. Moreover, in the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.[49] Finally, § 227(C)(5) of the TCPA provides that a telemarketer's implementation, with due care, of reasonable practices and procedures in compliance with the requirements for protection of residential subscribers from unwanted telephone solicitations will be an affirmative defense to a cause of action brought regarding a violation of such requirements.[50]

25. Time of Day Restrictions. While many commenters support reasonable time of day restrictions on telemarketing calls,[51] several state that such restrictions are unnecessary because responsible telemarketers already restrict their calls to reasonable hours as a sound business practice.[52] The OPUC notes that many telemarketing complaints mention the late or unreasonable hour of the call. Several commenters urge the Commission not to adopt time of day restrictions which would conflict with the requirements of the Fair Debt Collection Practices Act (FDCPA).[53]

26. We concur with commenters that responsible telemarketers are likely to restrict their calls to reasonable hours. However, both the record and the legislative history indicate that early morning and late night telephone solicitations are a significant nuisance to telephone subscribers. In light of the record and the legislative history, we conclude that it is in the public interest to impose time of day restrictions on telephone solicitations as reasonable limitations to invasions of residential subscriber privacy. We **8768** concur with the commenters that any conflict between the requirements of the TCPA and the FDCPA would make compliance with both statutes confusing. Accordingly, telemarketers will be subject to the same time of day restrictions as are imposed on debt collectors under the FDCPA. These regulations will coincide with the FDCPA prohibition against calls before the hour of 8 AM and after 9 PM, local time at the called party's location. We believe that time of day restrictions will protect consumers from objectionable calls while not unduly burdening legitimate telemarketing activity.

**11 C. Autodialers and Artificial or Prerecorded Messages

1. General Prohibitions.

27. The TCPA prohibits the use of autodialers and prerecorded messages to place calls to an emergency telephone line, to health care facilities, to radio common carrier services, and to services for which the called party is charged for the call, except in emergencies or with the prior express consent of the called party. The TCPA, however, permits the Commission to exempt from the residential prohibition calls which are non-commercial and commercial calls which do not adversely affect the privacy rights of the called party and which do not transmit an unsolicited advertisement. §§ 227(b)(2)(B). Accordingly, the NPRM proposed to exempt these calls from the residential prohibitions, as well as calls from parties with which the called party has an established business relationship and calls from tax-exempt nonprofit organizations.

28. Commenters generally support the prohibitions in the NPRM on the use of autodialers and prerecorded messages. Specifically, Centel Corporation (Centel) and Citicorp concur that the restrictions set forth in the NPRM properly balance consumer privacy concerns and legitimate telemarketing practices. Many commenters, however, request clarification regarding the scope of these prohibitions. As discussed below, we adopt the general prohibitions and the exemptions proposed in the NPRM, clarifying their scope as requested.

2. Prior Express Consent.

29. The TCPA allows autodialed and prerecorded message calls if the called party expressly consents to their use. Several commenters express concern that they would unintentionally incur liability by placing calls to individuals who provided a number at one of the "prohibited destinations" (for example, a hospital or an emergency line) as the number at which that individual could be reached. [54] Commenters note that they have no way of knowing whether numbers provided to them fall in one of the categories of destinations to which calls are prohibited, or whether such numbers have been changed without notification. [55]

**\*8769** 30. Many commenters express the view that any telephone subscriber that provides his or her telephone number to a business does so with the expectation that the party to whom the number was given will return the call. Hence, any telephone subscriber who releases his or her telephone number has, in effect, given prior express consent to be called by the entity to which the number was released. [56] Private Citizen urges the Commission to reject this interpretation and points out that some 800 numbers have the capacity to record the telephone number of an incoming call without the caller's knowledge or consent. It urges the Commission to clarify that telemarketers may not use the telephone numbers of persons who call to make inquiries without expressly requesting permission to use the number for that purpose.

31. We emphasize that under the prohibitions set forth in § 227(b)(1) and in §§ 64.1200(a)–(d) of our rules, only calls placed by automatic telephone dialing systems or using an artificial or prerecorded voice are prohibited. If a call is otherwise subject to the prohibitions of § 64.1200, persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary. [57] Hence, telemarketers will not violate our rules by calling a number which was provided as one at which the called party wishes to be reached. However, if a caller's number is "captured" by a Caller ID or an ANI device without notice to the residential telephone subscriber, the caller cannot be considered to have given an invitation or permission to receive autodialer or prerecorded voice message calls. Therefore, calls may be placed to "captured" numbers only if such calls fall under the existing exemptions to the restrictions on autodialer and prerecorded message calls.

**\*\*12** 3. Exemptions to Prohibited Uses of Artificial or Prerecorded Messages.

32. Established Business Relationship. The NPRM tentatively concluded that the privacy rights the TCPA intended to protect through the prohibition on prerecorded message calls to residences are not adversely affected where the called party has or had a voluntary business relationship with the caller. Most commenters support the proposed exemption in the NPRM for calls to persons with whom the caller has a prior or existing business relationship. CSC argues that the proposed exemption is overbroad because it extends beyond current or ongoing business relationships to prior business relationships. Further, CSC contends that the TCPA intended to exempt business relationship calls only from its restrictions on live operation solicitations and not from the autodialer prohibitions. CSC maintains that, at a minimum, the Commission should require actual consent to telephone solicitations and must clearly provide a means by which consumers may terminate any such relationship.

**\*8770** 33. In addition, we sought comment on the proper scope of this exemption and on the definition of the term "business relationship." However, comments regarding the proper definition and scope of this exemption vary widely. Many commenters concur that an existing business relationship could not be formed with a residential telephone subscriber solely on the basis of a prior solicitation. [58] Many commenters contend that the Commission should adhere to the broadest possible definition of the business relationship, rather than a narrow definition which may exclude many categories of appropriately exempted calls. [59] Other commenters suggest various factors for determining the existence of a business relationship, including an exchange of consideration; a transaction between the caller and the called party within some specified period prior to the telephone solicitation; a previous inquiry or an application made by the called

APPENDIX 2

party to the caller for products or services; time elapsed since last inquiry or transaction; and prior express consent by the called party to the caller for future calls. [60]

34. Although the TCPA does not explicitly exempt prerecorded message calls from a party with whom the consumer has an established business relationship, it provides an exemption for commercial calls which do not adversely affect residential subscriber privacy interests and do not include an unsolicited advertisement. We conclude, based upon the comments received and the legislative history, that a solicitation to someone with whom a prior business relationship exists does not adversely affect subscriber privacy interests. Moreover, such a solicitation can be deemed to be invited or permitted by a subscriber in light of the business relationship. [61] Additionally, the legislative history indicates that the TCPA does not intend to unduly interfere with ongoing business relationships; [62] barring autodialer solicitations or requiring actual consent to prerecorded message calls where such relationships exist could significantly impede communications between businesses and their customers. Thus, we are not persuaded that the TCPA precludes the use of prerecorded messages to make solicitations to a party with whom the telemarketer has an established business relationship. In view of the support in the record for the exemption and the legislative history, we conclude that the TCPA permits an exemption for established business relationship calls from the restriction on artificial or prerecorded message calls to residences. [63] We **8771** decline to create more specific business relationship exemptions as requested by several commenters, such as utility companies, in favor of an exemption broad enough to encompass a wide range of business relationships. Finally, consistent with our conclusions at para. 24 supra, we find that a consumer's established business relationship with one company may also extend to the company's affiliates and subsidiaries. [64]

**13** 35. Many commenters concur with our tentative conclusion that a business relationship should be defined broadly rather than narrowly (e.g., an exchange of consideration), but that it cannot be formed solely on the basis of a prior solicitation. [65] Based on the record in this proceeding and the legislative intent to address a broad range of business relationships in the rules, we adopt our tentative conclusion. [66] Accordingly, the rules define "established business relationship" as a prior or existing relationship formed by a voluntary two-way communication between the caller and the called party, which relationship has not been previously terminated by either party. The relationship may be formed with or without an exchange of consideration on the basis of an inquiry, application, purchase or transaction by the residential telephone subscriber regarding products or services offered by the telemarketer. [67] A broad definition of the business relationship can encompass a wide variety of business relationships (e.g., publishers with subscribers, credit agreements) without eliminating legitimate relationships not specifically mentioned in the record. Accordingly, we reject proposals to define a business relationship by reference to consideration or to a period of time because such narrow definitions may exclude legitimate categories of business relationships.

36. Debt Collection Calls. In the NPRM, we observed that all debt **8772** collection circumstances involve a prior or existing business relationship. In addition, we tentatively concluded that debt collection calls are exempt from the TCPA's prohibitions against prerecorded message calls because they are commercial calls which do not convey an unsolicited advertisement and do not adversely affect residential subscriber rights.

37. Commenters generally support an exemption for debt collection calls. [68] Commenters concur that debt collection calls are exempt as calls to parties with whom the caller has a prior or existing business relationship, and further argue that debtors have given prior express consent to such calls by incurring a debt. [69] AFSA requests the Commission to explicitly exempt calls where terms of a credit agreement are not met. Moreover, AFSA argues that debt collection calls should be exempted as commercial calls not transmitting an unsolicited advertisement and not adversely affecting privacy rights. A number of commenters urge the Commission to include language clarifying that calls made on behalf of a creditor or other entity attempting to collect a debt are exempted. CSC opposes a debt collection exemption, arguing that such an exemption would increase the potential for harassment. Other commenters maintain that prerecorded message calls

APPENDIX 2

are the least intrusive means of debt collection, and that elimination of this option could lead to higher transaction and loan servicing costs. [70]

38. Many commenters request clarification of the identification requirements for artificial or prerecorded voice messages because these requirements appear to conflict with the requirements of the FDCPA. The FDCPA prohibits debt collection agents from revealing the identity of the creditor or the purpose of the call to third parties, and that a debt collector determine that the called party is the debtor before revealing the purpose of the call. [71] If the call is delivered using an artificial or prerecorded voice message, the message must be fashioned so that the purpose of the call is not revealed to a third party. The TCPA, on the other hand, requires prerecorded messages to identify the individual, business, or other entity placing the call at the beginning of the message. Some commenters urge the Commission to provide **8773** specific language for use in prerecorded messages. Other commenters simply urge the Commission not to adopt requirements which would conflict with the requirements of the FDCPA. The ABA suggests that the Commission adopt language to the effect that no requirements under § 227(d)(3) of the TCPA be deemed to preempt the requirement of other federal or state laws.

**14** 39. Upon consideration of these comments, we conclude that an express exemption from the TCPA's prohibitions for debt collection calls is unnecessary because such calls are adequately covered by exemptions we are adopting here for commercial calls which do not transmit an unsolicited advertisement and for established business relationships. As proposed in the NPRM, these exemptions would also apply where a third party places a debt collection call on behalf of the company holding the debt. Whether the call is placed by or on behalf of the creditor, prerecorded debt collection calls would be exempt from the prohibitions on such calls to residences as: (1) calls from a party with whom the consumer has an established business relationship, and (2) commercial calls which do not adversely affect privacy rights and which do not transmit an unsolicited advertisement. [72] With respect to concerns regarding compliance with both the FDCPA and our rules in prerecorded message calls, we emphasize that the identification requirements will not apply to debt collection calls because such calls are not autodialer calls (i.e., dialed using a random or sequential number generator) and hence are not subject to the identification requirements for prerecorded messages in 64.1200(e)(4) of our rules. [73] Accordingly, we reject as unnecessary proposals that we provide specific language for use in prerecorded debt collection messages. In any event, to the extent any conflicts exist, compliance with both statutes is possible through the use of live calls.

40. Tax–Exempt Nonprofit Organizations and Non–Commercial Calls. In the NPRM, we sought comment on whether tax-exempt nonprofit organizations should be exempt from the TCPA's prohibitions on prerecorded message calls to residences either because such calls are not made for commercial purposes, or because they are commercial calls which do not adversely affect privacy interests and which do not transmit an unsolicited advertisement. See § 64.1200(a)(2). We observed that the TCPA seeks primarily to protect subscribers from unrestricted commercial telemarketing activities. Commenters generally support the proposed exemption. However, a number of commenters object to such exemptions for calls from nonprofit organizations, arguing that such calls are also a nuisance and an invasion of privacy. [74] The legislative history of the TCPA contrasts calls made by tax-exempt nonprofit organizations with commercial calls and indicates that commercial calls have by far produced the greatest number of complaints **8774** about unwanted calls. [75] Moreover, no evidence has been presented in this proceeding to show that non-commercial calls represent as serious a concern for telephone subscribers as unsolicited commercial calls. Accordingly, based on the comments and the legislative history of TCPA, we conclude that tax-exempt nonprofit organizations should be exempt from the prohibition on prerecorded message calls to residences as non-commercial calls. Therefore, we will not seek additional authority to curb calls by tax-exempt nonprofit organizations.

**15** 41. Some commenters urge the Commission to expressly exempt specific categories of additional organizations such as market research or polling organizations, whose activities are not invasive of residential privacy rights and were not intended to be prohibited by the TCPA. [76] We find that the exemption for non-commercial calls from the prohibition

APPENDIX 2

on prerecorded messages to residences includes calls conducting research, market surveys, political polling or similar activities which do not involve solicitation as defined by our rules. [77] We thus reject as unnecessary the proposal to create specific exemptions for such activities.

4. Clarifications.

42. Elderly Home. The TCPA prohibits autodialer and prerecorded message calls to "elderly homes" absent prior express consent or unless it is an emergency call. AFSA requests clarification of the term, as it appears in § 227(b)(1)(A)(ii) and in the proposed rules, § 64.1200(a)(1)(ii), noting that the term is sufficiently ambiguous to include the private homes of elderly telephone subscribers as well as health care establishments. Since the TCPA does not define the term, we must apply the plain meaning of the words in interpreting the statute. This term clearly refers to a residential setting for the elderly, but also suggests the vernacular for institutions like nursing homes and other long term health care facilities. Its placement in a section which refers to other health care facilities rather than in the following section regarding calls to residential telephone subscribers also suggests that the words are meant to describe an institutional setting in which the elderly reside, as opposed to any reference to the private homes of the elderly. Given the placement of this term in the statute and the lack of evidence in the legislative history suggesting any contrary meaning, we conclude that the words "elderly home" do not refer to the private homes of the elderly, and that the words are intended to include in the general prohibition against autodialer and **8775** artificial or prerecorded voice messages calls made to health care facilities and those institutions which house primarily elderly persons.

43. Radio Common Carriers. The TCPA prohibits autodialer and prerecorded message calls to radio common carrier services or any service for which the called party is charged for the call. § 227(b)(1)(iii). The Cellular Telecommunications Industry Association (CTIA) and Centel Corporation urge the Commission to exempt from the prohibitions on autodialers and prerecorded messages those calls made by cellular carriers to cellular subscribers (as part of the subscriber's service) for which the called party is not charged. These commenters point out that cellular customers are not charged for calls which, for example, monitor service or issue warnings to "roamers" that they are moving out of the carrier's service area. Therefore, such calls should either be exempted from the prohibitions of § 64.1200(a)(1)(iii), or should be interpreted as not intended to be prohibited by Congress.

**16** 44. In addition, West Marketing Services (West), a market research firm, states that it licenses a program, CelShare, which places calls to cellular phones to measure a cellular carrier's share of a given cellular market. The CelShare program monitors cellular telephone company messages to determine whether a random sample of telephone numbers is active or inactive. To avoid actually reaching a cellular customer, calling devices are normally used in the middle of the night, are set to two rings, and immediately disconnect if a cellular customer answers the call. West states that three live connections are made for every 1,000 calls. Since the primary function of its program is market research, and since no telemarketing is involved, West urges the Commission to allow its program to operate under the proposed rules. West notes that several states have specifically exempted its program from the definition of prohibited autodialer calls.

45. Based on the plain language of § 227(b)(1)(iii), we conclude that the TCPA did not intend to prohibit autodialer or prerecorded message calls to cellular customers for which the called party is not charged. Moreover, neither TCPA nor the legislative history indicates that Congress intended to impede communications between radio common carriers and their customers regarding the delivery of customer services by barring calls to cellular subscribers for which the subscriber is not called. Accordingly, cellular carriers need not obtain additional consent from their cellular subscribers prior to initiating autodialer and artificial and prerecorded message calls for which the cellular subscriber is not charged. However, the market research calls to cellular carriers, as conducted by the West CelShare program, are clearly prohibited absent the prior express consent of the cellular customer called. While West appears to take pains to avoid calls which will result in charges to cellular subscribers, the fact that its market research calls result in such charges and are made without prior consent from the subscribers places its service under the prohibitions of the TCPA and the rues. [78]

APPENDIX 2

**\*8776** 46. Voice Messaging Services. Several commenters request clarification that services which store and forward messages for later delivery to the called party are not intended to be prohibited by the TCPA or by the proposed rules.[79] In urging the Commission to create a specific exemption for such services, the commenters point to numerous statements in the legislative history in which members of Congress expressed an expectation that such services would be exempted from the prohibitions of the TCPA.[80] Bell Atlantic asserts that the intent of Congress was to restrict unsolicited advertising, not communications services which store and transmit individual customer messages. MessagePhone concurs and references the Modified Final Judgment,[81] which, inter alia, permits the regional Bell Operating Companies to engage in such services, and lends support for such an exemption. Commenters contend that the Commission has already found such services to be in the public interest, citing a recent Commission decision granting a waiver to permit the delivery of Coin Message Delivery Services,[82] which has been recently deployed by Bell Atlantic. Ameritech urges the Commission to clarify whether the prerecorded message identification requirement applies to the local operating company or the person leaving the message, or both, for messages recorded using services like the Public Telephone Message Delivery Service (PTMDS). Ameritech contends that if the person leaving the message identifies himself or herself, then further identifying information (such as a telephone number or address) is unnecessary.

**\*\*17** 47. The TCPA did not carve out a specific exemption for voice messaging services. However, the services referred to by the commenters would appear to fall either outside the TCPA's prohibitions or under an exemption. The prohibitions of § 227(b)(1) clearly do not apply to functions like "speed dialing," "call forwarding," or public telephone delayed message services (PTDMS), because the numbers called are not generated in a random or sequential fashion.[83] Voice messaging services used to send personal prerecorded voice **\*8777** messages are not subject to the identification requirements of 227(d)(3) and § 64.1200(d) of our rules because such calls do not use autodialers to transmit prerecorded messages. Moreover, under the rules adopted here, artificial and prerecorded message calls to residences are exempt from the TCPA's prohibitions in an emergency, where the caller received prior express consent, or if the call is exempted by the Commission as either a non-commercial call or a commercial call which does not include an unsolicited advertisement and does not adversely affect the called party's privacy interests. Thus, Automated Alternate Billing Systems (AABS), used by common carriers to perform operator services with artificial or prerecorded voice prompts, are exempt from the prohibition against artificial or prerecorded voice calls to residences to the extent they are non-commercial calls. However, voice message calls, as prerecorded messages, would be subject to the prohibitions of § 227(b)(1) and § 64.1200(a) of our rules. Thus, voice message calls could not be directed to an emergency line, a health care facility, radio common carrier services or other services for which the called party is charged for the call except in an emergency or with the prior express consent of the called party.

48. In light of the foregoing, we believe that the prohibitions set forth in the rules are not a barrier to the continued use and expansion of voice messaging service, and that the rules adopted here will be effective in preventing any potential abuse by telemarketers. See §§ 64.1200(a)–(d). Accordingly, a specific voice messaging exemption is not necessary to permit the present and future voice messaging services.

49. Public Utilities. Many public utilities note that they communicate with their customers through prerecorded message calls and automatic telephone dialing systems to notify customers of service outages, to warn customers of discontinuance of service, and to read meters for billing purposes. They note that under normal circumstances, customers can continue using their telephones normally as the meter information is being gathered and forwarded to a central office. The utilities urge the Commission to exempt such calls from the autodialer prohibitions, either under the existing business relationship exemption or under the "emergency" exemption for calls related to public health and safety. They note that information about service outages and about possible discontinuance of service affect public health and safety. Moreover, many public utilities state that they have a third party notification service for their customers, in which the utility agrees to contact a party designated by the customer in the event that a delinquent bill or a service outage threatens interruption of that customer's service. This program is designed to assist persons who have difficulty maintaining their accounts or who

APPENDIX 2

otherwise desire assistance in ensuring that service is not interrupted. However, several commenters express concern that a broad emergency exception could be a vehicle for campaigns targeted at the elderly, who in the past have been subjected to telemarketing calls involving vitamins, security systems, or other items purported to be important to the "health and safety" of the called party.

**\*\*18  \*8778**  50. BellSouth concurs with the public utilities and contends that the legislative history [84] indicates an intent to permit autodialed calls for the purpose of notifying customers of potential power outages, maintenance, or termination. In some jurisdictions, BellSouth is required by tariff to notify customers before disconnecting service. BellSouth requests the Commission to exempt from the prohibitions of § 64.1200(a)(1) autodialed calls regarding the installation, maintenance, or termination of telephone service in emergency situations. Further, Ameritech contends that the use of Automatic Meter Reading Systems by utility companies clearly satisfies the TCPA's requirements regarding prior express consent, and that such services were not intended by Congress to be prohibited.

51. Each of the circumstances described by the utilities is included within either the broad exemption for emergency calls, or the exemption for calls to which the called party has given prior express consent. Service outages and interruptions in the supply of water, gas or electricity could in many instances pose significant risks to public health and safety, and the use of prerecorded message calls could speed the dissemination of information regarding service interruptions or other potentially hazardous conditions to the public. Similarly, public utilities providing a third party notification service do not violate the prohibition against prerecorded calls to residences where the third party has given his or her prior express consent to the notification or the call relates to a public health and safety matter. In light of the comprehensive nature of the current exemptions, a specific exemption for public utilities to the general prohibition against autodialers and artificial or prerecorded voice message calls is not required. [85]

D. Technical and Procedural Standards

1. Line Seizure—5 Second Hang-up Requirement.

52. The TCPA requires, and the rules we adopt provide, that automatic telephone dialing systems used to transmit artificial or prerecorded messages shall automatically release the called party's line within 5 seconds of the time that the calling party's system is notified of the called party's hang-up. The ACA requests clarification of this requirement in order to ensure proper compliance. For the purposes of this rule section, the 5 second period begins when the called party's hang-up signal reaches the dialing system of the caller. Commenters generally do not indicate that they anticipate problems in complying with this requirement. [86]

 **\*8779**  2. Identification Requirements for Artificial or Prerecorded Voice Systems.

53. The TCPA mandates that all artificial or prerecorded telephone messages delivered by an autodialer state clearly the identity of the caller at the beginning of the message and the caller's telephone number or address during or after the message, § 227(d)(3)(A), and we adopt this requirement in our rules, 64.1200(d). A number of commenters request that prerecorded messages be required to state the identity of the caller and the caller's telephone number (other than that of any autodialing system used to place the call) or address within 30 seconds after the message begins, so that the called party would not have to listen to the entire message before deciding whether to hang up. We reject the proposal to require that a telephone number or address be stated within 30 seconds of the beginning of an artificial or prerecorded message, because the TCPA requires only that the caller's identity be stated at the beginning of the message. See § 227(d)(3)(B). We have been presented with no evidence to persuade us to request additional authority to adopt such a restriction. Finally, as suggested by several commenters, we will require callers leaving a telephone number to provide a number other than that of the autodialer or prerecorded message player which placed the call because the autodialer or message player number may be in constant use and not available to receive calls from the called party. § 64.1200(e)(4).

APPENDIX 2

**\*\*19** 3. Facsimile Machines.

54. The TCPA requires that identifying information be placed on all telephone facsimile transmissions, and that telephone facsimile machines be capable of placing such information on all transmissions. § 227(d). The TCPA further prohibits the use of telephone facsimile machines to send unsolicited advertisements. [87] § 227(b)(1)(C). Parties commenting on the facsimile **\*8780** requirements for senders of facsimile messages urge the Commission to clarify that carriers who simply provide transmission facilities that are used to transmit others' unsolicited facsimile advertisements may not be held liable for any violations of § 64.1200(a)(3). [88] We concur with these commenters. In the absence of "a high degree of involvement or actual notice of an illegal use and failure to take steps to prevent such transmissions," common carriers will not be held liable for the transmission of a prohibited facsimile message. Use of Common Carriers, 2 FCCRcd 2819, 2820 (1987).

E. Enforcement

1. Private Right of Action.

55. The TCPA provides consumers with a private right of action, if otherwise permitted by state law or court rules, for any violation of the autodialer or prerecorded voice message prohibitions and for any violation of the guidelines for telephone solicitations. § 227(c)(5). Absent state law to the contrary, consumers may immediately file suit in state court if a caller violates the TCPA's prohibitions on the use of automatic telephone dialing system and artificial or prerecorded voice messages. § 227(b)(3). A consumer may also file suit in state court if he or she has received more than one telephone call within any 12–month period by or on behalf of the same company in violation of the guidelines for making telephone solicitations. § 227(c)(5). Telemarketers who have established and implemented reasonable practices and procedures in compliance with the latter section may present such compliance as an affirmative defense to any action for violation of telephone solicitation guidelines. § 227(c)(5). The TCPA also permits states to initiate a civil action in federal district court against a telemarketer who engages in a pattern or practice of violations of the TCPA. §§ 227(f)(1) and (2). States retain the power to initiate action in state court for violations of state telemarketing statutes. § 227(f)(6). Finally, consumers may request that the Commission take enforcement action regarding violations of § 227, consistent with the Commission's existing complaint procedures. [89]

2. State Law Preemption.

56. The TCPA, in § 227(e), sets forth a standard for preemption of state **\*8781** law on autodialing, artificial or prerecorded voice messages, and telephone solicitations. The TCPA does not preempt state law which imposes more restrictive intrastate requirements or regulations regarding: the use of facsimile machines to send unsolicited advertisements; the use of automatic telephone dialing systems; the use of artificial or prerecorded voice messages; or the making of telephone solicitations. However, the TCPA specifically preempts state law where it conflicts with the technical and procedural requirements for identification of senders of telephone facsimile messages or autodialed artificial or prerecorded voice messages. § 227(e).

**\*\*20** 3. Other Matters

57. A number of commenters urge the Commission to request additional authority from Congress to protect consumer privacy interests, arguing that the NPRM errs on the side of protecting commercial speech and does not adequately protect telephone subscribers from invasions of privacy by telemarketers. These commenters point out that telephone subscribers must receive at least one unwanted solicitation before making a claim under the rules. The National

APPENDIX 2

Consumers League urges the Commission to withdraw the NPRM and begin the rulemaking process anew, stating that the Commission failed to make specific proposals for meeting the requirements of the TCPA.

58. Based upon our actions here, we find that no further authority is required at the present time to accomplish the goals of the TCPA to restrict unwanted telephone solicitations. The regulations implemented satisfy the TCPA's requirements that residential subscribers be provided with a means to avoid unwanted telephone solicitations, and that autodialers and prerecorded or artificial voice messages be used responsibly in ways that do not impede commerce or threaten public health and safety. The record supports our conclusion that the proposed rules strike a reasonable balance between privacy rights, public safety interests, and commercial freedoms of speech and trade, which Congress cited as its paramount concerns in enacting the TCPA. [90] Moreover, contrary to the allegation of the National Consumers League, the NPRM asked for comment on a variety of proposals for restricting telephone solicitations to residences and weighed their benefits, as directed by § 227(c) of the TCPA. Specific information on the various proposals was supplied in the comments and our decision is based upon the record. Accordingly, we find at this time that renewal of the rulemaking process is not warranted and would unduly delay implementation of consumer privacy protections.

59. However, we are concerned that consumers be fully informed of their rights under the TCPA. In addition to disseminating our own public notices, we will work with consumer groups, industry associations, local telephone companies, and state agencies to assure that the rules we adopt today are well publicized. We also will monitor closely any reports of alleged violations of the TCPA or the rules that are filed with the Commission to determine whether additional action is necessary to protect consumers from unwanted solicitations. If our current approach is not successful, a number of options are available. For example, we could convene a cross-industry board or **8782** advisory council to evaluate the complaints received and recommend effective solutions. Both Congress and the Commission have found telemarketing serves a valuable role in our economy, and it is appropriate for responsible telemarketers, who benefit from the activity, to devise solutions to problems. Alternatively, based upon our experience with the rules, it may be necessary to initiate a rulemaking proceeding to establish more stringent restrictions, or even to recommend to Congress that it increase penalties or make other statutory changes. Our objective in this proceeding has been to hold telemarketers accountable for their activities without undermining the legitimate business efforts of telemarketing. Existing Commission procedures will permit us to continue to do so.

## IV. CONCLUSION

**21** 60. This rulemaking proceeding seeks to protect consumers from automated calls which may pose a threat to health and safety as well as from unwanted solicitations. Section § 64.1200(a) prohibits calls using autodialers or prerecorded messages to emergency lines, health care facilities, and calls to radio common carriers or other numbers for which the called party may be charged for the call. Prerecorded message calls to residences are generally prohibited. We have created specific exemptions to this prohibition where the record demonstrates that the calls do not adversely affect the privacy interests of residential subscribers: non-commercial calls, commercial calls not transmitting an unsolicited advertisement, calls from parties with whom a resident has an established business relationship, and calls from tax-exempt nonprofit organizations. Finally, residential subscribers will be protected from unwanted telephone solicitations by the requirement that telemarketers maintain do-not-call lists for any telephone solicitations.

## V. PROCEDURAL MATTERS

61. Final Regulatory Analysis: Pursuant to the Regulatory Flexibility Act of 1980, 5 U.S.C. Section 601, et seq., the Commission's final analysis in this Report and Order is as follows:

I. Need and purpose of this action:

APPENDIX 2

This Report and Order amends Part 64 of the Commission's rules by adding § 64.1200 to restrict the use of automatic telephone dialing systems and artificial or prerecorded voice messages for telemarketing purposes or for transmitting unsolicited telephone facsimile advertisements. The rules require that persons or entities making telephone solicitations establish procedures to protect residential subscribers from unwanted solicitations, and set forth exemptions to certain prohibitions under this Part. The Report and Order also amends Part 68 of the rules by revising § 68.318(c)(2) and adding § 68.318(c)(3) to require that automatic telephone dialing systems delivering a recorded message release the called party's line within 5 seconds of **\*8783** notification of hang-up by the called party, and to require that telephone facsimile machines manufactured on and after December 20, 1992 must clearly identify the sender of a facsimile message. The amendments implement the Telephone Consumer Protection Act of 1991, which, inter alia, adds Section 227 to the Communications Act of 1934, as amended, 47 U.S.C. Section 227. The rules are intended to impose reasonable restrictions on autodialed or prerecorded voice telephone calls consistent with considerations regarding public health and safety and commercial speech and trade, and to allow consumers to avoid unwanted telephone solicitations without unduly limiting legitimate telemarketing practices.

II. Summary of issues raised by the public comments in response to the Initial Regulatory Flexibility Analysis:

No comments were submitted in direct response to the Initial Regulatory Flexibility Analysis.

III. Significant alternatives considered:

**\*\*22** The NPRM in this proceeding requested comments on proposed regulations implementing the TCPA and comments on several proposals restricting telephone solicitations to residential telephone subscribers. The Commission has considered all comments and has adopted regulations to implement the prohibitions and technical requirements mandated by the TCPA as well as regulations which allow consumers to avoid unwanted telephone solicitations through placement on company-specific do-not-call lists. The Commission considers its Report and Order to be the most reasonable course of action under the mandate of Section 227 of the Communications Act, as amended.

## VI. ORDERING CLAUSES

62. Accordingly, It Is Ordered, that, pursuant to authority contained in Sections 1, 4(i), 4(j), 201–205, 218, and 227 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i), 154(j), 201–205, 218 and 227, Parts 64 and 68 of the Commission's Rules and Regulations ARE AMENDED as set forth in Appendix B hereof, effective December 20, 1992.

**\*8784** 63. It Is Further Ordered, that, the Secretary shall cause a summary of this Report and Order to be published in the Federal Register which shall include a statement describing how members of the public may obtain the complete text of this Commission decision. The Secretary shall also provide a copy of this Report and Order to each state utility commission.

64. It Is Further Ordered, that, this proceeding IS TERMINATED.

FEDERAL COMMUNICATIONS COMMISSION

Donna R. Searcy
Secretary

### **\*8785**  APPENDIX A

**\*\*23**  Parties Filing Comments

APPENDIX 2

Aberdeen American News

Alpha Information

Altoona Mirror

American Bankers Association (ABA)

American Civil Liberties Union

American Collectors Association [a] (ACA)

American Council of Life Insurance and the National Association of Life Underwriters

American Express Company [a] (AMEX)

American Financial Services Association [a] (AFSA)

American Newspaper Publishers Association [a] (Reply Comments by Newspaper Association of America)

American Resort Development Association

American Service Telemark

American Telemarketing Association, Inc. (ATA)

Ameritech Operating Companies [a] (Ameritech)

Amway

Ann Arbor News

Annenberg School for Communications

Argus Leader

Arizona Republic/Phoenix Gazette

Association of National Advertisers, Inc.

Asheville Citizen–Times

American Telephone and Telegraph Company [a] (AT & T)

Audio Technica

Avon

**APPENDIX 2**

Baltimore Gas and Electric Company

Baltimore Sun

Banc One Corporation, California Bankers Clearing House Association, First USA Bank, New York Clearing House Association, QVC Network, VISA U.S.A., Inc.[a]  (the Coalition)

Bell Atlantic

BellSouth [a]

Bellingham Herald

Bellville News–Democrat

Blue Cross & Blue Shield

Brazosport Facts

Brewster, Congressman Bill J.[aa]

Buchan MD, Janet H. and Robert R.C.

Bucks County Courier Times (Mark Gursky)

Bucks County Courier Times (Arthur E. Mayhew)

California Department of Justice

California Public Utilities Commission

Capital Newspapers

Cellular Telecommunications Industry Association

Centel Corporation (Centel)

Center for the Study of Commercialism [a]  (CSC)

**\*8786**  Centre Daily Times

Chico Enterprise–Record

Citicorp [a]

Clark County Rural Electric Cooperative

CMS A/R Services

Coalition of Higher Education Assistance Organizations

ComCast Cellular [aa]

Community Benefits Corporation

Conservation Fund

Consumer Action [a]

Consumer Bankers Association (CBA)

Contractors Clearing House

Courier–Journal

Cox Enterprises, Inc. (Cox)

CUC International, Inc.

CUNA Mutual Insurance Group

Daily News, Bowling Green, KY (Pipes Gaines)

Daily News, Lebanon, PA (Blake L. Sanderson)

Daily News, Los Angeles, CA (Kirk Felgenhauer)

Daily News, Los Angeles, CA (Lynne Hanchett)

Daily News, Los Angeles, CA (Chuck Schussman)

Detroit Newspaper Agency

Digital Systems International, Inc. [a]

Direct Marketing Association [a] (DMA)

Direct Selling Association

Electronic Information Systems, Inc.

Firelands Rural Electric Cooperative, Inc. [aa]

Florida Today/USA Today

APPENDIX 2

Forum

Franklinton Financial

Free Press Standard

Gadsden Times

Gannett Co., Inc. [a]

Gazette Printing Company

Gleaner

Goshen News

**24** Grand Island Independent

Grand Rapids Press

Green Bay Press

GTE Service Corporation (GTE)

Guam Attorney General

Hartford Courant

Household International [a]

Huntsville Times

Idaho State Journal

Illinois Student Assistance Commission

Illinois, University of

Indianapolis Star, Indianapolis News

Independent Telecommunications Network, Inc. [a] (ITN)

Infiniti Group, Inc.

International Communications Association [a]

International Telesystems Corporation

APPENDIX 2

**\*8787** InterVoice

Inventures

Investor's Business Daily

ITI Marketing Services, Inc.

Investment Company Institute

J. BLenkarn Systems

J.C. Penney Company, Inc.

Jersey Journal

Johnstown Tribune Publishing Company

Jones Intercable [aa]

Journal and Courier

Kalamazoo Gazette/Weekly Gazette, Hometown Gazette

Kauffman Group

King TeleServices

Knight Ridder, Inc.

La Crosse Tribune

Lansing State Journal

LCS Direct Marketing Services

Lee County Electric Cooperative, Inc.

Lejeune Associates of Florida [a] (Lejeune)

Mary Kay Cosmetics

MBNA America Bank, N.A.

MCI Telecommunications Corporation [a]

Merrill Lynch, Pierce, Fenner & Smith, Inc.

**APPENDIX 2**

MessagePhone, Inc. [a]

Metrocall

Midland Daily News

Minnesota Attorney General

Mktg. Inc. [aa]

Mobile Press Register

Montgomery Advertiser, Alabama Journal

Morning Call (Donald J. Belasco)

Morning Call (Richard E. Forgay II)

Mr. Fax [a]

Muskegon Chronicle

National Association of Realtors

National Association of Water Companies

National Consumers League (NCL)

National FaxList

National Retail Federation (NRF)

National Rural Electric Cooperative Association [a]

National Telephone Cooperative Association (NTCA)

NationsBank

New Haven Register

News and Observer

Newspaper Association of America [aa]  (Initial Comment by American Newspaper Publishers Association)

New York Department of Public Service [a]

New York State Consumer Protection Board [aa]

**APPENDIX 2**

New York Times

Newsday

NonProfit Group [aa]

 **8788**  North American Telecommunications Association (NATA)

Norwest Card Services

Nynex Telephone Companies

Ohio Newspaper Association

Ohio Public Utilities Commission (OPUC)

Ohio Student Loan Commission

Olan Mills, Inc. [a]

Oregonian

Orlando Sentinel

Pacesetter Corporation

Pacific Bell, Nevada Bell [a] (Pacific Bell)

Palm Beach Post

Pennsylvania Newspaper Publishers' Association

Pueblo Chieftain

Pierce–Pepin Electric Cooperative

Pioneer Electric Cooperative

Pitney Bowes [aa]

Plain Dealer

PNC Financial Corporation

Press Journal

Princeton Packet, Inc.

**APPENDIX 2**

Privacy Times

Private Citizen, Inc. [a] (Private Citizen)

Public Forum [aa]

Record Journal Publishing

**25** Reese Brothers, Inc.

Review

RMH Telemarketing

Rochester Telephone Corporation

Rocky Mountain BankCard System

SafeCard Services, Inc. [a] (Safecard)

San Francisco Newspaper Agency

Santa Barbara News–Press

Santa Cruz, County of

Santa Monica, City of [aa]

Scottsdale Progress

Sears, Roebuck and Co.

Securities Industry Association [a] (SIA)

Sentinel–Record

Shotten III, Bert K.

Southern New England Telephone Company [a] (SNET)

Southwestern Bell Telephone Company [a] (SWBT)

Spokesman–Review, Spokane Chronicle

Sprint [a]

**APPENDIX 2**

Star–Ledger

Stockton Record

Student Loan Marketing Association [a]

Sun, The

Syracuse Herald–Journal, Post–Standard, Herald American

Tampa Tribune

Tandy Corporation [aa]

Teknekron Infoswitch Corporation

**\*8789** Telecheck Services

Telegram & Gazette

Telemarketing Magazine [aa]

Telocator, the Personal Communications Industry Association

Texarkana Gazette

Texas Public Utilities Commission [a]

Thomas Construction [a]

Thomasville Times–Enterprise

Time Warner Inc. [a]

Times–Picayune

Union–News, Sunday–Republican

Unisys

United Electric Cooperative, Inc.

United States Postal Service [aa]

United States Telephone Association

United Student Aid Funds, Inc. [aa]

APPENDIX 2

U.S. Intelco Networks, Inc.

U.S. West Communications, Inc. (U.S. West)

USAA Federal Savings Bank

Utilities Telecommunications Council

Vanguard Cellular Systems, Inc.

Verde Independent

Vermont Public Service Board <sup>aa</sup>

Victoria Advocate

Waco Tribune

Wachovia

Washington State Attorney General

Wells Fargo Bank

West Marketing Services

Western Express Service Company

Wisconsin, State of, Department of Justice

Worcester Telegram & Gazette

Zacson Corporation

**\*8790** APPENDIX B

Title 47 of the Code of Federal Regulations, parts 64 and 68, are amended as follows:

1. The table of contents for part 64 is amended by adding subpart L to read as follows:

Subpart L—Restrictions on Telephone Solicitation

§ 64.1200 Delivery restrictions.

2. The authority citation for subpart L is added to part 64 to read as follows:

Authority: 47 U.S.C. §§ 151, 154(i), 154(j), 201–205, 218, and 227.

**APPENDIX 2**

3. Subpart L is added to part 64 to read as follows:

Subpart L—Restrictions on Telephone Solicitation

§ 64.1200 Delivery Restrictions.

(a) No person may


(1) Initiate any telephone call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice,
(i) to any emergency telephone line, including any 911 line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency;

 **26  (ii) To the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii) To any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;


(2) Initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by § 64.1200(c).

 *8791  (3) Use a telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine.

(4) Use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.
(b) For the purpose of § 64.1200(a) the term "emergency purposes" means calls made necessary in any situation affecting the health and safety of consumers.

(c) The term "telephone call" in § 64.1200(a)(2) shall not include a call or message by, or on behalf of, a caller:


(1) that is not made for a commercial purpose,

(2) that is made for a commercial purpose but does not include the transmission of any unsolicited advertisement,

(3) to any person with whom the caller has an established business relationship at the time the call is made, or

(4) which is a tax-exempt nonprofit organization.
(d) All artificial or prerecorded telephone messages delivered by an automatic telephone dialing system shall:

**APPENDIX 2**

(1) At the beginning of the message, state clearly the identity of the business, individual, or other entity initiating the call, and

(2) During or after the message, state clearly the telephone number (other than that of the autodialer or prerecorded message player which placed the call) or address of such business, other entity, or individual.

(e) No person or entity shall initiate any telephone solicitation to a residential telephone subscriber (1) before the hour of 8 A.M. or after 9 P.M. (local time at the called party's location), and (2) unless such person or entity has instituted procedures for maintaining a list of persons who do not wish to receive telephone solicitations made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

(i) Written policy. Persons or entities making telephone solicitations must have a written policy, available upon demand, for maintaining a do-not-call list.

(ii) Training of personnel engaged in telephone solicitation. Personnel engaged in any aspect of telephone solicitation must be informed and trained in the existence and use of the do-not-call list.

(iii) Recording, disclosure of do-not-call requests. If a person or entity making a telephone solicitation (or on whose behalf a solicitation is made) receives a request from a residential telephone subscriber not to receive **8792** calls from that person or entity, the person or entity must record the request and place the subscriber's name and telephone number on the do-not-call list at the time the request is made. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the solicitation is made, the person or entity on whose behalf the solicitation is made will be liable for any failures to honor the do-not-call request. In order to protect the consumer's privacy, persons or entities must obtain a consumer's prior express consent to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a solicitation is made or an affiliated entity.

**27** (iv) Identification of telephone solicitor. A person or entity making a telephone solicitation must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. If a person or entity makes a solicitation using an artificial or prerecorded voice message transmitted by an autodialer, the person or entity must provide a telephone number other than that of the autodialer or prerecorded message player which placed the call.

(v) Affiliated persons or entities. In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.

(vi) Maintenance of do-not-call lists. A person or entity making telephone solicitations must maintain a do-not-call list for the purpose of any future telephone solicitations.

(f) As used in this section:

(1) The terms "automatic telephone dialing system" and "autodialer" mean equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers.

(2) The term "telephone facsimile machine" means equipment which has the capacity to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

APPENDIX 2

(3) The term "telephone solicitation" means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message (i) to any person with that person's prior express invitation or permission, (ii) to any person with whom the caller has an established business relationship, or (iii) by a tax-exempt nonprofit organization.

**\*8793**  (4) The term "established business relationship" means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party.

(5) The term "unsolicited advertisement" means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission.

**\*\*28**  4. The authority citation for subpart D of part 68 is revised to read as follows:

Authority: 47 U.S.C. §§ 151, 154, 155, 201–205, 218, 227, and 303.

5. Section 68.318(c) is amended by revising paragraph (c)(2) and adding paragraph (c)(3) to read as follows:

§ 68.318 Additional limitations.

\* \* \* \* \*

(c) \* \* \*

(2) Line seizure by automatic telephone dialing systems. Automatic telephone dialing systems which deliver a recorded message to the called party must release the called party's telephone line within 5 seconds of the time notification is transmitted to the system that the called party has hung up, to allow the called party's line to be used to make or receive other calls.

(3) Telephone facsimile machines; identification of the sender of the message. It shall be unlawful for any person within the United States to use a computer or other electronic device to send any message via a telephone facsimile machine unless such message clearly contains, in a margin at the top or bottom of each transmitted page or on the first page of the transmission, the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual. Telephone facsimile machines manufactured on and after December 20, 1992 must clearly mark such identifying information on each transmitted message.

September 17, 1992

**\*8794**  STATEMENT OF COMMISSIONER ANDREW C. BARRETT

RE: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (CC Docket No. 92–90).

**APPENDIX 2**

This item adopts regulations to implement the prohibitions and technical requirements mandated by the Telephone Consumer Protection Act (TCPA) of 1991. This item also establishes regulations which allow consumers to avoid unwanted telephone solicitations through the placement on company specific do-not-call lists.

In crafting these provisions I was mindful of the need to strike a reasonable balance between privacy rights, public safety interests, and commercial freedoms of speech and trade, which Congress cited as a paramount concern in enacting the 1991 Act. I believe the proposed requirements balances the objectives of protecting customers from nuisance calls while permitting legitimate telemarketing practices.

In particular this item prohibits calls using autodialers or prerecorded messages to emergency and health care facilities. Prerecorded messages to residences would be prohibited. This Order also establishes mandatory guidelines for telemarketers regarding the maintenance of company specific do-not-call lists. These guidelines will require a written policy, training of customer representatives regarding do-not-call policy and procedures and other related requirements. I believe that the current record clearly supports the company-specific do-not call lists as the most effective, most easily implemented and the least costly of the methods proposed to curb unwanted telephone solicitations.

**29** It is my expectations that the proposed rules will have a significant impact in curtailing intrusive nuisance calls by telemarketers. I will be monitoring these rules closely to make sure that they adequately protect consumers from unwanted calls.

FCC

Footnotes

1    The President signed the bill into law because it gives the Commission "ample authority to preserve legitimate business practices." Statement by the President upon signing the TCPA into law, December 20, 1991.

2    See Notice of Proposed Rulemaking in CC Docket No. 92–90, 7 FCCRcd 2736 (1992). The Commission designates Subpart L of Part 64 of its rules as the appropriate location for most of the rules implementing the TCPA. Additional rules implementing the TCPA which address certain requirements for terminal equipment are located in Part 68 of the Commission's rules. The full text of the TCPA is included as an appendix to the NPRM. The rules adopted in this order appear in Appendix B.

3    In addition to comments filed by the parties listed in Appendix A, we received numerous letters and other informal comments in response to the NPRM. We have considered each of these additional comments in adopting this Report and Order.

4    In this order, the term "telemarketer" refers to any person or entity making a telephone solicitation (regardless of the precise means used to place or complete such a call).

5    See Appendix B.

6    All terms except "established business relationship" are defined in the TCPA (see § 227(a)); we have incorporated those statutory definitions in our rules.

7    47 U.S.C. § 227(c). The TCPA also requires the Commission to consider whether specific regulations should be adopted regulating artificial or prerecorded voice calls to businesses. § 227(b)(2)(A). Concerns regarding telemarketer intrusions upon commerce are largely addressed in the rules, which prohibit autodialed and artificial or prerecorded message calls where the called party would incur costs for such calls, such calls would likely affect public health and safety, or where such calls would tie up two or more lines of a business simultaneously. See 47 C.F.R. §§ 64.1200(a)(1), (a)(4), and (b). Commenters express concern that prerecorded message calls will affect public health and safety and impede commerce. Most commenters, however, do not raise privacy concerns with respect to prerecorded calls to businesses. Based on the record and on the scope of the prohibitions on autodialers and prerecorded messages in the rules we adopt today, we are not persuaded that additional prohibitions on prerecorded voice message calls to businesses are necessary at this time.

8    See, e.g., comments of American Telephone and Telegraph (AT & T).

9    See, e.g., comments of Center for the Study of Commercialism (CSC) and National Consumers League (NCL). Commenters point to statements in reports on earlier versions of the TCPA noting that technology which permits a greater volume of solicitations with less personnel has led to an increasing number of consumer complaints and has prompted at least 40 states

APPENDIX 2

to enact restrictions on the use of autodialers, prerecorded message players, and unwanted solicitations. As examples of the source of consumer complaints, the reports note that callers making solicitations often fail to identify themselves, and that autodialers and prerecorded messages do not release a line after hangup. See Senate Report 102–177, 102d Cong., 1st Sess. (1991), p. 2; Senate Report 102–178 102d Cong, 1st Sess. (1991), pp. 2–3.

10    Lejeune Associates of Florida (Lejeune) notes that Florida receives 300–500 complaints per month under its telephone solicitation statute. The Ohio Public Utilities Commission (OPUC) receives an average of 100 telephone solicitation complaints per month. The Direct Marketing Association (DMA) notes that 400,000 consumers have asked to be included in its Telephone Preference Service, which functions as a do-not-call list for the telemarketing industry.

11    See Senate Report 102–177, 1st Sess., pp. 1–3 (1991); House Report 102–317, 1st Sess., pp. 8–10.

12    Autodialer and prerecorded message calls are subject to a stricter standard, as discussed in paras. 27–51, infra.

13    See, e.g., comments of AT & T.

14    See, e.g., comments of Securities Industry Association (SIA).

15    See, e.g., comments of National Retail Federation (NRF).

16    See, e.g., comments of Pacific Bell, Nevada Bell (Pacific Bell).

17    See, e.g., comments of SafeCard Services, Inc. (Safecard); and Sprint.

18    See, e.g., comments of AT & T.

19    See, e.g., comments of Sprint.

20    See, e.g., comments of DMA.

21    See, e.g., comments of Consumer Bankers Association (CBA).

22    See, e.g., comments of J.C. Penney. Southwestern Bell Telephone (SWBT) notes that laws in each of the states it serves prohibit SWBT from breaching the confidentiality of subscribers having unpublished or unlisted numbers.

23    We note that the TCPA prohibits any alternative which calls for any charge for participation to residential subscribers. § 227(c)(2). The Florida database, for example, charges subscribers for their participation in the database. Nynex Telephone Companies (Nynex) states that although New England Telephone has spent more that $1 million to implement a statewide do-not-call database in Massachusetts, only nine telemarketers have purchased the $300 do-not-call list. Nynex further notes that Massachusetts allows New England Telephone to recover costs of its state do-not-call database from the subscriber rate base.

24    Commenters largely support the Commission's tentative conclusion in the NPRM that a national database should neither receive federal funds nor a federal contract for its establishment, operation, or maintenance. NCL objects to the finding, arguing that the failure of self-regulation, along with the TCPA, require strict federal regulatory oversight of telemarketing practices. In light of the action taken in the TCPA and in our rules to restrict the most abusive telemarketing practices, and in the absence of more persuasive evidence to support federal expenditures to further restrict such practiceS, we find that it is not in the public interest to pass on to taxpayers the costs of a national database system.

25    See, e.g., comments of Citicorp, Sprint.

26    See, e.g., comments of AMEX and Olan Mills. Moreover, based upon the comments, we are not persuaded that the current state of technology would permit the rapid and cost-efficient utilization of LIDB to function as a national do-not-call database. See, e.g., comments of ITN, Pacific Bell, Southern New England Telephone (SNET), SWBT, and Sprint.

27    See, e.g., comments of AT & T, Lejeune Associates, and Sprint.

28    See, e.g., comments of SNET, Sprint.

29    See, e.g., comments of SIA.

30    See, e.g., comments of Bell Atlantic; BellSouth; Pacific Bell; and SNET.

31    See, e.g., comments of CSC, GTE.

32    See, e.g., comments of J.C Penney, North American Telecommunications Association (NATA) and SafeCard. Nynex states that inserting an asterisk to mark do-not-call preferences in its directories would cost its publishing division $100,000, in addition to $300,000 for an additional 400 tons of paper and $125,000 in printing costs. Nynex's experiment in using an asterisk to mark customer preferences received complaints that marks confused readers. BellSouth provided special directory markings in its state of Florida directory from October 1, 1987 to October 1, 1990. In its comments, BellSouth states that the service proved to be largely ineffective in reducing unwanted solicitations and was withdrawn. See comments of BellSouth at 9, n. 13.

33    See, e.g. comments of BellSouth and Consumer Action.

34    See, e.g., comments of National Telephone Cooperative Association (NTCA) and Pacific Bell.

35    See, e.g., comments of Citicorp; Olan Mills; Sprint; and SWBT.

36    See, e.g., comments of CUC International, Olan Mills, Pacific Bell.

**APPENDIX 2**

37    See, e.g., comments of Ameritech Operating Companies (Ameritech) and Cox Enterprises, Inc. (Cox).

38    See, e.g., comments of American Telemarketing Association (ATA), Citicorp.

39    See, e.g., comments of Citicorp; DMA; reply comments of AMEX and Ameritech.

40    See, e.g., comments of AMEX, Citicorp.

41    See, e.g., comments of Ameritech, Citicorp.

42    CSC cites House Report 102–317 at 19–20, finding the existing DMA list to be unsatisfactory because it is "not comprehensive in nature." See also comments of Consumer Action, Lejeune, and U.S. West.

43    "With respect to both company-specific and industry-wide databases, the Commission should consider whether making such practices mandatory, and imposing substantial sanctions for violations would increase their effectiveness to the point that they could satisfy the statutory requirements of this Act." House Report 102–317, 102d Cong., 1st Sess. (1991) at 20.

44    Several commenters oppose the implementation of mandatory industry-based lists, arguing that this alternative raises the same problems of cost, confidentiality, and obsolescence as a national database. See, e.g., comments of Bell Atlantic and CUC International. Industry-based do-not-call lists may be appropriate for smaller telemarketers who find it more economical or efficient to maintain do-not-call lists in cooperation with other telemarketers in the same region or industry. See, e.g., comments of Time Warner, Inc. (TWI). Therefore, our decision to choose the company-specific do-not-call list alternative does not preclude telemarketers from voluntarily maintaining an industry-based do-not-call list as long as that method comports with the rules set forth in § 64.1200(e) for maintaining do-not-call lists. We emphasize that, regardless of the method chosen, the person or entity making a telephone solicitation, or on whose behalf a telephone solicitation is made, will ultimately be held responsible for compliance with our rules. See para. 24, infra.

45    We emphasize that § 227(c)(2) prohibits the imposition of any charge on residential subscribers from procedures to protect them from unwanted solicitations.

46    See, e.g., comments of DMA.

47    Tax-exempt nonprofit organizations are not subject to this requirement because the TCPA excludes such organizations from the definition of "telephone solicitation." See § 227(a)(3). Therefore, tax-exempt nonprofit organizations need not maintain do-not-call lists.

       The definition of "telephone solicitation" in § 227(a)(3) also excludes calls made to parties with whom the caller has an established business relationship and calls for which the calling party has received the called party's prior express invitation or permission. We emphasize, however, that subscribers may sever any business relationship, i.e., revoke consent to any future solicitations, by requesting that they not receive further calls from a telemarketer, thus subjecting that telemarketer to the requirements of § 64.1200(e).

48    See n. 44, supra. The TCPA enforcement mechanisms are discussed in paras. 55–56, infra.

49    See House Report 102–317, 102d Cong., 1st Sess., pp. 13–17 (1991).

50    The Newspaper Association of America suggests that alternative methods and procedures should be permitted for second class mail permit holders if the national database alternative is mandated, but states that separate treatment would not be necessary under the company-specific do-not-call list option. In light of our selection of the company-specific do-not-call list as the preferred alternative for limiting unwanted telephone solicitations, we do not believe that separate methods and procedures are required for small businesses, independent contractors, or holders of second class mail permits. We conclude that the benefits of company-specific do-not-call lists are the same, e.g. cost, efficiency, and effectiveness, for small entities and for holders of second class mail permits as they are for larger enterprises, and therefore these entities will be subject to the same requirements under our rules.

51    See, e.g., comments of Ameritech; CBA; and NATA.

52    See, e.g., comments of Bell Atlantic.

53    See, e.g., comments of American Collectors Association (ACA). The FDCPA prohibits calls before the hour of 8 AM and after 9 PM, local time at the called party's location. 15 U.S.C. § 1692c(1). See also paras. 36–39 infra.

54    See, e.g., comments of American Bankers Association (ABA).

55    See, e.g., comments of BellSouth.

56    See, e.g., comments of Citicorp and J.C. Penney.

57    See House Report, 102–317, 1st Sess., 102nd Cong. (1991), at p. 13, which supports this interpretation, noting that in such instances "the called party has in essence requested the contact by providing the caller with their telephone number for use in normal business communications."

58    See, e.g., comments of OPUC.

59    See, e.g., comments of ACA and AMEX.

APPENDIX 2

60    See, e.g., comments of ABA and ACA.

61    See, e.g., comments of InterVoice.

62    See House Report, 102–317, 102d Cong., 1st Session (1991), p. 13.

63    We emphasize, however, that a business may not make telephone solicitations to an existing or former customer who has asked to be placed on that company's do-not-call list. A customer's request to be placed on the company's do-not-call list terminates the business relationship between the company and that customer for the purpose of any future solicitation. See n. 47, supra.

64    See House Report, 102–317, 102d Cong., 1st Session (1991), pp. 13–17, noting that solicitations by persons or entities affiliated with businesses which have an established business relationship with the consumer would be permissible in certain circumstances, but that companies should honor requests not to call again notwithstanding any business relationship with the consumer.

65    See, e.g., comments of AMEX, TWI.

66    See, e.g., House Report 102–317, 102d Cong., 1st Session (1991), pp. 13–17.

67    As we noted in para. 31, supra, a party making an inquiry cannot be considered to have given prior express consent to future autodialed or prerecorded message calls simply because that party's number has been "captured" by an ANI device or similar system. Nor can a consumer inquiry be considered to create a business relationship where the consumer's number has been captured absent that consumer's express invitation or permission to be contacted at the captured number.

68    See comments of ABA; American Financial Services Association (AFSA); the Coalition; Citicorp; CBA; Gannett; Household International; National Retail Federation; Teknekron; and Wells Fargo.

69    See comment of ACA; AFSA; Ameritech; Citicorp; CBA; Household International; Ohio Student Loan Commission; and Wells Fargo.

70    See comments of the Coalition; CBA; Digital Systems International; and the National Retail Federation.

71    Debt collectors subject to the FDCPA are prohibited from conveying any information to third parties, even inadvertently, with respect to the existence of a debt. 15 U.S.C. § 1629b–c. The FDCPA requires a collector initiating a call answered by a third party to identify himself by name but not to disclose the name of his employer unless asked. 15 U.S.C. § 1629b(1). See comments of ACA.

72    A creditor may solicit a residential subscriber using a prerecorded message as long the established business relationship has not been previously severed by the debtor. This interpretation reflects the legislative intent expressed in House Report, 102–317, 102d Cong., 1st Session (1991), pp. 14–17.

73    See comments of ABA, ACA. See also paras. 25–26 supra.

74    See, e.g., comments of NCL and OPUC.

75    See, House Report 102–317 at 16–17 stating that "most unwanted telephone solicitations are commercial in nature" and that "the two main sources of consumer problems—high volume of solicitations and unexpected solicitations—are not present in solicitations by nonprofit organizations." See also, Senate Report 102–177 at 6, to accompany Bill S. 1410. 102d Cong., (1991).

76    See comments of Congressman Brewster and Public Forum.

77    See para. 45, infra., emphasizing that market research or surveys would be prohibited under § 227 of the TCPA and § 64.1200(a)(1) if the called party were charged for the call without the party's prior express consent or if such calls contain unsolicited advertisements.

78    A few commenters note that the NPRM omitted from the proposed rules the phrase "or other radio common carrier service," as it appears in § 227(b)(1)(A)(iii) of the TCPA. This language was indeed inadvertently omitted from the text of the proposed rule, and has been included in § 64.1200(a)(1)(iii) to mirror the language of the TCPA. See Appendix B.

79    See comments of Ameritech and MessagePhone.

80    See comments of Ameritech and reply comments of Ameritech at 4, n. 9.

81    See United States v. American Tel. and Tel. Co., 552 F.Supp. 226 (D.D.C.1982), aff'd mem. sub nom. Maryland v. United States, 460 U.S. 1001 (1983), modified United States v. Western Elec. Co., 673 F.Supp. 525 (D.D.C.1987), 714 F.Supp. 1 (D.D.C.1988), affirmed in part and reversed in part 900 F.2d 283 (D.C.Cir.1990).

82    See Bell Atlantic Order, 6 FCCRcd at 3400, 3401 (Com.Car.Bur.1991).

83    We emphasize that where such services are used for the purpose of telephone solicitation in violation of our rules and the TCPA, the users of the services, not the carriers providing the services, would be held liable, consistent with Congress' policy that carriers not be held responsible for the content of messages transmitted through the network. See statement of Senator Hollings, Congressional Record, S 18785 (November 27, 1991). Of course, carriers initiating telephone solicitations on their own behalf using such service would be subject to our rules and the TCPA.

84    Congressional Record, H 11310 (November 26, 1991).

APPENDIX 2

In the Matter of Rules and Regulations Implementing the..., 7 FCC Rcd. 8752 (1992)

85    We emphasize that telephone solicitations as defined in our rules can never be classified as "emergencies." See § 64.1200(b).

86    Commenters point out that the proposed rules, in the prohibition against line seizure, § 68.318, refer to "automatic dialing devices," a term not employed elsewhere in the rules or the TCPA. Reading § 227(d) as a whole, it is clear that the requirement refers only to automatic telephone dialing systems. The title and language of that section will thus be revised to read "automatic telephone dialing systems."

87    Mr. Fax and National Faxlist urged the Commission not to impose a ban on unsolicited telephone facsimile advertisements; National Faxlist suggested that a telephone facsimile do-not-call list be created in lieu of a complete prohibition on such unsolicited advertisements. GTE requested clarification that the identification requirement does not apply to each page of messages transmitted through imaging systems.

In banning telephone facsimile advertisements, the TCPA leaves the Commission without discretion to create exemptions from or limit the effects of the prohibition (see § 227(b)(1)(C)); thus, such transmissions are banned in our rules as they are in the TCPA. § 64.1200(a)(3). We note, however, that facsimile transmission from persons or entities who have an established business relationship with the recipient can be deemed to be invited or permitted by the recipient. See para. 34, supra. Furthermore, the term "telephone facsimile machine" as defined in the TCPA and identically in our rules, § 64.1200(f) clearly includes imaging systems. The rules state that the first page or each page of a transmission to a facsimile machine must include identifying information.

88    See comments of SNET, Sprint, and reply comments of AT & T.

89    Pacific Bell asserts that complaint proceedings brought under § 208 of the Communications Act, 47 U.S.C. § 208, and based on violations of § 227 of the Act, 47 U.S.C. § 227, could only be instituted against common carriers. Pacific Bell is correct with respect to complaints filed under Section 208 of the Act. In addition to the private right of action noted above, aggrieved persons or entities may report violations of the TCPA to the Commission and request action on such violations through the informal procedures set forth in Section 1.41 of the rules, 47 C.F.R. § 1.41. See, e.g., 47 U.S.C. §§ 312 and 503(b).

90    See Section 2 of the TCPA.

a     also filed reply comments

aa    filed only reply comments

7 FCC Rcd. 8752 (F.C.C.), 71 Rad. Reg. 2d (P & F) 445, 7 F.C.C.R. 8752, 1992 WL 690928

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.