# APPENDIX 3

27 FCC Rcd. 1830 (F.C.C.), 27 F.C.C.R. 1830, 55 Communications Reg. (P&F) 356, 2012 WL 507959

Federal Communications Commission (F.C.C.)
Report and Order

IN THE MATTER OF RULES AND REGULATIONS IMPLEMENTING
THE TELEPHONE CONSUMER PROTECTION ACT OF 1991

CG Docket No. 02-278
FCC 12-21
Adopted: February 15, 2012
Released: February 15, 2012

**\*\*1  \*1830**  By the Commission: Chairman Genachowski and Commissioners McDowell and Clyburn issuing separate statements.

## \*1831  I. INTRODUCTION

1. In this Report and Order (Order), we take steps to protect consumers from unwanted telemarketing calls pursuant to the Telephone Consumer Protection Act of 1991 (TCPA).[1]  The protections we adopt will protect consumers from unwanted autodialed or prerecorded telemarketing calls, also known as "telemarketing robocalls," and maximize consistency with the Federal Trade Commission's (FTC) analogous Telemarketing Sales Rule (TSR), as contemplated by the Do-Not-Call Implementation Act (DNCIA).[2]

2. Specifically, in this Order, we: (1) revise our rules to require prior express written consent for all autodialed or prerecorded telemarketing calls to wireless numbers[3] and residential lines[4] and accordingly eliminate the established business relationship exemption for such calls to residential lines while maintaining flexibility in the form of consent needed for purely informational calls; (2) adopt rules applicable to all prerecorded telemarketing calls[5] that allow consumers to opt out of future robocalls during a robocall; and (3) revise our rules to limit permissible abandoned calls on a per-calling campaign basis, in order to discourage intrusive calling campaigns. Finally, we exempt from TCPA requirements prerecorded calls to residential lines made by health care-related entities governed by the Health Insurance Portability and Accountability Act of 1996. Taken together, today's actions offer consumers greater protection from intrusive telemarketing calls and harmonize our rules with those of the FTC's in a way that reduces industry confusion about telemarketers' obligations and does not increase compliance burdens for most telemarketers.

3. None of our actions change requirements for prerecorded messages that are non-telemarketing, informational calls, such as calls by or on behalf of tax-exempt non-profit organizations, calls for political purposes, and calls for other noncommercial purposes, including those that deliver purely informational messages such as school closings. Such calls continue to require some form of prior express consent under the TCPA and the Commission's rules, if placed to wireless numbers and other specified recipients.[6]  Because the TCPA's restrictions do not apply to calls initiated for emergency  **\*1832**  purposes, our changes also do not affect messages sent to consumers to alert them to emergency situations.[7]

## II. BACKGROUND

### A. The Telephone Consumer Protection Act of 1991 and the FCC's Implementing Rules

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

4. To protect consumers from unwanted calls, the TCPA imposes restrictions on the use of the telephone network for unsolicited advertising by telephone and facsimile. [8] Two provisions of the TCPA, as codified in the Communications Act of 1934, as amended (the Act), restrict the use of automatic telephone equipment. [9] Section 227(b)(1)(A) of the Act prohibits certain categories of autodialed calls, absent an emergency or the "prior express consent" of the consumer. [10] This provision prohibits the use of automatic telephone dialing systems (autodialers) or artificial or prerecorded voice messages for calling emergency telephone lines, health care facilities (including patient rooms), telephone numbers assigned to wireless services, and services for which the consumer is charged for the call. [11] The Commission has concluded that the prohibition encompasses both voice and text calls, including short message service (SMS) calls, if the prerecorded call is made to a telephone number assigned to such service. [12] Section 227(b)(2)(C) authorizes the Commission to exempt from this provision calls to a number assigned to a wireless service that are not charged to the consumer, subject to certain conditions intended to protect consumers' privacy rights. [13]

**2 5. Section 227(b)(1)(B) prohibits non-emergency calls to a residential line "using an artificial or prerecorded voice" without the recipient's "prior express consent" unless the call is "exempted by rule or order by the Commission under paragraph (2)(B)." [14] Section 227(b)(2)(B), in turn, *1833 authorizes the Commission to adopt limited exemptions to this ban, including exemptions for calls "that are not made for a commercial purpose" and calls for a commercial purpose that the Commission has determined will not adversely affect the privacy rights of the consumer and that do not transmit any unsolicited advertisement. [15]

6. In its *1992 TCPA Order*, [16] the Commission implemented the TCPA by prohibiting: (1) autodialed calls and artificial or prerecorded voice messages (in the absence of an emergency or the prior express consent of the consumer) to emergency lines, health care facilities, numbers associated with wireless phone service, or any number for which the consumer is charged for the call; and (2) prerecorded voice message calls to residences, with exemptions for particular types of calls as described below. [17] The Commission further determined that an autodialed or prerecorded call that consists of a free offer, coupled with offers of goods or services for sale, constitutes an advertisement and is prohibited, unless otherwise exempted. [18]

7. *Prior Express Consent*. In the *1995 TCPA Order on Recon*, the Commission stated that "[a]lthough the term 'express permission or invitation' is not defined in statutory language or history, there is no indication that Congress intended that calls be excepted from telephone solicitation restrictions unless the residential subscriber has (a) clearly stated that the telemarketer may call, and (b) clearly expressed an understanding that the telemarketer's subsequent call will be made for the purpose of encouraging the purchase or rental of, or investment in, property, goods or services." [19] The Commission has addressed prior express consent in other contexts, including the provision of telephone numbers, telephone number capturing, and telephone number registration on the national Do-Not-Call Registry. [20]

8. *Exemptions*. In the *1992 TCPA Order*, the Commission exempted from the section 227(b)(1)(B) prohibition calls to residential consumers with whom the caller has an established business relationship. [21] Based upon the record and the TCPA's legislative history, the Commission concluded that a solicitation to someone with whom the caller has had such a relationship does not adversely affect the privacy interests of the consumer. [22] As a result, under our existing rules, the calling party is not required *1834 to secure any form of consent to place prerecorded calls to a residential telephone line of a consumer with which it has had such a relationship.

**3 9. The Commission also exempted from the section 227(b)(1)(B) prohibition on prerecorded voice message calls to residences calls not made for commercial purposes and calls made for commercial purposes that do not contain an

APPENDIX 3

unsolicited advertisement. [23] Because the Commission determined that debt collection calls are not telemarketing calls, it concluded that a specific exemption for debt collection calls was not warranted. [24]

10. In the *1992 TCPA Order*, the Commission also concluded that, in crafting the TCPA, Congress did not intend to prohibit autodialed or prerecorded message calls by wireless carriers to their customers when their customers are not charged for the call. [25] The Commission based this conclusion on the fact that neither the TCPA nor its legislative history indicates that Congress intended to impede communications between wireless carriers and their customers regarding the delivery of customer services by barring calls to wireless consumers for which the consumer is not charged. [26] Moreover, following enactment of the TCPA and adoption of the *1992 TCPA Order*, Congress enacted Section 227(b)(2)(C) of the Act, which, as noted above, provides that the Commission may exempt from the Section 227(b)(1)(A)(iii) prohibition calls to a telephone number assigned to a wireless telephone service that are not charged to the consumer, "subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights Section 227 is intended to protect." [27]

11. *Opt-Out Mechanism*. The TCPA requires the Commission to adopt certain technical and procedural standards for prerecorded voice systems. [28] In the *1992 TCPA Order*, the Commission required that all prerecorded telephone messages state clearly: (1) at the beginning of the message, the identity of the business, individual, or other entity initiating the call; and (2) during or after the message, the telephone number or address of such calling business, other entity or individual. [29] The Commission required that, for telemarketing messages to residential telephone consumers, such telephone number **\*1835** must allow any individual to make a do-not-call request during regular business hours for the duration of the telemarketing campaign. [30]

12. *Abandoned Calls*. In the *2003 TCPA Order*, the Commission addressed predictive dialers. [31] To minimize the potential inconvenience and irritation to consumers receiving calls, it determined that a telemarketer may abandon, during a 30-day period, no more than three percent of calls answered by a person and must deliver a prerecorded identification message when abandoning a call. [32]

**B. The Telemarketing Consumer Fraud and Abuse Prevention Act and the FTC's Implementing Rules**

13. The FTC also has jurisdiction over telemarketing. Under the Federal Trade Commission Act (FTC Act), the FTC is empowered to address unfair or deceptive acts or practices in or affecting commerce, which that statute declares unlawful. [33] The later Telemarketing Consumer Fraud and Abuse Prevention Act (Telemarketing Act) specifically required the FTC to adopt rules prohibiting deceptive and abusive telemarketing acts or practices, including "unsolicited telephone calls which the reasonable consumer would consider coercive or abusive of such consumer's right to privacy." [34] The body of regulations adopted by the FTC to implement the Telemarketing Act is known as the Telemarketing Sales Rule (TSR). [35] The FTC Act, however, provides that the FTC's jurisdiction does not extend to common carriers, banks, credit unions, savings and loans, companies engaged in the business of insurance, and airlines. [36] The FTC's jurisdiction also does not extend to intrastate telemarketing calls. [37]

**\*\*4** 14. In 2008, the FTC revised certain provisions of the TSR relating to the permissibility of prerecorded telemarketing messages. [38] The FTC determined that it is an abusive telemarketing practice for a seller or telemarketer to initiate an outbound telephone call that delivers a prerecorded telemarketing message unless, among other things, the seller has previously obtained the recipient's signed, written agreement to receive such calls. [39] The FTC also announced that prerecorded telemarketing calls must **\*1836** include an automated, interactive mechanism by which a consumer may "opt-out" of receiving future prerecorded messages from the seller or telemarketer. [40] Finally, the FTC modified the

APPENDIX 3

Case 3:16-cv-01320-NJR-SCW Document 20-3 Filed 10/03/17 Page 5 of 45 Page ID #302

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

method by which it calculates the three percent call abandonment rate to measure the rate for a single calling campaign over a 30-day period. [41] The FTC observed that while its telemarketing rules differ from those of the Commission, they are not in conflict, and that entities subject to the authority of both agencies need only comply with the FTC's more restrictive requirements to ensure compliance with both agencies' rules. [42]

### C. The Do-Not-Call Implementation Act and Agency Coordination

15. The DNCIA states that "the Federal Communications Commission shall consult and coordinate with the Federal Trade Commission to maximize consistency with the rule promulgated by the Federal Trade Commission." [43] Agency coordination is necessary because, as noted above, both agencies have jurisdiction over telemarketing. The FCC's jurisdiction, however, covers *all* telemarketers, while, as noted above, the FTC's jurisdiction *excludes* common carriers, banks and other financial institutions, insurance companies, airlines, and intrastate telemarketers. [44] Although each agency's regulations are the product of distinct statutory mandates, the agencies have created consistent and complementary regulatory schemes, with the exception of the FTC rules adopted in its TSR proceeding. [45] The agencies agreed to a Memorandum of Understanding on enforcement of the respective telemarketing rules to avoid unnecessary duplication of enforcement efforts. [46]

### D. FCC TCPA Notice of Proposed Rulemaking

16. In the *2010 TCPA NPRM*, the Commission proposed to conform its rules to the FTC's rules. Specifically, the Commission proposed to: (1) require sellers and telemarketers to obtain consumers' prior express written consent to receive autodialed or prerecorded telemarketing calls even when there is an established business relationship between the caller and the consumer; (2) require that prerecorded telemarketing calls include an automated, interactive mechanism by which a consumer may "opt-out" of receiving future prerecorded messages from a seller or telemarketer; (3) exempt certain federally regulated health care-related calls from the general section 227(b)(1)(B) prohibition on **\*1837** prerecorded telemarketing calls to residential telephone lines; and (4) adopt a "per-calling-campaign" standard for measuring the maximum percentage of live telemarketing sales calls that a telemarketer lawfully may drop or "abandon" as a result of the use of autodialing software or other equipment. [47] The Commission also sought comment on whether harmonizing the Commission and FTC rules would benefit consumers and industry, and the costs of implementing the proposed changes. [48]

**\*\*5** 17. The Commission stated in the *2010 TCPA NPRM* that its proposals would not affect the regulatory treatment of prerecorded message calls that are not covered by the TCPA rules at issue here, [49] such as calls by or on behalf of tax-exempt non-profit organizations; calls for political purposes, including political polling calls and other calls made by politicians or political calling campaigns; and calls made for other noncommercial purposes, including those that deliver purely "informational" messages -- for example, prerecorded calls that notify recipients of a workplace or school closing. [50] In addition, the Commission stated that because the TCPA's restrictions on prerecorded messages do not apply to calls initiated for emergency purposes, the proposed changes would not affect messages sent to consumers to alert them to emergency situations, including, for example, emergency messages permitted by the WARN Act and/or the Commercial Mobile Alert System (CMAS). [51]

### III. DISCUSSION

18. Based on substantial record support and evidence of continued consumer frustration with unwanted telemarketing robocalls, and in furtherance of the statutory goal of maximizing consistency with the FTC's telemarketing rules, we adopt the consumer protection measures proposed in the *2010 TCPA NPRM*. First, we require prior express written

APPENDIX 3

consent for telemarketing robocalls to wireless numbers and residential lines. Second, we eliminate the "established business relationship" exemption as it previously applied to telemarketing robocalls to residential lines. Third, we require telemarketers to implement an automated, interactive opt-out mechanism for telemarketing robocalls, which would allow a consumer to opt out of receiving additional calls immediately during a robocall. Fourth, we require that the permissible three percent call abandonment rate be calculated for each calling campaign, so that telemarketers cannot shift more abandoned calls to certain campaigns, as is possible if calculation is made across multiple calling campaigns. Finally, we adopt an exemption to our TCPA rules for prerecorded health care-related calls to residential lines, which are already regulated by the federal Health Insurance Portability and Accountability Act.

19. At the outset, we note that the benefits to consumers of increased protection from unwanted telemarketing robocalls are significant. By enacting the TCPA and its prohibitions on unwanted calls, Congress has already made an assessment that the benefits of protecting consumer privacy are substantial. Congress, through enactment of a second law - the DNCIA - has further determined that there are substantial benefits to consistency in telemarketing regulations by the Commission and the FTC. We further find that the significant ongoing consumer frustration reflected in our complaint data and the positive consumer response to the FTC's proceeding confirm the need to strengthen our current rules in some respects, and narrow them in others where other legal protections are in place. Moreover, with the exception of the limited group of entities that are outside the FTC's **1838 jurisdiction, we expect that many telemarketers affected by our changes today have already incurred the cost of implementing a written consent requirement, have already given up reliance on the EBR as a basis for making robocalls without prior express consent, have implemented an automated opt-out mechanism, and are calculating the call abandonment rate on a per-campaign basis. As a result, we find that increased consumer protection from unwanted telemarketing robocalls will provide substantial benefits to consumers without substantial implementation costs. While these benefits may not be easily quantifiable, nothing in the record persuades us that the costs of complying with our revised rules outweigh the benefits.

**A. Autodialed and Prerecorded Message Calls**

**1. Prior Express Written Consent Requirement**

 **\*\*6** 20. Based on substantial record support, the volume of consumer complaints we continue to receive concerning unwanted, telemarketing robocalls, and the statutory goal of harmonizing our rules with those of the FTC, we require prior express written consent for all telephone calls using an automatic telephone dialing system or a prerecorded voice to deliver a telemarketing message to wireless numbers and residential lines. [52]

21. As an initial matter, we note that the TCPA is silent on the issue of what form of express consent - oral, written, or some other kind - is required for calls that use an automatic telephone dialing system or prerecorded voice to deliver a telemarketing message. [53] Thus, the Commission has discretion to determine, consistent with Congressional intent, the form of express consent required. The vast majority of commenters support harmonizing our rules with those of the FTC by adopting a written consent requirement for autodialed or prerecorded telemarketing calls to wireless numbers and residential lines. [54] For example, Bank of America asserts that we should harmonize our regulations with those of the FTC. [55] Similarly, the National Cable & Telecommunications Association urges that a written consent requirement should apply to telemarketing calls. [56] The National Council of Higher Education Loan Programs and the Educational Finance Council also supports a written consent requirement for telemarketing calls. [57] While a few commenters argue that we should require written consent for *all* autodialed or prerecorded calls (*i.e.*, not simply those delivering marketing messages), [58] we conclude that requiring prior express written consent for all such calls would unnecessarily restrict consumer access to information communicated through purely informational calls. For instance, bank account balance, credit card fraud alert, package delivery, and school closing information are types of information calls that we do not

**APPENDIX 3**

want to unnecessarily impede. [59] We take this action to maximize consistency with the FTC's TSR, as contemplated in the DNCIA, and avoid unnecessarily impeding consumer access to desired information.

**\*1839** 22. Since the TCPA's enactment and the adoption of implementing rules, the Commission has continued to receive thousands of complaints regarding unwanted telemarketing robocalls. Furthermore, in its TSR proceeding, the FTC noted that it received over 13,000 comments opposing its proposal to, among other things, adopt an established business relationship (EBR) exemption for prerecorded telemarketing calls. [60] In deciding to amend its rules to require prior written consent for prerecorded telemarketing calls, the FTC also considered its enforcement experience that resulted in multi-million dollar settlements where telemarketers, among other things, failed to secure the appropriate consent for telemarketing calls. [61] In light of our record and the record amassed by the FTC in its TSR proceeding, we find that, notwithstanding current consent requirements and other TCPA safeguards, consumers continue to experience frustration in receiving unwanted telemarketing robocalls.

**\*\*7** 23. We also find that a written consent requirement would advance Congress' objective under the DNCIA to harmonize the Commission's rules with those of the FTC. As stated previously, the DNCIA provides that "the Federal Communications Commission shall consult and coordinate with the Federal Trade Commission to *maximize consistency* with the telemarketing rule promulgated by the Federal Trade Commission." [62] Eliminating the differences between our rules and those of the FTC where warranted will "maximize consistency" with the FTC's consent requirements.

24. Among the findings Congress made when adopting the TCPA were that: (1) the use of the telephone to market goods and services to the home and to other businesses has become pervasive due to the increased use of cost-effective telemarketing techniques; (2) telephone subscribers considered automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy; and (3) individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals yet permits legitimate telemarketing practices. [63] While current regulations provide a measure of consumer protection from unwanted and unexpected calls, the complaint data, as noted above, show that the proliferation of intrusive, annoying telemarketing calls continues to trouble consumers. [64] We conclude that requiring prior express written consent for telemarketing calls utilizing autodialed or prerecorded technologies will further reduce the opportunities for telemarketers to place unwanted or unexpected calls to consumers. We believe that requiring prior written consent will better protect consumer privacy because such consent requires conspicuous action by the consumer -- providing permission in writing -- to authorize autodialed or prerecorded telemarketing calls, and will reduce the chance of consumer confusion in responding orally to a telemarketer's consent request.

25. We further find that the unique protections for wireless consumers contained in the TCPA supports requiring prior written consent for telemarketing robocalls. Because section 227(b)(1)(A) of the Act specifically protects wireless users, among others, from autodialed or prerecorded calls to which they have not consented, we must ensure that our rules address privacy issues for wireless consumers. In addition, we note that the substantial increase in the number of consumers who use wireless phone service, sometimes as their only phone service, means that autodialed and prerecorded calls are increasingly intrusive in the wireless context, especially where the consumer pays for the **\*1840** incoming call. [65] Further, the costs of receiving autodialed or prerecorded telemarketing calls to wireless numbers often rests with the wireless subscriber, even in cases where the amount of time consumed by the calls is deducted from a bucket of minutes. [66] Given these factors, we believe that it is essential to require prior express written consent for autodialed or prerecorded telemarketing calls to wireless numbers. One commenter, USAA, appears to suggest that oral consent is sufficient to permit any autodialed or prerecorded calls to wireless numbers. It argues that its customers may orally provide their wireless phone number as a point of contact and therefore those customers expect *marketing* and service calls. [67] We disagree. Consumers who provide a wireless phone number for a limited purpose -- for service calls only -- do not necessarily expect to receive telemarketing calls that go beyond the limited purpose for which oral consent

regarding service calls may have been granted. Moreover, as use of wireless numbers continues to increase, we believe that increased protection from unwanted telemarketing robocalls is warranted.

 **8  26. We further conclude that harmonizing our prior consent requirement with that of the FTC will reduce the potential for industry and consumer confusion surrounding a telemarketer's obligations because similarly situated entities will no longer be subject to different requirements depending upon whether the entity is subject to the FTC's or the FCC's jurisdiction. We also find that requiring prior written consent will enhance the FCC's enforcement efforts and better protect both consumers and industry from erroneous claims that consent was or was not provided, given that, unlike oral consent, the existence of a paper or electronic record can be more readily verified and may provide unambiguous proof of consent. [68]

27. *Calls Not Subject to Written Consent Requirement*. While we adopt rules to protect consumers from unwanted telemarketing robocalls, we leave undisturbed the regulatory framework for certain categories of calls. Specifically, consistent with section 227(b)(2)(C) of the Act and the Commission's implementing rules and orders, we do not require prior written consent for calls made to a wireless customer by his or her wireless carrier if the customer is not charged. [69] One commenter requests that the Commission clarify that wireless carriers may send free autodialed or prerecorded calls, including text messages, without prior written consent, if the calls are intended to inform wireless customers about new products that may suit their needs more effectively, so long as the customer has not expressly opted out of receiving such communications. [70] As noted above, the Commission addressed this issue in the *1992 TCPA Order* by concluding that Congress did not intend to prohibit autodialed or prerecorded **1841  message calls by a wireless carrier to its customer when the customer is not charged. [71] The Commission based its conclusion on the fact that neither the TCPA nor its legislative history indicates that Congress intended to impede communications between common carriers and their customers regarding the delivery of customer services by barring calls to wireless consumers for which the consumer is not charged. [72] Nothing in the record or our analysis of consumer complaints gives us a reason to alter this finding.

28. Moreover, while we revise our consent rules to require prior written consent for autodialed or prerecorded *telemarketing* calls, we maintain the existing consent rules for *non-telemarketing, informational* calls, such as those by or on behalf of tax-exempt non-profit organizations, calls for political purposes, and calls for other noncommercial purposes, including those that deliver purely informational messages such as school closings. Our rules for these calls will continue to permit oral consent if made to wireless consumers and other specified recipients, and will continue to require no prior consent if made to residential wireline consumers. [73] Commenters support distinguishing telemarketing calls from non-telemarketing, informational calls. For instance, the National Cable & Telecommunications Association has urged that a written consent requirement should apply only to telemarketing calls and notes that its members make informational, non-telemarketing calls to wireless phones that should not be subject to a written consent requirement. [74] The National Council of Higher Education Loan Programs and the Educational Finance Council also seek clarification that the written consent requirement will be limited to telemarketing calls. [75] Additionally, we note that many commenters expressed concern about obtaining written consent for certain types of autodialed or prerecorded calls, including debt collection calls, airline notification calls, bank account fraud alerts, school and university notifications, research or survey calls, and wireless usage notifications. [76] Again, such calls, to the extent that they do not contain telemarketing messages, would not require any consent when made to residential wireline consumers, but require either written or oral consent if made to wireless consumers and other specified recipients. [77]

 **9  29. While we observe the increasing pervasiveness of telemarketing, we also acknowledge that wireless services offer access to information that consumers find highly desirable and thus do not want to discourage purely informational messages. As was roundly noted in the comments, wireless use has expanded tremendously since passage of the TCPA in 1991. [78] We believe that requiring prior express written consent for all robocalls to wireless numbers would serve

APPENDIX 3

Case 3:16-cv-01320-NJR-SCW   Document 20-3   Filed 10/03/17   Page 9 of 45   Page ID #306

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

as a disincentive to the provision of services on which consumers have come to rely. [79] Moreover, in adopting these rules today, we employ **1842** the flexibility Congress afforded to address new and existing technologies and thereby limit the prior express written consent requirement to autodialed or prerecorded telemarketing calls. [80] In addition, we note that Section 227(b)(1)(A) and our implementing rules continue to require some form of prior express consent for autodialed or prerecorded non-telemarketing calls to wireless numbers. [81] We also maintain the requirement of prior express consent for autodialed or prerecorded non-telemarketing calls to wireless numbers that are not subject to any exemptions under Section 227(b)(2) of the Act. We leave it to the caller to determine, when making an autodialed or prerecorded *non-telemarketing* call to a wireless number, whether to rely on oral or written consent in complying with the statutory consent requirement. [82]

30. Some commenters also express concern that written consent for autodialed or prerecorded calls that offer certain home loan modifications and refinancing would frustrate their compliance with the American Recovery and Reinvestment Act, also known as the Recovery Act, which established certain outreach requirements designed to prevent foreclosure. [83] These commenters assert that the calls may be interpreted as telephone solicitations because certain fees or charges to the consumer may be involved. These commenters note that calls and messages made pursuant to the Recovery Act also include non-telemarketing information regarding the status of the consumer's loan and repayment options, among other things. In the *2003 TCPA Order*, the Commission articulated a standard in evaluating "dual-purpose" robocalls. The Commission asserted that in evaluating dual-purpose calls, it would determine whether the call includes an advertisement. [84] The Commission provided that if the call, notwithstanding its free offer or other information, is intended to offer property, goods, or services for sale either during the call, or in the future, that call is an advertisement. [85]

31. We believe that the intent of calls made pursuant to the Recovery Act, when the call is made by the consumer's loan servicer, is to fulfill a statutory requirement rather than offer a service for sale. Similarly, the Commission, in analyzing telephone solicitation, states that the application of the **1843** prerecorded message rule should turn, not on the caller's characterization of the call, but on the purpose of the message. [86] Again, we believe that the predominant purpose of a "Recovery Act" call, when it is made by the consumer's loan servicer, is compliance with the Recovery Act. In this instance, we find that the home loan modification and refinance calls placed pursuant to the Recovery Act generally [87] are not solicitation calls and do not include or introduce an unsolicited advertisement, when those calls are made by the consumer's loan servicer, because the primary motivation of the calling party is to comply with that statute's outreach requirements. We note, however, that should such calls be challenged as TCPA violations because the primary motivation appears to be sending a telephone solicitation or unsolicited advertisement rather than complying with the Recovery Act, we will consider the facts on a case-by-case basis. Further, if a "Recovery Act" robocall is made to a wireless number, prior express consent, which may be either oral or written, is specifically required pursuant to the Act. [88]

**10** 32. *Content and Form of Consent*. With respect to written consent, the Commission has indicated that the term "signed" may include an electronic or digital form of signature, to the extent such form of signature is recognized as a valid signature under applicable federal or state contract law. [89] Under the FTC's rules, prior express consent to receive prerecorded telemarketing calls must be in writing. [90] The FTC's rules require that the written agreement must be signed by the consumer and be sufficient to show that he or she: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. [91] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service." [92] The FTC has determined that written agreements obtained in compliance with the E-SIGN Act [93] will satisfy the requirements of its rule, such as, for example, agreements obtained via an email, website form, text message,

In the Matter of Rules and Regulations Implementing the..., 27 F.C.C. Rcd. 1830...

telephone keypress, or **1844** voice recording. Finally, under the TSR, the seller bears the burden of proving that a clear and conspicuous disclosure was provided, and that an unambiguous consent was obtained. [94]

33. Consistent with the FTC's TSR, we conclude that a consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. [95] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service." [96] Finally, should any question about the consent arise, the seller will bear the burden of demonstrating that a clear and conspicuous disclosure was provided and that unambiguous consent was obtained. [97]

34. *Electronic Consent*. In the *2010 TCPA NPRM*, the Commission proposed to allow sellers or telemarketers to obtain prior express written consent using any medium or format permitted by the E-SIGN Act, as the FTC permits in the TSR. [98] The FTC specifically found that consent obtained via an email, website form, text message, telephone keypress, or voice recording are in compliance with the E-SIGN Act and would satisfy the written consent requirement in the amended TSR. [99] Consistent with the FTC, we now similarly conclude that consent obtained in compliance with the E-SIGN Act will satisfy the requirements of our revised rule, including permission obtained via an email, website form, text message, telephone keypress, or voice recording. [100] Allowing documentation of consent under the E-SIGN Act will minimize the costs and burdens of acquiring prior express written consent for autodialed or prerecorded telemarketing calls while protecting the privacy interests of consumers. Because it greatly minimizes the burdens of acquiring written consent, commenters generally support using electronic signatures consistent with the E-SIGN Act. [101] We conclude that the E-SIGN Act significantly facilitates our written consent requirement, while minimizing any additional costs associated with implementing the requirement.

**1845  2. Established Business Relationship Exemption**

**11  35. We next consider whether to retain the exemption to the prior consent requirement for prerecorded telemarketing calls made to consumers with whom the caller has an established business relationship (EBR). [102] In making our determination here, we are again mindful of the statutory goal of maximizing consistency with the FTC's regulations in this area. [103] As described below, we eliminate the established business relationship exemption for prerecorded telemarketing calls to residential lines.

36. *The FCC's Rules*. In the *1992 TCPA Order*, the Commission allowed, without the need for additional consent, prerecorded telemarketing calls to residential lines when the caller has an established business relationship with the consumer. [104] The Commission concluded, based on the record and legislative history, that a solicitation to someone with whom a prior business relationship exists does not adversely affect consumer privacy interests because a consumer with an established business relationship implicitly consents to the call. [105] Such a solicitation, the Commission reasoned, can be deemed to be invited or permitted by the consumer. [106] In addition, the Commission relied on the legislative history, which suggests that Congress did not intend that the TCPA unduly interfere with ongoing business relationships. [107] The Commission later codified in its rules the EBR exemption for telemarketing calls to residential lines. [108]

37. *The FTC's Approach*. The FTC has recently taken a different view of whether an established business relationship alone should allow prerecorded telemarketing calls when there is no prior express consent. [109] In its 2008 amendment to the TSR, the FTC terminated its previously announced policy of forbearing from bringing enforcement actions against

APPENDIX 3

sellers and telemarketers who, in accordance with a safe harbor that was proposed in November 2004, made calls that deliver prerecorded messages to consumers with whom the seller has an EBR. [110] In reaching this conclusion, the FTC was persuaded by the number of comments opposing its safe harbor rule, lack of consumer **1846** confidence in industry assurances to self-regulate and not abuse consumers, consumer privacy concerns, and the difficulty in stopping unwanted calls. [111]

38. At the outset, we note that there is no statutory barrier to eliminating the established business relationship exemption for prerecorded telemarketing calls. Section 227 of the Act grants the Commission authority to create exemptions to the restrictions on prerecorded calls to residential lines but does not require that we recognize an EBR exemption in this context. [112] Hence, the statute gives the Commission authority to establish - or not establish - an EBR exemption for prerecorded telemarketing calls. While, as noted above, the Commission previously interpreted the statute to permit an EBR exemption and did adopt one, additional experience, the record before us, and evidence of ongoing consumer frustration lead us to conclude that the exemption has adversely affected consumer privacy rights. [113]

 **\*12** 39. Based on the record in this proceeding and the volume of complaints filed by consumers that have an established business relationship with the caller, and consistent with the FTC's findings, we conclude that the public interest would be served by eliminating the established business relationship exemption for telemarketing calls. As such, telemarketing calls to residential lines will require prior written consent, even where the caller and called party have an EBR.

40. In general, consumer groups and individual commenters in this proceeding support eliminating the established business relationship exemption. For example, some commenters assert that a reasonable consumer would consider prerecorded telemarketing messages even where an EBR exists to be coercive or abusive of the consumer's right to privacy. [114] Another commenter contends that businesses falsely claim to have an EBR when none exists, or improperly expand the scope of their business relationships with customers to permit calls. [115] One commenter objects to the notion that consumers welcome or expect prerecorded messages from companies with which they conduct business. [116] Two other commenters argue that telemarketing calls should not be "deemed invited" by virtue of an EBR and assert that prerecorded telemarketing calls are intrusive whether or not the caller has a preexisting relationship with the recipient. [117] Business groups and industries, however, support retention of the exemption because, they assert, communication between businesses and their customers would be significantly impeded without it. [118] Another commenter reiterates the Commission's 1992 determination that the exemption does not adversely affect the consumer's privacy interests. [119] We disagree with commenters advocating retention of the EBR for the reasons described below.

 **\*1847** 41. Our complaint data show that thousands of consumers remain unhappy with prerecorded telemarketing messages even when they have an established business relationship with the caller. We find these complaints to be a clear indication that many consumers do not consider prerecorded calls made pursuant to an established business relationship either invited or expected. Consistent with our data, the FTC has found "compelling evidence that consumer aversion to artificial or prerecorded message telemarketing - regardless of whether an established business relationship exists - has not diminished since enactment of the TCPA, which, in no small measure, was prompted by consumer outrage about the use of artificial or prerecorded messages." [120] More than 13,000 comments opposing an EBR exemption were received on the issues presented in the FTC's proceeding, and, the FTC concluded, such opposition to artificial or prerecorded telemarketing messages could not be ignored. [121] The FTC subsequently decided to discontinue its recognition of an EBR exemption for prerecorded telemarketing calls. [122]

 **\*\*13** 42. Complaints about EBR-based calls demonstrate that, in many cases, a prior business relationship does not necessarily result in a consumer's willingness to receive prerecorded telemarketing calls and often adversely affects

Case 3:16-cv-01320-NJB-SCW   Document 20-3   Filed 10/03/17   Page 12 of 45   Page ID #309

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

consumer privacy rights. We emphasize that our decision to eliminate the established business relationship exemption is consistent with the FTC's findings rejecting an EBR exemption and the DNCIA's requirement that the Commission "maximize consistency" with the FTC's approach in this area. In doing so, we ensure that all telemarketers subject to federal law are given clear and consistent guidance regarding the circumstances under which prior express consent must be obtained from consumers before making prerecorded telemarketing calls. We believe that our decision here strikes an appropriate balance between preserving ongoing business relationships and protecting consumer privacy, as intended by Congress. [123] Since the enactment of the TCPA and our creation of an established business relationship exemption, methods for efficiently obtaining electronic consent have been developed and have been legally recognized by the E-SIGN Act. [124] These newer consent options have significantly facilitated business relationships while, at the same time, allowing consumers to affirmatively choose whether they wish to receive prerecorded telemarketing calls before such calls invade their privacy. [125]

43. While commenters' assertions that eliminating the EBR exemption will impede business communications suggest that there are compliance costs associated with this new rule, commenters do not, however, quantify any such costs. In light of the fact that the FTC's rules have been in place for more than two years, we believe that compliance costs, if substantial, should be known. Commenters have failed to put forward evidence of such costs, however. Nevertheless, elimination of the EBR will require telemarketers to secure consent from consumers in some cases where they would not have obtained consent under the current rules. As with the other changes we adopt today, many telemarketers are already free to market without benefit of the EBR for entities under FTC jurisdiction, and given the absence of record evidence on the incremental cost of complying with our changes, we lack a basis for finding that the costs outweigh the substantial consumer benefits. For those entities that currently rely on **1848** the EBR exemption, we note that our rules require "clear and convincing evidence" that an EBR exists. [126] Although commenters opposing elimination of the EBR exemption have not provided information on compliance costs, we note that the incremental cost resulting from our action is offset to some degree by the costs that these entities already incur to retain "clear and convincing evidence." We believe that any additional cost incurred by having to obtain written consent is further lowered by the option of using electronic measures consistent with E-SIGN.

### 3. Opt-Out Mechanism

**14** 44. We next consider whether to require an automated opt-out mechanism that would allow consumers to bar unwanted prerecorded telemarketing calls. [127] The FTC has recently required such an automated opt-out mechanism, and we now consider how we can maximize consistency with its approach. We adopt an automated, interactive opt-out requirement for autodialed or prerecorded telemarketing calls.

45. *The FCC's Rules*. Under our existing rules, a consumer who does not wish to receive further prerecorded telemarketing calls can "opt out" of receiving such calls by dialing a telephone number (required to be provided in the prerecorded message) to register his or her do-not-call request. Specifically, our rules require that, at the beginning of all artificial or prerecorded message calls, the message identify the entity responsible for initiating the call (including the legal name under which the entity is registered to operate), [128] and during or after the message, provide a telephone number that consumers can call during regular business hours to make a company-specific do-not-call request. [129]

46. *The FTC's Rule*. The FTC's TSR, as amended in 2008, requires, with limited exception, that any artificial or prerecorded message call that could be answered by the consumer in person provide an interactive opt-out mechanism that is announced at the outset of the message and is available throughout the duration of the call. [130] The opt-out mechanism, when invoked, must automatically add the consumer's number to the seller's do-not-call list and immediately disconnect the call. [131] Where a call could be answered by the consumer's answering machine or voicemail service, the

**APPENDIX 3**

Case 3:16-cv-01320-NJR-SCW   Document 20-3   Filed 10/03/17   Page 13 of 45   Page ID #310

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

message must also include a toll-free number that enables the consumer to subsequently call back and connect directly to an autodialed opt-out mechanism. [132]

47. Based on the record, we revise our rules to require any artificial or prerecorded message call that could be answered by the consumer in person provide an interactive opt-out mechanism that is **\*1849** announced at the outset of the message and is available throughout the duration of the call. [133] In addition, the opt-out mechanism, when invoked, must automatically add the consumer's number to the seller's do-not-call list and immediately disconnect the call. Where a call could be answered by the consumer's answering machine or voicemail service, the message must also include a toll-free number that enables the consumer to subsequently call back and connect directly to an autodialed opt-out mechanism. We adopt these rules to enable consumers to control their exposure to, and continued participation in, prerecorded telemarketing calls and to harmonize our opt-out rules with the FTC's TSR, consistent with the Congressional intent expressed by the DNCIA. We note that the TCPA does not require implementation of a particular opt-out mechanism. Rather, the TCPA provides that the Commission shall prescribe technical and procedural standards for systems that are used to transmit any prerecorded voice message via telephone and provides two elements that the Commission must include in its standards. [134]

**\*\*15** 48. We believe that the automated, interactive opt-out mechanism we adopt will empower consumers to revoke consent if they previously agreed to receive autodialed or prerecorded telemarketing calls and stop receipt of unwanted, autodialed or prerecorded telemarketing calls to which they never consented. [135] The record developed in the FTC proceeding includes an industry analysis showing, among other things, that consumers are four times more likely to opt out of a prerecorded call that has an automated, interactive opt-out mechanism as opposed to opting out of a prerecorded call that provides a toll-free number for the consumer to call during business hours. [136] This analysis suggests that consumers are reluctant to use toll-free numbers to end unwanted telemarketing calls. [137] The majority of commenters in this proceeding who address this issue support an automated, interactive opt-out mechanism for telemarketing calls. [138] For instance, the National Consumer Law Center states that the Commission's current opt-out mechanism, which requires a separate call to the telemarketer, is far less useful or protective of a consumer's privacy, and thus advocates adopting the more consumer-friendly automated, interactive opt-out mechanism. [139] While a few commenters assert that we should apply the automated, interactive opt-out requirement to both non-telemarketing and telemarketing calls, [140] we decline to do so at this time because the record does not reveal a level of consumer frustration with non-telemarketing calls that is equal to that for telemarketing calls. We therefore limit the automated, interactive opt-out requirement that we adopt today to autodialed or prerecorded telemarketing calls.

**\*1850** 49. We emphasize that an entity placing an otherwise unlawful autodialed or prerecorded call cannot shield itself from liability simply by complying with our opt-out and identification rules. Furthermore, the revised rules we adopt today do not alter the current technical and procedural standards as applied to non-telemarketing, informational calls. [141] We maintain our identification and contact information requirements in Section 64. 1200(b) of the Commission's rules. We also take this opportunity to stress that the identification and contact information must be valid, verifiable, and actionable.

**B. Abandoned Calls/Predictive Dialers**

50. We next decide whether to adopt rules that are consistent with the FTC's method for determining whether a telemarketer's "abandoned" call rate is within the lawful numerical limits for such calls. [142] Based on the record, we modify our abandoned call rule to require that the three percent call abandonment rate be calculated for each calling campaign.

APPENDIX 3

51. *The FCC's Rules*. Predictive dialers initiate phone calls while telemarketers are talking to other consumers and frequently disconnect those connected calls when a telemarketer is otherwise occupied and unavailable to take the next call, resulting in a hang-up or dead-air call. [143] Under the Commission's rules, an outbound telephone call is deemed "abandoned" if a person answers the telephone and the caller does not connect the call to a sales representative within two seconds of the called person's completed greeting. [144] The Commission's existing rules restrict the percentage of live telemarketing calls that a telemarketer may drop (or abandon) as a result of predictive dialers. [145] Specifically, a seller or telemarketer would not be liable for violating the two-second restriction if, among other things, it employs technology that ensures abandonment of no more than three percent of all calls answered by the called person (rather than by an answering machine). [146] The Commission's existing call abandonment rule measures the abandonment rate over a 30-day period, but contains no "per-calling-campaign" limitation. [147]

**\*\*16** 52. *The FTC's Rule*. As does our rule, the FTC's TSR deems an outbound telephone call to be "abandoned" if the called person answers the telephone and the caller does not connect the call to a sales representative within two seconds of the called person's completed greeting. [148] Under the TSR, a seller or telemarketer is not liable for violating the prohibition on call abandonment if, among other things, the seller or telemarketer employs technology that ensures abandonment of no more than three percent of all calls answered by a person (rather than by an answering machine) for the duration of a *single calling campaign*, if the campaign is less than 30 days, or separately over each successive 30-day period or portion thereof during which the calling campaign continues. [149]

**\*1851** 53. We revise our rules to match the FTC's and require assessment of the call abandonment rate to occur during a single calling campaign over a 30-day period, and if the single calling campaign exceeds a 30-day period, we require that the abandonment rate be calculated each successive 30-day period or portion thereof during which the calling campaign continues. Our revised requirement will deprive telemarketers of the opportunity to average abandoned calls across multiple calling campaigns, which can result in targeting abandoned calls to less desirable consumers, a form of robocall "redlining." [150]

54. Several commenters support our proposed rules, and several oppose them. Michigan PSC, NASUCA, and SmartReply generally support the proposed rule and favor harmonization of the Commission rule with the FTC's rule. [151] Bank of America (BofA) opposes the per-calling campaign measurement because, BofA asserts, it does not engage in the kind of rate manipulation the proposed rule attempts to address. [152] The Newspaper Association of American opposes the per-campaign modification to the Commission's existing rule because it claims that the rule would adversely impact smaller organizations that utilize shorter calling lists. [153] Roylance opposes the proposed rule and instead argues that a per-day measurement should be used to ensure a reduction in the abandoned call rate and that a per-telephone number limitation, without regard to the number of telemarketers or campaigns, should be imposed to ensure that the consumer does not receive more than a certain number of abandoned calls to a certain telephone number. [154] Although BofA claims that it has not calculated the abandoned call rate based upon multiple calling campaigns, no commenter in this proceeding provided industry data regarding the occurrence of averaging over multiple calling campaigns. [155] We note, however, that the Connecticut Attorney General supported the FTC's per-calling campaign limitation, as did several consumer commenters. [156]

55. We decline to adopt a "per-day" assessment of the abandonment rate instead of the 30-day assessment, as urged by some commenters. [157] In changing its per-day, per-calling campaign assessment to a 30-day, per-calling campaign assessment, the FTC noted that the biggest problem with the per-day calculation is adjusting for the unexpected spikes in answered and abandoned calls. [158] As the FCC has previously noted, a rate measured over a longer period of time will allow for reasonable variations in telemarketing calling campaigns such as calling times, number of operators

**APPENDIX 3**

Case 3:16-cv-01320-NJR-SCW    Document 20-3   Filed 10/03/17    Page 15 of 45    Page ID #312

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

available, number of telephone lines used by the call centers, and similar factors. [159] This allowance alleviates some of the difficulties experienced by small businesses that use a smaller calling list. Thus, we find it **\*1852** necessary to maintain the 30-day time period for measurement of abandoned calls. [160] We also decline to adopt a "per-telephone number" assessment of the abandoned call rate instead of the 30-day assessment as noted above by one commenter. The cost implementing a per-telephone number limitation would outweigh the benefit of the extra measure of protection against abandoned calls.

**\*\*17**  56. In addition, we will apply the term "campaign" as defined by the FTC. In the *2008 TSR*, the FTC defines "campaign" as "the offer of the same good or service for the same seller." [161] So long as a telemarketer is offering the same good or service for the same seller, we will regard the offer as part of a single campaign, irrespective of whether telemarketing scripts used to convey the offer use or contain different wording.

## C. Exemption for Health Care-Related Calls Subject to HIPAA

57. We next consider whether prerecorded calls subject to the Health Insurance Portability and Accountability Act of 1996 (HIPAA) [162] should be exempt from our TCPA consent, identification, time-of-day, opt-out, and abandoned call rules. [163] Once again, as contemplated by the DNCIA, we consider the FTC's approach to this issue so that we "maximize consistency" with the FTC's TSR. The HIPAA statute strives to improve portability and continuity of health insurance coverage in the group and individual markets, to combat waste, fraud, and abuse in health insurance and health care delivery, to promote the use of medical savings accounts, to improve access to long-term care services and coverage, and to simplify the administration of health insurance, among other purposes. [164] HIPAA also gives individuals important controls over whether and how their protected information is used and disclosed for marketing purposes. [165] With limited exceptions, HIPAA requires an individual's written authorization before his or her protected health information can be used or disclosed for marketing purposes. [166] In view of the privacy protections afforded under HIPAA, we exempt from our consent, identification, time-of-day, opt-out, and abandoned call requirements all prerecorded health care-related calls to residential lines that are subject to HIPAA.

58. *The FCC's Statutory Authority*. The Act provides that the Commission may establish exemptions from the prohibitions on prerecorded voice calls to residential lines. Specifically, Section 227(b)(2)(B) of the TCPA provides, in relevant part, that two types of calls may be exempted: "(i) calls that are not made for a commercial purpose, *and* (ii) such classes or categories of calls made for commercial purposes as the Commission determines (I) will not adversely affect the privacy rights that **\*1853**  this section is intended to protect; *and* (II) do not include the transmission of any unsolicited advertisement." [167]

59. *The FTC's Approach*. In its 2008 amendment to the TSR, the FTC exempted health care-related prerecorded message calls subject to HIPAA from its restrictions on such calls, basing its determination on six primary considerations. [168] First, the FTC found that delivery of health care-related prerecorded calls subject to HIPAA is already regulated extensively at the federal level. [169] Second, it found that coverage of such calls by the TSR could frustrate the Congressional intent embodied in HIPAA, as well as other federal statutes governing health care-related programs. [170] Third, the FTC found that the number of health care providers who might call a patient is inherently quite limited--as is the scope of the resulting potential privacy infringement--in sharp contrast to the virtually limitless number of businesses potentially conducting commercial telemarketing campaigns. [171] Fourth, the FTC found that there is no incentive, and no likely medical basis, for providers who place health care-related prerecorded calls to attempt to boost sales through an ever-increasing frequency or volume of calls. [172] Fifth, the FTC concluded that the existing record did not show that "the reasonable consumer" would consider prerecorded health care calls coercive or abusive. [173] Finally, FTC

APPENDIX 3

Case 3:16-cv-01320-NJR-SCW   Document 20-3   Filed 10/03/17   Page 16 of 45   Page ID #313

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

enforcement experience did not suggest that health care-related calls have been the focus of the type of privacy abuses the exemption was intended to remedy. [174] For these reasons, the FTC determined, pursuant to both its authority under the Telemarketing Act and its authority under the FTC Act, that health care-related prerecorded message calls subject to HIPAA should be exempt from the TSR because application of the TSR to such calls "is not necessary to prevent the unfair or deceptive act or practice [that harms consumer privacy] to which the [TSR] relates." [175]

**18** 60. For the reasons discussed herein and consistent with the FTC's action, we exempt from our consent, identification, time-of-day, opt-out, and abandoned call requirements applicable to prerecorded calls all health care-related calls to residential lines subject to HIPAA. Establishing this exemption advances the statutory goal of maximizing consistency with the FTC's rules, and our record affirmatively supports adopting the FTC's approach. [176] Therefore, pursuant to Section 227(b)(2)(B) of **1854** the Act, which allows the Commission to establish an exemption for specified prerecorded calls that are commercial in nature if such calls will not adversely affect consumer privacy rights and do not include an unsolicited advertisement, [177] we find that prerecorded calls to residential lines that are subject to HIPAA should be exempted from the consent, identification, time-of-day, opt-out, and abandoned call requirements under our TCPA rules. Furthermore, we agree with commenters that assert these calls serve a public interest purpose: to ensure continued consumer access to health care-related information. [178]

61. As has the FTC, we find that HIPAA's existing protections, which we describe below, already safeguard consumer privacy, and we therefore do not need to subject these calls to our consent, identification, opt-out, and abandoned call rules. We note at the outset that HIPAA regulations cover all communications regarding protected health information and all means of communication regarding such information. The Department of Health and Human Services (HHS) explains that HIPAA protects individually identifiable health information held or transmitted by a covered entity or its business associate, in any form or media, whether electronic, paper, or oral. [179] In addition to limiting the use or disclosure of health information for treatment, payment, or health care operations or otherwise permitted or required disclosures, HIPAA restricts the use of this information for marketing. [180] Unless the covered entity secures the individual's written authorization, HIPAA allows marketing only if the communication imparts information about a product or service that is included in a health care benefits plan offered by the covered entity, gives information concerning treatment, or describes goods or services for case management or care coordination. [181] It is also noteworthy that HIPAA applies its regulations not only to certain uses or disclosures by the covered entity, but also extends HIPAA obligations, without exception, to third parties to which covered entities disclose protected health information. [182] Violations of HIPAA are subject to civil penalties [183] and criminal penalties, including possible imprisonment. [184]

**1855** 62. All health care industry commenters support a consent exemption for health care-related prerecorded calls subject to HIPAA. [185] Among those opposing the exemption, one commenter states without elaboration that an exemption should not be established for health care-related prerecorded marketing calls. [186] Although it is unclear from the comment, this commenter may not understand that restrictions imposed by HIPAA would restrain any such marketing calls. A second commenter opposes a HIPAA exemption but misjudges the effect of an exemption, not acknowledging that without an exemption, calls permitted by HIPAA would be prohibited by our existing rules [187] and not acknowledging that HIPAA provides rigorous privacy protections and penalties. [188]

**19** 63. In the FTC's TSR proceeding, concern was raised, in relevant part, whether immunization reminders, health screening reminders, medical supply renewal requests, and generic drug migration recommendations would constitute inducements to purchase goods or services. [189] In our proceeding, one commenter argues that a call "pushing" flu vaccines would be illegal under the TCPA. [190] Without reaching the merits of this argument, we do believe that an exemption for prerecorded health care-related calls to residential lines is warranted when such calls are subject to HIPAA.

APPENDIX 3

Case 3:16-cv-01320-NJR-SCW Document 20-3 Filed 10/03/17 Page 17 of 45 Page ID #314

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

With respect to the privacy concerns that the TCPA was intended to protect, [191] we believe that prerecorded health care-related calls to residential lines, when subject to HIPAA, do not tread heavily upon the consumer privacy interests because these calls are placed by the consumer's health care provider to the consumer and concern the consumers' health. [192] Moreover, the exemption we adopt today does not leave the consumer **1856** without protection. The protections provided by HIPAA safeguard privacy concerns. [193] Under the second prong of the TCPA exemption provision, which requires that such calls not include an unsolicited advertisement, [194] we find the calls at issue here are intended to communicate health care-related information rather than to offer property, goods, or services and conclude that such calls are not unsolicited advertisements. [195] Therefore, such calls would satisfy the TCPA standard for an exemption as provided in the Act and our implementing rules.

64. Third, a commenter anticipates abuse of the HIPAA marketing definition and suggests that robocalling a neighborhood to alert persons that the calling entity will provide immunizations would be allowed under HIPAA. [196] HHS enforcement measures of HIPAA discourage abuse because these measures include civil and criminal penalties. [197] Lastly, one commenter that opposes the HIPAA exemption questions the Commission's authority to adopt such an exemption. [198] Because we conclude that prerecorded, health care-related calls, subject to HIPAA, to residential lines do not constitute an unsolicited advertisement and will not adversely affect the privacy rights that the Act was intended to protect, the Act allows the Commission to establish an exemption for such calls, and we do so today. [199]

65. In sum, based on the record and the HIPAA requirements, we agree with the FTC approach under the TSR and are persuaded that the HIPAA privacy regulations are rigorous and reflect a statutory mission to protect privacy rights. HHS enforcement measures of HIPAA discourage abuse because these measures include civil and criminal penalties. [200] We therefore adopt an exemption from our TCPA rules for prerecorded health care-related calls to residential lines that are subject to HIPAA. In those instances where the prerecorded health care-related call is not covered by HIPAA, as determined by HHS, restrictions imposed by the TCPA and our implementing rules will apply as the facts warrant.

**D. Implementation**

**\*\*20** 66. Finally, we address the timing and cost of implementing the rules we adopt in this Order. [201] We seek to ensure that the consumer protection measures we adopt are timely implemented so that consumers can realize the benefits, while allowing a reasonable time for affected parties to implement **1857** necessary changes in a way that makes sense for their business models. Each of our implementation periods is consistent with the implementation periods adopted by the FTC. [202] Specifically, we establish a twelve-month period for implementation of the requirement that prior express consent be in writing for telemarketers employing autodialed or prerecorded calls or messages. This twelve-month period will commence upon publication of OMB approval of our written consent rules in the Federal Register. In connection with the implementation of the written consent requirement for telemarketing robocalls, we will phase out the established business relationship exemption over the same twelve month period that follows publication of OMB approval of our written consent rule in the Federal Register. To reiterate, we allow telemarketers twelve months from publication of OMB approval of our written consent rules to cease utilization of the established business relationship as evidence of consumer consent to receive prerecorded telemarketing calls. Second, we establish a 90-day implementation period for the automated, interactive opt-out mechanism for telemarketing calls, again commencing upon publication of OMB approval of our opt-out rules in the Federal Register. Finally, we establish a 30-day implementation period for the revised abandoned call rule, also commencing upon publication of OMB approval of our abandoned calls rule in the Federal Register.

67. Based on our review of the record and the considerations noted above, we adopt implementation timetable as described herein. Although industry commenters focused their remarks on the time that would be needed for

APPENDIX 3

implementing a prior express written consent requirement for non-telemarketing calls,[203] they did not address implementation where the proposed consent requirement was limited to telemarketing calls. We find that establishing a twelve month implementation period for the written consent requirement is appropriate because, as noted in the FTC proceeding, it will take time for businesses to redesign web sites, revise telemarketing scripts, and prepare and print new credit card and loyalty program applications and response cards to obtain consent from new customers, as well as to use up existing supplies of these materials and create new record-keeping systems and procedures to store and access the new consents they obtain.

68. One commenter in this proceeding supports the use of consent obtained under the Commission's existing rules to authorize continued autodialed or prerecorded calls for a limited period of time.[204] Because allowing telemarketers to rely on such consent pending the effective date of our new written consent requirement would ease the operational and technical transition for autodialed or prerecorded voice telemarketing calls, we find that it would serve the public interest to permit continued use of existing consents for an interim period. For example, in cases where a telemarketer has not obtained prior written consent under our existing rules, we will allow such telemarketer to make autodialed or prerecorded voice telemarketing calls until the effective date of our written consent requirement, so long as it has obtained another form of prior express consent. Once our written consent rules become effective, however, an entity will no longer be able to rely on non-written forms of express consent to make autodialed or prerecorded voice telemarketing calls, and thus could be liable for making such calls absent prior written consent.

**21 69. With respect to the 90-day implementation period for the automated, interactive opt-out mechanism for telemarketing calls, there is no indication in our record that implementing the proposed opt-out mechanism would be especially burdensome or pose extraordinary technical issues. Moreover, the FTC observed in its proceeding, that industry comments uniformly represent that interactive technology is affordable and widely available.[205] In addition, we believe that the implementation *1858 circumstances associated with our revised abandonment rate measurement rules merit a 30-day allotment of time for compliance. None of the commenters on the proposed abandoned call rule requested any delay to give affected entities sufficient time to comply. Having received no input regarding the implementation period needed to implement the abandoned call rule, we believe the appropriate time for implementation of this revised rule is also 30 days after publication of OMB approval of this rule in the Federal Register.

70. In the *2010 TCPA NPRM*, we asked for comment on the incremental costs of implementing our proposals to require written consent.[206] With one exception (elimination of the EBR, which we address above), industry commenters do not substantially oppose the proposals we adopt today.[207] As described above, neither telemarketers nor sellers oppose the written consent requirement for telemarketing robocalls -- we would have expected such opposition if compliance costs were material. Many, perhaps the vast majority, of telemarketers already have processes in place to comply with this requirement. Hence, with the exception of the limited group of entities that are outside the FTC's jurisdiction, we expect that many telemarketers affected by our changes today have already incurred the cost of implementing a written consent requirement, have already given up reliance on the EBR as a basis for making robocalls without prior express consent, have implemented an automated opt-out mechanism, and are calculating the call abandonment rate on a per-campaign basis. Because there is little record opposition to these changes, other than elimination of the EBR, and because many affected entities should already have processes in place to comply with the changes and of the availability of electronic means to obtain written consent, we find no reason to conclude that the consumer benefits that will result from these changes are outweighed by the associated costs.

71. Finally, to the extent that there are compliance costs resulting from our action, we find that the implementation periods we adopt here -- 30 days from publication of OMB approval for the abandoned call rule, 90 days from publication of OMB approval for the automated, interactive opt-out requirement, and one year from publication of OMB approval for the written consent requirement and phase-out of the EBR exemption -- should allow covered entities time to find

cost-efficient ways to comply with these changes, to the extent they have not already made such changes to comply with the FTC's rules.

## IV. PROCEDURAL MATTERS

### A. Regulatory Flexibility Act Analysis

**\*\*22** 72. Pursuant to the Regulatory Flexibility Act of 1980, [208] as amended, the Commission's Final Regulatory Flexibility Analysis in this Order is attached as Appendix C.

### \*1859 B. Paperwork Reduction Act Analysis

73. This Order contains modified information collections subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. It will be submitted to the Office of Management and Budget (OMB) for review under § 3507(d) of the PRA. OMB, the general public, and other Federal agencies are invited to comment on the modified information collections contained in this proceeding.

### C. Late-Filed Comments

74. We note that there were comments filed late in this proceeding. In the interest of having as complete and accurate a record as possible, and because we would be free to consider the substance of those filings as part of the record in this proceeding in any event, [209] we will accept late-filed comments and waive the requirements of 47 C.F.R. § 1.46(b), and have considered them in this Order.

### D. Materials in Accessible Formats

75. To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an email to fcc504 @fcc.gov or call the Consumer & Governmental Affairs Bureau at (202) 418-0531 (voice), (202) 418-7365 (TTY). This Report and Order can also be downloaded in Text and ASCII formats at: http://www.fcc.gov/cgb/policy/telemarketing.html.

## V. ORDERING CLAUSES

76. Accordingly, IT IS ORDERED, pursuant to the authority contained in Sections 1-4, 222, 227, and 303(r) of the Communications Act of 1934, as amended; 47 U.S.C. §§ 151-154, 222, 227, and the Do-Not-Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557, that the Report and Order in CG Docket No. 02-278 IS ADOPTED, and that Part 64 of the Commission's rules, 47 C.F.R. Part 64.1200, is amended as set forth in Appendix A. The requirements of this Report and Order shall become effective as specified in paragraphs 66-71 herein. The rules containing information collections, which require approval by OMB under the PRA, shall become effective after the Commission publishes a notice in the *Federal Register* announcing such approval and the relevant effective dates.

77. IT IS FURTHER ORDERED that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Report and Order, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION

**\*\*23** Marlene H. Dortch

**APPENDIX 3**

Case 3:16-cv-01320-NJR-SCW   Document 20-3   Filed 10/03/17   Page 20 of 45   Page ID #317

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

Secretary

*1860  APPENDIX A

Final Rules

Part 64 of the Code of Federal Regulations is amended as follows:


PART 64 -- Subpart L -- Restrictions on Telemarketing, Telephone Solicitation, and Facsimile Advertising

1. The authority citation for part 64 is amended to read as follows:

Authority: 47 U.S.C. 154, 254(k); §§ 403(b)(2)(B), (C), Public Law 104-104, 110 Stat. 56. Interpret or apply 47 U.S.C. §§ 201, 218, 222, 225, 226, 227, 228, and 254(k) unless otherwise noted.


2. Section 64.1200(a) is amended by redesignating paragraphs (a)(2) through (a)(7) as paragraphs (a)(3) through (a)(8), and by revising paragraph (a)(1), adding a new paragraph (a)(2), and revising redesignated paragraphs (a)(3), (a)(4), and (a)(7) to read as follows:


(a) * * *

(1) Except as provided in paragraph (a)(2), initiate any telephone call (other than a call made for emergency purposes or is made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice;

* * *

(2) Initiate, or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to any of the lines or telephone numbers described in paragraphs (a)(1)(i)-(iii) of this section, other than a call made with the prior express written consent of the called party or the prior express consent of the called party when the call is made by or on behalf of a tax-exempt nonprofit organization, or a call that delivers a "health care" message made by, or on behalf of, a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 45 C.F.R. § 160.103.

(3) Initiate any telephone call to any residential line using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party, unless the call;

(i) Is made for emergency purposes;

(ii) Is not made for a commercial purpose;

(iii) Is made for a commercial purpose but does not include or introduce an advertisement or constitute telemarketing;

(iv) Is made by or on behalf of a tax-exempt nonprofit organization; or

(v) Delivers a "health care" message made by, or on behalf of, a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 45 C.F.R. § 160.103.

(4) * * *

(iii) * * *

APPENDIX 3

Case 3:16-cv-01320-NJR-SCW   Document 20-3   Filed 10/03/17   Page 21 of 45   Page ID #318

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

(B) The notice states that the recipient may make a request to the sender of the advertisement not to send any future advertisements to a telephone facsimile machine or machines and that failure to comply, within 30 days, with such a request meeting the requirements under paragraph (a)(4)(v) of this section is unlawful;

(C) The notice sets forth the requirements for an opt-out request under paragraph (a)(4)(v) of this section;

*****

 **1861**  (iv) A facsimile advertisement that is sent to a recipient that has provided prior express invitation or permission to the sender must include an opt-out notice that complies with the requirements in paragraph (a)(4)(iii) of this section.

*****

(vi) A sender that receives a request not to send future unsolicited advertisements that complies with paragraph (a)(4)(v) of this section must honor that request within the shortest reasonable time from the date of such request, not to exceed 30 days, and is prohibited from sending unsolicited advertisements to the recipient unless the recipient subsequently provides prior express invitation or permission to the sender. The recipient's opt-out request terminates the established business relationship exemption for purposes of sending future unsolicited advertisements. If such requests are recorded or maintained by a party other than the sender on whose behalf the unsolicited advertisement is sent, the sender will be liable for any failures to honor the opt-out request.

(vii) A facsimile broadcaster will be liable for violations of paragraph (a)(4) of this section, including the inclusion of opt-out notices on unsolicited advertisements, if it demonstrates a high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such facsimile transmissions.

*****

(7) Abandon more than three percent of all telemarketing calls that are answered live by a person, as measured over a 30-day period for a single calling campaign. If a single calling campaign exceeds a 30-day period, the abandonment rate shall be calculated separately for each successive 30-day period or portion thereof that such calling campaign continues. A call is "abandoned" if it is not connected to a live sales representative within two (2) seconds of the called person's completed greeting.

(i) Whenever a live sales representative is not available to speak with the person answering the call, within two (2) seconds after the called person's completed greeting, the telemarketer or the seller must provide:

(A) A prerecorded identification and opt-out message that is limited to disclosing that the call was for "telemarketing purposes" and states the name of the business, entity, or individual on whose behalf the call was placed, and a telephone number for such business, entity, or individual that permits the called person to make a do-not-call request during regular business hours for the duration of the telemarketing campaign; provided, that, such telephone number may not be a 900 number or any other number for which charges exceed local or long distance transmission charges, and

(B) An automated, interactive voice- and/or key press-activated opt-out mechanism that enables the called person to make a do-not-call request prior to terminating the call, including brief explanatory instructions on how to use such mechanism. When the called person elects to opt-out using such mechanism, the mechanism must automatically record the called person's number to the seller's do-not-call list and immediately terminate the call.

**APPENDIX 3**

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

(ii) A call for telemarketing purposes that delivers an artificial or prerecorded voice message to a residential telephone line or to any of the lines or telephone numbers described in paragraphs (a)(1)(i)-(iii) of this section after the subscriber to such line has granted prior express written consent for the call to be made shall not be considered an abandoned call if the message begins within two (2) seconds of the called person's completed greeting.

(iii) The seller or telemarketer must maintain records establishing compliance with paragraph (a)(7) of this section.

(iv) Calls made by or on behalf of tax-exempt nonprofit organizations are not covered by paragraph (a)(7) of this section.

*****

**\*1862** 3. Section 64.1200(b) is revised to read as follows:

(b) All artificial or prerecorded voice telephone messages shall:

(1) At the beginning of the message, state clearly the identity of the business, individual, or other entity that is responsible for initiating the call. If a business is responsible for initiating the call, the name under which the entity is registered to conduct business with the State Corporation Commission (or comparable regulatory authority) must be stated;

(2) During or after the message, state clearly the telephone number (other than that of the autodialer or prerecorded message player that placed the call) of such business, other entity, or individual. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges. For telemarketing messages to residential telephone subscribers, such telephone number must permit any individual to make a do-not-call request during regular business hours for the duration of the telemarketing campaign; and

(3) In every case where the artificial or prerecorded voice telephone message includes or introduces an advertisement or constitutes telemarketing and is delivered to a residential telephone line or any of the lines or telephone numbers described in paragraphs (a)(1)(i)-(iii), provide an automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not-call request, including brief explanatory instructions on how to use such mechanism, within two (2) seconds of providing the identification information required in paragraph (b)(1) of this section. When the called person elects to opt out using such mechanism, the mechanism, must automatically record the called person's number to the seller's do-not-call list and immediately terminate the call. When the artificial or prerecorded voice telephone message is left on an answering machine or a voice mail service, such message must also provide a toll free number that enables the called person to call back at a later time and connect directly to the automated, interactive voice- and/or key press-activated opt-out mechanism and automatically record the called person's number to the seller's do-not-call list.

4. Section 64.1200(c) is amended by revising the introductory text to read as follows:

(c) No person or entity shall initiate any telephone solicitation to:

*****

5. Section 64.1200(f) is amended by redesignating paragraphs (f)(7) through (f)(14) as paragraphs (f)(9) through (f)(16), redesignating paragraphs (f)(1) through (f)(6) as paragraphs (f)(2) through (f)(7), adding a new paragraphs (f)(1) and (f)(8), and revising redesignated paragraphs (f)(3), (f)(6), and (f)(10) to read as follows:

(f) * * *

(1) The term *advertisement* means any material advertising the commercial availability or quality of any property, goods, or services.

*****

(3) The term *clear and conspicuous* means a notice that would be apparent to the reasonable consumer, separate and distinguishable from the advertising copy or other disclosures. With respect to facsimiles and for purposes of paragraph (a)(4)(iii)(A) of this section, the notice must be placed at either the top or bottom of the facsimile.

*****

 **\*1863**  (6) The term *established business relationship* for purposes of paragraph (a)(4) of this section on the sending of facsimile advertisements means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a business or residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the business or residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party.

*****

(8) The term *prior express written consent* means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

(i) The written agreement shall include a clear and conspicuous disclosure informing the person signing that:

(A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and

(B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

(ii) The term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

*****

(10) The term *sender* for purposes of paragraph (a)(4) of this section means the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement.

 **\*\*24**  *****

## *1864  APPENDIX B

### Comments Filed

*Due to the significant number of comments filed by individual consumers in this proceeding, we have listed below only those comments received from industry, consumer advocacy groups, and governmental entities. All individual consumer comments,*

*including those cited in the Report and Order, are available for inspection on the Commission's Electronic Comment Filing System (ECFS).*

| | |
|---|---|
| ACA International | ACA |
| Adeptra Limited | Adeptra |
| Alliance for Telecommunications Industry Solutions | ATIS |
| America's Health Insurance Plans | AHIP |
| American Council of Life Insurers | ACLI |
| American Financial Services Association | AFSA |
| American Teleservices Association | ATA |
| Arbitron, Inc. | Arbitron |
| Bank of America | BofA |
| Bill Me Later, Inc. | BML |
| Career College Association | CCA |
| The CGE Group | CBE |
| Citigroup, Inc. | Citi |
| Consumer Litigation Group | CLG |
| DirecTV, Inc. | DirecTV |
| Discover Bank | Discover |
| DMAA: The Care Continuum Alliance | DMAA |
| Financial Services Roundtable, American Bankers Association and the Consumers Bankers Association | Financial Services |
| FreeEats.Com, Inc. | FreeEats |
| Independent Bankers Association of Texas | IBA |
| International Bank of Commerce | IBC |
| JPMorgan Chase & Co. | JPMorgan |
| KGB USA, Inc. | KGB |
| Marketing Research Association | MRA |
| MarketLink | MarketLink |
| MDS Communications, Inc. | MDS |

**APPENDIX 3**

Case 3:16-cv-01320-NJR-SCW   Document 20-3   Filed 10/03/17   Page 25 of 45   Page ID #322

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

| Medco Health Solutions, Inc. | Medco |
| Michigan Public Service Commission | MPSC |
| Mobile Marketing Association | MMA |
| Mortgage Bankers Association | MBA |
| National Association of Chain Drug Stores | NACDS |
| National Association of Mutual Insurance Companies | NAMIC |
| National Association of State Utility Consumer Advocates | NASUCA |
| National Consumer Law Center | NCLC |
| National Council of Higher Education Loan Programs and Education Finance Council | NCHELP |
| National Retail Federation | NRF |
| National School Boards Association | NSBA |
| Newspaper Association of America | NAA |
| Ohio Department of Education | Ohio |
| Online Lenders Alliance | OLA |
| PayPal, Inc. | PayPal |
| Portfolio Recovery Associates | PRA |
| Protocol Global Solutions | PGS |
| SCANA Corporation | SCANA |
| Silverlink Communications, Inc. | Silverlink |
| SmartReply, Inc. | SmartReply |
| Soundbite Communications | Soundbite |
| Sprint Nextel Corporation | Sprint |
| Student Loan Servicing Alliance | SLSA |
| Sunrise Credit Services | Sunrise |
| USAA | USAA |
| U.S. Department of Treasury -- Financial Management Service | Treasury |
| United States Telecom Association | USTA |
| Visa, Inc. | Visa |

**APPENDIX 3**

| | |
|---|---|
| Walgreen Company | Walgreen |
| Wells Fargo | Wells Fargo |
| West Corporation | West |
| World Financial Capital Bank | WFCB |
| World Financial Network National Bank | WFNNB |

**Reply Comments Filed**

| | |
|---|---|
| ACA International | ACA |
| Air Transport Association | Air Transport |
| Alarm Industry Communications Committee | AICC |
| American Teleservices Association | ATA |
| Arbitron, Inc. | Arbitron |
| CallAssistant | CallAssistant |
| Cargo Airline Association | Cargo |
| Cross-Industry Group -- Trade Associations | CIG |
| CTIA -- The Wireless Association | CTIA |
| Federal Reserve System | Federal Reserve |
| Financial Services Roundtable | Financial Services |
| JPMorgan Chase & Co. | JPMorgan |
| MetroPCS Communications, Inc. | MetroPCS |
| National Association of State Utility Consumer Advocates | NASUCA |
| National Cable & Telecommunications Association | NCTA |
| Portfolio Recovery Associates | PRA |
| Preferred Women's Healthcare | PWC |
| Qwest Communications International, Inc. | Qwest |
| Soundbite Communications | Soundbite |
| T-Mobile USA, Inc. | T-Mobile |

**\*1866  APPENDIX C**

**Final Regulatory Flexibility Analysis**

 **\*\*25**  1. As required by the Regulatory Flexibility Act of 1980, as amended (RFA), [1]  an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the Notice of Proposed Rulemaking (*2010 TCPA NPRM*) released by the Federal Communications Commission (Commission) on January 22, 2010. [2]  The Commission sought written public comments on the proposals contained in the *2010 TCPA NPRM*, including comments on the IRFA. None of the comments filed in this proceeding were specifically identified as comments addressing the IRFA; however, comments that address the impact of the proposed rules and policies on small entities are discussed below. This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA. [3]

## A. Need for, and Objectives of, the Order

2. The Do Not Call Implementation Act (DNCIA) provides that "the Federal Communications Commission shall consult and coordinate with the Federal Trade Commission to maximize consistency with the rule promulgated by the Federal Trade Commission." [4]  We note that the Federal Trade Commission amended its Telemarketing Sales Rule (TSR) in 2008 to require, among other things, that telemarketers secure the consumer's express written agreement to receive prerecorded telemarketing messages, provide an automated, interactive opt-out mechanism, terminate its safe harbor provision allowing prerecorded telemarketing calls to consumers with whom the telemarketer enjoyed an established business relationship, and limit abandoned calls on a 30-day, per campaign period. [5]  This Commission has determined to harmonize its rules with the FTC's TSR to protect consumers from unwanted autodialed or prerecorded telemarketing calls, also known as "robocalls." Despite establishing a National Do-Not-Call Registry and adopting other consumer protection rules, the Commission observes that consumers continue to receive unwanted robocalls. The continued receipt of unwanted robocalls demonstrates a need for the actions taken in this Order. Abuses in telemarketing have motivated the Commission to the objective of bringing an end to consumers receiving unwanted robocalls, encountering difficult or ineffective opt-out procedures, and receiving dead-air calls. In adopting these rules today, the Commission fulfills another objective in this Order by acting upon Congress's directive in the DNCIA.

3. In this Report and Order (Order), the Commission adopts measures under the Telephone Consumer Protection Act (TCPA) to help consumers protect their privacy from unwanted telemarketing calls. [6]  Specifically, to summarize the rules adopted, we revise our rules to require prior express written consent for all autodialed or prerecorded telemarketing calls to wireless numbers and residential lines and to eliminate the established business relationship exemption for autodialed or prerecorded calls to  **\*1867**  residential lines [7]  while providing more flexibility for purely informational calls. We revise our rules to require an automated, interactive opt-out feature at the outset of any autodialed or artificial or prerecorded telemarketing Call that could be answered by the consumer in person and is available throughout the duration of the autodialed or prerecorded telemarketing call. [8]  In addition, if the called party elects to opt out, the calling party's mechanism must automatically add the consumer's number to the seller's do-not-call list and immediately disconnect the call. [9]  The revised rules will also require provision of a toll-free number that enables the consumer to call back and connect directly to an autodialed opt-out mechanism if the telemarketing call could be answered by an answering machine or voicemail service. [10]  Next, the Order revises the Commission's abandoned call rule whereby measurement of abandoned calls will occur over a 30-day period for the duration of a single calling campaign to discourage certain targeted calling campaigns. [11]  A campaign consists of the offer of the same good or service for the same seller. [12]

 **\*\*26**  4. Finally, for health care-related entities governed by the Health Insurance Portability and Accountability Act of 1996 (HIPAA), the Commission establishes an exemption from its TCPA rules. The Commission adopts these new rules

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:16-cv-01320-NJB-SCW   Document 20-3   Filed 10/03/17   Page 28 of 45   Page ID #325

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

to further protect consumers from unwanted autodialed or prerecorded telemarketing calls, also known as "robocalls," and establish consistency with the Federal Trade Commission's Telemarketing Sales Rule (TSR), as required by statute.

5. We believe the rules the Commission adopts in the Order strike an appropriate balance between maximizing consumer privacy protections and avoiding imposing undue burdens on telemarketers. This Order avoids imposing undue burdens of (1) requiring written consent for informational calls, (2) requiring handwritten consent agreements and handwritten signatures to fulfill the written consent requirement for telemarketing calls, and (3) requiring immediate implementation of the rules adopted herein on large and small telemarketers. For example, a community bank will not have to secure prior express written consent to provide a fraud alert notification to its customer's wireless number. In this instance, prior express oral consent to receive notifications satisfies our rules. Similarly, while we adopt a prior express written consent requirement for prerecorded or autodialed telemarketing calls, we also allow documentation and signature requirements recognized by the Electronic Signatures in Global and National Commerce Act (E-SIGN Act) satisfies our rules and avoids the undue burden associated with generating hardcopy documentation to evidence written consent.[13]  In 2000, Congress enacted the E-SIGN Act to "facilitate the use of electronic records and signatures in interstate or foreign commerce" by granting legal effect, validity, and enforceability to electronic signatures, contracts, or other records relating to transactions in or affecting interstate or foreign commerce.[14]  Finally, we ease the burden on telemarketers by deferring the effective date of the rules adopted. By adopting the rules in this  **1868**  Order, the Commission maximizes the consistency between its rules and the FTC's TSR, as contemplated in the DNCIA.

**B. Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

6. There were no comments filed in direct response to the IRFA. Some commenters, however, raised issues and questions about the impact the proposed rules and policies would have on small entities.

7. Prior Express Written Consent Requirement. Commenters expressed a variety of concerns regarding adoption of a prior express written consent requirement for autodialed or prerecorded non-telemarketing calls. American Financial Services Association (AFSA), Bank of American (BofA) and Cross-Industry Group are concerned that requiring written consent to authorize autodialed or prerecorded calls delivering account or loan application or modification information and other informational calls would be too costly for small financial institutions.[15]  AFSA argues that the Commission should limit the prior express written consent requirement to telemarketing calls only, or alternatively that account and loan modification calls be exempt from the prior express written consent requirement.[16]  Bank of America appears to object to a prior express written consent requirement for account-servicing and loan application calls made to wireless numbers.[17]  It cautions that such a requirement would be disadvantageous to individual and small business customers seeking credit approval if Bank of America is unable to communicate with them on their wireless numbers to secure needed information.[18]  Cross-Industry Group opposes written consent for autodialed or prerecorded, non-telemarketing calls to wireless services because requiring written consent unnecessarily impedes efficient communication between businesses and consumers.[19]  The Commission limits its prior express written consent requirement to telemarketing calls; therefore, the actions we take impose no new burdens on entities placing autodialed or prerecorded non-telemarketing calls, including home loan modification calls placed pursuant to the American Recovery and Reinvestment Act.[20]

 **27**  8. We reiterate that the Commission requires prior express written consent for autodialed or prerecorded telemarketing call only. Prior express consent is not required for purely informational calls, *i.e.* non-telemarketing. As stated earlier, several commenters expressed concerns about the consent requirement for autodialed or prerecorded non-telemarketing calls. Below you will find a summary of those concerns.

9. Research organizations expressed a concern opposing written consent for autodialed or prerecorded calls that deliver research or survey messages. For instance, Marketing Research Association (MRA) states that small businesses conducting research studies that include cell phone users in their samples would face increased costs if a written consent

**APPENDIX 3**

standard is adopted.[21]  The Commission does not require prior express written consent for autodialed or prerecorded informational, non-telemarketing calls.

10.  Similarly, charitable organizations contend that they would be negatively impacted if they had to secure prior express written consent for fundraising calls using autodialed or prerecorded  **\*1869**  messages. MDS Communications, Inc. asserts that a prior express written consent requirement for calls to cell phones using autodialed or prerecorded messages will have a material, detrimental effect on non-profit organizations that utilize telephone fundraising.[22]  Again, the Commission does not require prior express written consent for autodialed or prerecorded informational, non-telemarketing calls.

11.  Likewise, Portfolio Recovery Associates (PRA) predicts that numerous entities, including school boards, non-profit organizations, political candidates, debt collectors, small businesses, and large established companies would be unnecessarily and adversely affected if the written consent requirement is applied to all autodialed and prerecorded calls to mobile telephones, including purely informational calls.[23]  The Commission's actions do not require prior express written consent for informational, non-telemarketing calls.

12.  The last comment to address potential burdens on small businesses arising from the consent rules concerns electronic documentation obtained pursuant to the E-SIGN Act. Mark Schwartz states that it is incorrect for the Commission to reason that the burden of requiring a small business to obtain an existing customer's written or electronic consent to send intrastate prerecorded sales calls to that customer is lessened by the E-SIGN Act. He argues that the E-SIGN Act (1) was written for interstate and foreign commerce only and (2) burdens small businesses with determining which technological methods are compliant with the E-SIGN Act.[24]  Congress enacted the E-SIGN Act to "facilitate the use of electronic records and signatures in interstate or foreign commerce" by granting legal effect, validity, and enforceability to electronic signatures, contracts, or other records relating to transactions in or affecting interstate or foreign commerce. The Commission believes that by allowing E-SIGN measures to secure written consent, it relieves all businesses, including small businesses, from the burden of securing paper documents from consumers to evidence prior express written consent. Although the E-SIGN Act may be directed to interstate and foreign commerce, the Commission concludes that the measures to affect an electronic signature described in the E-SIGN Act should be allowed here because these measures would significantly facilitate our written consent requirement.[25]  With regard to any uncertainty concerning what satisfies the prior express consent requirement, the Commission concludes that consent obtained in compliance with the E-SIGN Act will satisfy the requirements of our revised rule, including permission obtained via an email, website form, text message, telephone keypress, or voice recording.[26]

 **\*\*28**  13.  Abandoned Calls. Predictive dialers initiate phone calls while telemarketers are talking to other consumers and these dialers frequently disconnect those calls when a telemarketer is unavailable to take the next call. In attempting to "predict" the average time it takes for a consumer to answer the phone and when a telemarketer will be free to take the next call, predictive dialers may either "hang-up" on consumers or keep the consumer on hold until connecting the call to a sales representative, resulting in what has been referred to as "dead air." Dead-air calls are abandoned calls. The Commission's existing rules limit the percentage of abandoned calls that a telemarketer may incur to three percent (3%) over a thirty day period.

14.  Newspaper Association of America (NAA) states that the "per campaign" limitation adopted in this Order has a negative impact on smaller businesses, including newspapers. A campaign consists of the offer of the same good or service for the same seller.[27]  NAA believes that small  **\*1870**  community newspapers would be hampered the most because their telemarketing calling list is less than 5,000.[28]  It contends that when calling a small list the algorithm used by predictive dialers is not as precise and results in more abandoned calls.[29]  NAA favors the existing abandoned call rule.[30]

**APPENDIX 3**

NAA's concern is not significant because the FTC has already implemented this same abandoned call requirement and the burden, if any, is significantly mitigated by the FTC's action.

#### C. Description and Estimate of the Number of Small Entities to Which the Rules Will Apply

15. The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein. [31] The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction." [32] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act. [33] Under the Small Business Act, a "small business concern" is one that: 1) is independently owned and operated; 2) is not dominant in its field of operation; and 3) satisfies any additional criteria established by the Small Business Administration (SBA). [34]

16. The Commission's rules on telephone solicitation and the use of autodialers and artificial or prerecorded messages apply to a wide range of entities, including all entities that call residential telephone lines and/or telephone numbers assigned to wireless numbers to advertise. [35] In the IRFA, the Commission concluded that determining the precise number of small entities that will be subject to the rules is not readily feasible and invited comment on such number. [36] None of the commenting parties provided the requested information. Based on the absence of available date in this proceeding, the Commission, like the FTC, believes that determining the precise number of small entities to which the rules adopted herein will apply is not currently feasible.

**29** 17. Because our action affects the myriad of businesses throughout the nation that use telemarketing to advertise, we offer these following categories of businesses which we believe will be impacted by rules we adopt in this Report and Order. For example the types of business impacted by our rules include, but are not limited to, commercial banks, mortgage brokers, pharmacies, freight airlines, **1871** and utility companies that elect to use automated or prerecorded telemarketing calls or health care-related calls.

18. **Commercial Banks.** SBA defines a commercial bank as a small business if its total assets do not exceed $175 million. This industry comprises establishments primarily engaged in accepting demand and other deposits and making commercial, industrial, and consumer loans. Commercial banks and branches of foreign banks are included in this industry. U.S. Census data for 2007 indicate that, in this industry, there were 6,490 commercial banks that operated for the entire year. Of these, 6,490, 6135 operated with annual receipts of $100,000,000 or less; 189 operated with annual receipts of $100,000,000 to $249,999,999; and 166 operated with annual receipts of more than $250,000,000. Based on this data, it is impossible to state precisely how many commercial banks operated with annual receipts of $175 million or less, but since the data do specifically indicate that 6,135 of 6,490 banks operated with less than $100,000,000 in annual receipts, we conclude that substantial majority of commercial banks are small under the SBA standard. [37]

19. **Mortgage Brokers.** SBA defines a mortgage broker as a small business if its annual receipts do not exceed $7 million. [38] Census data for 2007 indicate that in 2007, 17,702 mortgage broker firms operated for the entire year. Of these, 17,363 operated with annual receipts of $5 million or less; 177 operated with annual receipts of between $5 million and 9,999,999; and 132 operated with annual receipts of $10 million or more. [39] While the exact number that operated with annual receipts of $7 million or less cannot be stated precisely, the available data clearly show that a substantial majority of brokerage firms were small by the SBA standard.

20. **Pharmacies and Drug Stores.** Likewise, pharmacies and drug stores which do not exceed $25.5 million in annual receipts are considered small businesses. [40] U.S. Census data show that17,217 firms operated in this category during that entire years. Of these 7,217 firms, 14,136 received annual receipts of $5million or less; 2,311 received annual receipts of

APPENDIX 3

between $ 5 million and $9,999,999; and 770 received annual receipts of $10 million or more. [41]  Based on this data, we cannot state precisely how many businesses earned $7.0 million or less in annual receipts. We conclude, however, that a substantial majority of businesses in this category are small under the SBA standard.

21. **Freight Airlines.** This U.S. industry comprises establishments primarily engaged in providing air transportation of cargo without transporting passengers over regular routes and on regular schedules. Establishments in this industry operate flights even if partially loaded. Establishments primarily engaged in providing scheduled air transportation of mail on a contract basis are included in this industry. For freight airlines, the SBA developed a small business size standard for such companies stating that those companies having 1500 or fewer employees are small. [42]  U.S. Census data for 2007 indicate that there were 221 businesses in this category that operated for the entire year. Of these 221, **\*1872**  220 operated with 999 employees or less, and one(1) operated with more than 1000 employees. [43]  Based on this data, we conclude that a substantial majority of the freight airlines in this category are small under the SBA standard.

**\*\*30**  22. **Utility Companies.** The SBA also developed a small business size standard for utility companies. [44]  For electric utility companies, the small business size standard is any electric utility that it is primarily engaged in the generation, transmission, and/or distribution of electric energy for sale and its total electric output for the preceding fiscal year did not exceed 4 million megawatt hours. [45]  U.S. Census does not provide megawatt hours information and does not provide a specific number of small utility companies.

23. **Telemarketing Bureaus and Other Contact Centers.** This U.S. industry comprises establishments primarily engaged in operating call centers that initiate or receive communications for others-via telephone, facsimile, email, or other communication modes-for purposes such as (1) promoting clients products or services, (2) taking orders for clients, (3) soliciting contributions for a client; and (4) providing information or assistance regarding a client's products or services. These establishments do not own the product or provide the services they are representing on behalf of clients. The SBA has determined that "Telemarketing Bureaus and other Contact Centers" with $7 million or less in annual receipts qualify as small businesses. [46]  U.S. Census data for 2007 indicate that 2,100 businesses in this category operated throughout that year. Of those 2,100 businesses, 1,764 operated with annual receipts of less than $5 million; 145 operated with annual receipts between $5 million and $9,999,999; and 191 operated with annual receipts of $10 million or more. [47]  Based on this data, it is not possible to state precisely how many business in this category operated with annual receipts of $7 million or less. We conclude, however, that a substantial majority of businesses in this category are small under the SBA standard.

   **D. Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities**

24. The rules adopted herein establish recordkeeping requirements for a large variety of businesses, including small business entities. First, the seller must secure a written agreement between itself and the consumer showing that the consumer agrees to receive autodialed or prerecorded telemarketing calls from the seller. The Commission allows the seller the flexibility to determine the type of written agreement that it will secure from the consumer. The Commission does not require a particular form or format for this written agreement or its retention. The E-SIGN Act also provides additional flexibility in obtaining electronic consent producing minimal additional recordkeeping efforts. To the extent that the calling parties rely on an established business relationship, we note that the Commission previously stated that telemarketers that claim their prerecorded messages are delivered pursuant to an established business relationship must be prepared to provide clear and convincing evidence of the  **\*1873**  existence of such a relationship. Because of these factors, any additional recording keeping costs should be minimal. [48]

 **\*\*31**  25. Second, telemarketers and sellers, including small business entities, that initiate telemarketing calls using autodialed or prerecorded messages, must provide an automated, interactive opt-out feature at the outset of such a call. This rule obligates telemarketers and sellers to retain records of providing this feature and to retain records of consumers

Case 3:16-cv-01320-NJR-SCW Document 20-3 Filed 10/03/17 Page 32 of 45 Page ID #329

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

opting out of receiving these autodialed or prerecorded telemarketing messages. Such records should demonstrate the telemarketer's and seller's compliance with the provision and utilization of the automated, interactive opt-out feature. The Commission allows the telemarketers and sellers the flexibility to determine how to implement the mechanism. The Commission does not require a particular form or format evidencing this mechanism or its implementation.

26. Thirdly, the Commission revises it abandoned call requirement. There is no additional recordkeeping burden for this revision because the Commission's rules already require that the seller or telemarketer maintain records establishing compliance with the abandoned call rules. [49]

### E. Steps Taken to Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered

27. The RFA requires an agency to describe any significant alternatives that it has considered in developing its approach, which may include the following four alternatives (among others): "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for such small entities; (3) the use of performance rather than design standards; and (4) an exemption from coverage of the rule, or any part thereof, for such small entities." [50] As indicated above, various groups will be subject to our new rules, and some of these entities are classified as small entities.

28. _Prior Express Written Consent Requirement._ At the outset, we note that the adopted rules differ from the proposed rules. In the proposed rules, the Commission considered adopting prior express written consent for all autodialed or prerecorded calls. [51] Here, the Commission adopts prior express written consent for autodialed or prerecorded telemarketing calls only. [52] Limiting the written consent requirement to telemarketing calls significantly reduces the compliance burden for all entities, including small entities. In adopting the written consent requirement for autodialed or prerecorded calls made only for telemarketing, the Commission also concluded that consent obtained pursuant to the E-SIGN Act will satisfy the requirement of our revised rule, including permission obtained via an email, website form, text message, telephone keypress, or voice recording. [53] Accepting consent pursuant to the E-SIGN Act relieves all businesses, including small entities, from the economic impact of generating and retaining a paper document to evidence their compliance.

**32 29. _Elimination of Established Business Relationship Exemption._ In this _Order_, we amend our rules to eliminate the established business relationship (EBR) exemption for prerecorded *1874 telemarketing calls. [54] Eliminating the established business relationship exemption will be a burden to the calling telemarketer because the calling party will not be able to rely on the EBR as its form of prior express consent. That burden is mitigated because the prior express written consent requirement can be fulfilled using electronic measures including those described in the E-SIGN Act. Securing written consent using electronic measures relieves the calling parties from the task of securing handwritten documentation and handwritten signatures. [55] This reasoning applies equally to small entities. Moreover, with the increasing use of cell phones, the burden of eliminating the established business relationship exemption on telemarketers is further diminished because the EBR never applied to robocalls to cell phones. [56] In addition, because the FTC's TSR already imposes a prior express written consent requirement for telemarketing calls and does not recognize an EBR, many entities have already implemented steps to fulfill this requirement, thereby reducing the burden associated with the rule the Commission adopts in this Order.

30. _Opt-Out Mechanism._ The opt-out provisions in this Order do not impose significant economic impact on small businesses. We did not receive any comments stating that this rule would cause a significant economic impact on small businesses.

APPENDIX 3

Case 3:16-cv-01320-NJR-SCW  Document 20-3  Filed 10/03/17  Page 33 of 45  Page ID #330

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

31. _Abandoned Call._ One business concern, the Newspaper Association of America, suggests that the abandoned call rule adopted will present an adverse economic impact on small businesses. We disagree. Neither NAA nor its membership will be burdened by the abandoned call rule adopted in this Order because these entities are already subject to the FTC's abandoned call provision in the TSR. The abandoned call provision adopted in this Order is identical to the FTC's TSR abandoned call provision. This Order also rejects an alternate proposal to measure the abandoned calls on a per-campaign, per day basis. Measuring the abandoned call rate on a per-campaign, per-day basis, instead of a per-campaign, 30-day basis, would pose a significant economic burden on all businesses, including small businesses.

32. We identified alternatives to the rules adopted in this Order, but we reject these alternatives because they are more costly to small businesses.

33. **REPORT TO CONGRESS:** The Commission will send a copy of the Order, including this FRFA, in report to be sent to Congress pursuant to the Congressional Review Act.[57] In addition, the Commission will send a copy of the Order, including this FRFA, to the Chief Counsel for Advocacy of the SBA. A copy of the Order and FRFA (or summaries thereof) will also be published in the Federal Register.[58]

## *1875  STATEMENT OF CHAIRMAN JULIUS GENACHOWSKI

**Re: _Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,_ CG Docket No. 02-278**

**\*\*33**  Today, we take action to further empower consumers to avoid unwanted "robocalls."

For decades, Congress and the Commission have recognized that consumers should have control over the telemarketing calls that come to their homes and mobile devices, and be able to stop the ones that they don't want to receive. The Commission and the FTC have long had rules to put consumers in control. But despite these clear ground rules, too many telemarketers, aided by autodialers and prerecorded messages, have continued to call consumers who don't want to hear from them. Consumers by the thousands have complained to us, letting us know that they remain unhappy with having their privacy invaded and their time wasted by these unwanted calls.

Today, we respond to those consumers, providing consumers greater protection from unwanted robocalls. First, before robocalling any consumer, telemarketers will now have to get that consumer's _written_ consent, which may be electronic. Second, telemarketers will no longer be able to robocall a consumer simply because he or she has previously done business with that telemarketer -- something our data and the FTC's record show frustrates many consumers. Now, written consent will be necessary for _all_ telemarketing robocalls.

And to ensure that the consumer can easily change his or her mind even when written consent has been given, our new rules give consumers instant control: each and every telemarketing robocall will have to include an automated, interactive opt-out mechanism, so that a consumer can revoke consent by pressing just a few keys during the call. The telemarketer will have to automatically add the consumer to the company's do-not-call list and immediately disconnect the call. We are also closing a loophole so that every single telemarketing campaign will have to comply with strict limits on the "dead-air" telemarketing calls that are so frustrating to consumers when they interrupt their dinners or other activities to answer the phone, only to hear nothing on the other end.

At the same time that we help consumers avoid unwanted robocalls, we do so in a manner that is minimally burdensome to businesses, including small businesses. Because our rules largely mirror those the FTC applies to telemarketers in its jurisdiction, we have consistent rules applying to all telemarketers, and we avoid confusion for those telemarketers subject to both the Commission's and the FTC's rules. In addition, we leave unchanged our rules for robocalls that are informational and that consumers may have come to rely on. Some of these informational robocalls include automated

APPENDIX 3

calls that update consumers on airline flights, provide school notifications, or even warn them about fraudulent activity in their bank accounts.

I thank the staff from the Bureaus involved in this item for their diligent efforts, particularly the Consumer and Governmental Affairs Bureau, which worked closely with our Enforcement Bureau, Office of General Counsel, and the Wireline and Wireless Bureaus -- and for their great work to empower and protect consumers.

### *1876  STATEMENT OF COMMISSIONER ROBERT M. McDOWELL

**Re:** *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278

**\*\*34**  Sometimes it seems like there's no escape. The minute you sit down at the family dinner table or settle in to watch your favorite basketball team, the phone rings. And on the other end is not even an offshore telemarketer, but a pre-recorded voice. Today, the FCC is giving American consumers some help to keep a little more peace and serenity in their homes. We are carrying out Congress' intent to ensure that the FCC's rules regarding telemarketing "robocalls" are harmonized with those of the Federal Trade Commission ("FTC"). Such an effort makes good sense because there is no reason for industry and consumers to be confused by an array of inconsistent rules. This effort makes additional good sense because . . . Congress told us to do it!

Our action today enables consumers to: (1) consciously invite these visitors into their homes, if so desired, by requiring telemarketers to obtain written consent from consumers, and (2) ask them to stay away by requiring telemarketers to include a simple and easy to use interactive opt-out function as part of each call. Additionally, we strike a balance between protecting consumers' privacy on the one hand and, on the other hand, making the written consent requirements easy to obtain by electronic means, as contemplated by Congress in 2000 when it enacted the E-SIGN Act. [1]

I also recognize that, in an effort to harmonize our rules with the FTC's rules, our Report and Order is appropriately narrow in scope -- limited to *telemarketing* robocalls. Our changes today do not affect current requirements regarding informational calls or calls involving charities or political speech.

I am also aware, however, that robocalls trigger debates over many other public policy issues including assisting our public safety colleagues to eliminate robocalls dialed to public safety answering points. As such, I look forward to hearing from all interested parties, especially consumers and public safety, on how we can amend our rules more effectively.

I thank the Chairman, his staff, and the Consumer Bureau staff for their work in this proceeding, and I hope everyone enjoys a quiet night at home tonight.

### *1877  STATEMENT OF COMMISSIONER MIGNON L. CLYBURN

**Re:** *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278

The Order before us today is yet another victory for consumers. Very soon there will be one less chance that they are distracted during dinner. They will also have an enhanced opportunity to watch their favorite prime time shows without unwanted interruptions from telemarketing robocalls. No longer will telemarketers solely be able to rely upon the established business relationship exception. By requiring prior *written* consent, consumers will be making an *affirmative and definitive choice,* whether or not to receive telemarketing robocalls. However, should consumers change their minds and decide that they no longer want to receive even those calls, they will soon be able to easily opt out at any point during a call through the automated functionality we now require.

**\*\*35**  This Order is also a win for industry. We are ensuring that our rules are as consistent as possible with the FTC's rules; thus, making compliance with the rules for both agencies more straightforward. In addition, we are permitting

Case 3:16-cv-01320-NJB-SCW   Document 20-3   Filed 10/03/17   Page 35 of 45   Page ID #332

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

telemarketers to rely upon electronic signatures, including e-mails, which we expect will make it easier to comply with the prior written consent requirement. We are also clarifying that informational robocalls, such as school closings and prescription refill reminders, are not classified as telemarketing calls for purposes of these rules.

Overall, this is a well balanced Order. Consumers are not as likely to be annoyed by unwanted telemarketing robocalls, and as such, will be more likely to show interest in the goods and services being offered; and those authorized telemarketers may, in turn, find a higher percentage of success from their marketing campaigns.

I wish to thank the Consumer and Governmental Affairs Bureau for its hard work on this Report and Order.

## Footnotes

1       *See* 47 U.S.C. § 227; 47 C.F.R. § 64.1200.

2       Do-Not-Call Implementation Act, Public Law No. 108-10, 117 Stat. 557 (2003), *codified at* 15 U.S.C. § 6101 (stating in Section 3, in relevant part, that the Federal Communications Commission shall consult and coordinate with the Federal Trade Commission to maximize consistency with the rule promulgated by the Federal Trade Commission (16 C.F.R. § 310.4(b)).

3       In 1992, the Commission concluded that cellular carriers need not obtain additional consent from their cellular subscribers prior to initiating autodialed or prerecorded calls for which the cellular subscriber is not charged. *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Report and Order, 7 FCC Rcd 8752, 8774, para. 45 (1992) (*1992 TCPA Order*). We do not depart from this conclusion. *See infra* para 28.

4       The portion of the statute we are addressing in this Report and Order restricts certain calls to "any telephone number assigned to ... cellular telephone service" and to "any residential telephone line." 47 U.S.C. §§ 227(b)(1)(A)(iii), (B). For ease of reference in this Report and Order and to avoid confusion as to which rules apply to calls directed to a cellular telephone number (wireless) or to a residential telephone line (wireline), we will refer to such calls as being placed to a "wireless number" and to a "residential line," respectively. We also note that the existing "established business relationship" (EBR) exemption in this context applies only to prerecorded or artificial voice telemarketing calls to any residential line. 47 U.S.C. § 227(b)(2)(B); 47 C.F.R. § 64.1200(a)(2)(iv).

5       Throughout this Report and Order, we use the term "prerecorded" message or call to refer to "artificial or prerecorded voice" messages or calls.

6       *See* 47 U.S.C. § 227(b)(1)(A); *see also* 47 C.F.R. § 64.1200(a)(1). Examples of other specified recipients include, but are not limited to, 911 emergency centers, hospital emergency lines, law enforcement agencies, and patient rooms in health care facilities. *Id.*

7       In addition, nothing in this Order changes the Do-Not-Call consent requirements. Thus, sellers may contact consumers registered on the national Do-Not-Call Registry if they have obtained prior express invitation or permission from those consumers. Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by the seller and includes the telephone number to which the calls may be placed. *See* 47 C.F.R. § 64.1200(c)(2)(ii); *see also 2003 TCPA Order*, 18 FCC Rcd at 14043, para. 44.

8       47 U.S.C. § 227 (TCPA). Under the Commission's TCPA rules and orders, if the consumer's number is listed on the national Do-Not-Call Registry, prior express consent of a consumer to receive a prerecorded telemarketing call (or live telephone solicitation) must be in writing. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, 14043, para. 44 n.157 (2003) (*2003 TCPA Order*) (discussing prior express written permission required for consumers who have registered their numbers on the Do-Not-Call Registry).

9       47 U.S.C. § 227(b).

10      47 U.S.C. § 227(b)(1)(A).

11      *Id.*; *see also* 47 C.F.R. § 64.1200(a)(1). An "automatic telephone dialing system" is "equipment which has the capacity -- (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

12      *See 2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165. In particular, Section 227(b)(1)(A)(iii) prohibits prerecorded calls "to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." *See generally* 47 U.S.C. §

**APPENDIX 3**

227(b)(1)(A)(iii); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) (noting that text messaging is a form of communication used primarily between telephones and is therefore consistent with the definition of a "call").

13    47 U.S.C. § 227(b)(2)(C).

14    47 U.S.C. § 227(b)(1)(B).

15    47 U.S.C. § 227(b)(2)(B).

16    *1992 TCPA Order*, 7 FCC Rcd 8752.

17    *Id.* at 8754-55, para. 5.

18    *2003 TCPA Order*, 18 FCC Rcd at 14097-98, para. 140.

19    *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12396, para. 11. (1995) (*1995 TCPA Order on Recon*). In the *2003 TCPA Order*, the Commission concluded that "[it] will presume wireless subscribers who ask to be placed on the national Do-Not-Call Registry to be 'residential subscribers.'" *See 2003 TCPA Order*, 18 FCC Rcd at 14039, para. 36.

20    *See 1992 TCPA Order*, 7 FCC Rcd at 8769, para. 31 (explaining the persons who knowingly release their phone number have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary; *see also id.* (noting that telemarketers capturing telephone numbers by utilizing caller ID or an Automatic Number Identification device without notice to the residential telephone subscriber will be in violation of its TCPA rules, and capturing a telephone number does not indicate the called party's invitation or permission to receive autodialed or prerecorded calls); *see also 2003 TCPA Order*, 18 FCC Rcd at 14043, para. 44 n.157 (discussing prior express permission required for consumers who have registered their numbers on the Do-Not-Call Registry).

21    *See 1992 TCPA Order*, 7 FCC Rcd at 8770-71, para. 34; *see also* 47 C.F.R. § 64.1200(a)(2)(iv). The Commission has also codified exemptions for non-commercial calls; commercial calls that do not include an unsolicited advertisement or constitute a telephone solicitation; and calls by or on behalf of tax-exempt nonprofit organizations. *See 1992 TCPA Order*, 7 FCC Rcd at 8773-74, para. 40; *see also* 47 C.F.R. § 64.1200(a)(2)(v).

22    *1992 TCPA Order*, 7 FCC Rcd at 8770-71, para. 34.

23    47 C.F.R. § 64.1200(a)(2)(iii); *see also 2003 TCPA Order*, 18 FCC Rcd at 14094, 14144-45, para. 136 and Appendix A. The Commission amended its rules to exempt a call that is made for a commercial purpose but does not include or introduce an unsolicited advertisement. *2003 TCPA Order*, 18 FCC Rcd at 14097, para. 141 n.478.

24    *See 1992 TCPA Order*, 7 FCC Rcd at 8770-71, para. 34. In the *1995 TCPA Reconsideration Order*, the Commission concluded, among other things, that debt collection calls not directed to randomly or sequentially generated telephone numbers do not require an identification message. *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12400-01, paras. 17, 19 (1995) (*1995 TCPA Reconsideration Order*). With respect to debt collection calls to telephone numbers assigned to wireless numbers, the Commission concluded that the provision of a cell phone number to a creditor, *e.g.*, as a part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt. *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Request of ACA International for Clarification and Declaratory Ruling*, CG Docket No. 02-278, Declaratory Ruling, 23 FCC Rcd 559, 564, para. 9 (2007).

25    *See 1992 TCPA Order*, 7 FCC Rcd at 8774, para. 43.

26    *Id.* The Commission provided two examples of the types of wireless calls it was addressing: (1) calls monitoring service (*e.g.*, customer satisfaction, service quality, or other matters relevant to the management of their operations); and (2) warnings to roamers that they were moving out of their carrier's service area. *Id.*

27    *See* Telephone Disclosure and Dispute Resolution Act, Pub. L. No. 102-556, 106 Stat 4181 (1992); *see also* 47 U.S.C. § 227(b)(2)(C).

28    47 U.S.C. § 227(d)(3).

29    *1992 TCPA Order*, 7 FCC Rcd at 8779, para. 53; *see also* 47 C.F.R. § 64.1200(b).

30    47 C.F.R. § 64.1200(b)(2).

31    A predictive dialer is a dialing system that automatically dials consumers' telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a telemarketer will be available to take the call. Telemarketers use such software programs to minimize the amount of downtime for a salesperson. In some instances, however, no telemarketer is free to take a call that has been placed by a predictive dialer, and the consumer answers the phone only to hear "dead air" or a dial tone, causing frustration. *2003 TCPA Order*, 18 FCC Rcd at 14022, para. 8 n.31.

32    *2003 TCPA Order*, 18 FCC Rcd at 14104-05, para. 150. The abandoned call provision was intended to address the problem of dropped calls resulting from the use of predictive dialers.

**APPENDIX 3**

Case 3:16-cv-01320-NJB-SCW Document 20-3 Filed 10/03/17 Page 37 of 45 Page ID #334

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

33    Federal Trade Commission Act, 15 U.S.C. §§ 41-58.

34    15 U.S.C. §§ 6101-08 (Telemarketing and Consumer Fraud and Abuse Prevention Act).

35    16 C.F.R. § 310.1, *et seq.* (FTC implementing regulations).

36    *See* 15 U.S.C. § 45(a)(2). The FTC has asserted that it can reach telemarketing activities of entities outside its jurisdiction if the telemarketing campaigns are conducted by parties within its jurisdiction. The FTC has provided that when a financial institution, telephone company, insurance company, airline, or nonprofit entity conducts a telemarketing campaign using a third-party telemarketer, the campaign is subject to the provisions of the TSR. *See FTC Order*, 68 Fed. Reg. 4580, 4587 (2003).

37    *See* 15 U.S.C. § 45(a)(2).

38    *Telemarketing Sales Rule*, Final Rule Amendments, 73 Fed. Reg. 51164 (2008) (*2008 TSR*).

39    *Id.* at 51165. Among the more than 13,000 comments supporting more restrictive rules governing artificial or prerecorded telemarketing calls, the FTC identified four general themes: (1) sellers' and telemarketers' self interest in retaining established customers is not enough to prevent abuse through excessive pre-recorded message telemarketing; (2) prerecorded message calls are coercive and abusive invasions of consumer privacy; (3) prerecorded messages impose costs and burdens on consumers; and (4) opt-out (as opposed to prior express consent) approaches may not adequately protect consumers. *Id.* at 51166.

40    *Id.*

41    *Id.* at 51195-51200.

42    *Id.* at 51172, n.104 (citing *Telemarketing Sales Rule*, *Denial and Revised Proposed Rule*, Federal Trade Commission, 71 Fed. Reg. 58716, 58719-20, 58724-25 (Oct. 4, 2006) (stating that there may be a need to conform its rule to the FCC's "if the two sets of regulations were so contradictory that they imposed inconsistent obligations on sellers and telemarketers, but that is not the case here, where compliance with the more restrictive requirements of the TSR does not violate the FCC regulations").

43    DNCIA, 117 Stat. 557 § 3.

44    *But see supra* n.36 (telemarketing activities of entities otherwise excluded from FTC jurisdiction are subject to FTC's jurisdiction if their telemarketing campaigns are conducted by third-party telemarketers that are within the FTC's jurisdiction).

45    *See Report To Congress Pursuant To The Do Not Call Implementation Act On Regulatory Coordination In Federal Telemarketing Laws Submitted By The Federal Trade Commission*, Report to Congress, 2003 WL 22120161 (Sept. 2003) (available at http://www.ftc.gov/os/2003/09/dnciareport.pdf) (*2003 FTC Report to Congress*).

46    FCC-FTC Memorandum of Understanding: Telemarketing Enforcement (Dec. 2003).

47    *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Notice of Proposed Rulemaking, 25 FCC Rcd 1501, 1502, para. 2. (2010) (*2010 TCPA NPRM*).

48    *Id.* at 1502, 1511, paras. 2, 23.

49    *Id.* at 1502-03, para. 3.

50    *Id.*

51    *Id. See generally* Warning, Alert and Response Network ("WARN") Act, Title VI of the Security and Accountability for Every Port Act of 2006, Pub. L. No. 109-347, 120 Stat. 1884 (2006); 47 C.F.R. §§ 10.1 *et seq.* (Commission's CMAS rules).

52    *2010 TCPA NPRM*, 25 FCC Rcd at 1508-11, paras. 16-23. *But see supra* n.3.

53    *See* 47 U.S.C. § 227(b)(1)(A), (B); *see also* S. REP. 102-178 at 3 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968, 1971; *see also* H.R. REP. 102-317, at 13 (1991).

54    *See*, *e.g.*, Adeptra Comments at 6; ATA Comments at 2; Financial Services Roundtable Comments at 4; NRF Comments at 2-3; SLSA Comments at 5.

55    BofA Comments at 2-3.

56    NCTA Comments at 1-2.

57    NCHELP Comments at 1-2.

58    *See*, *e.g.*, Consumer Litigation Group Comments at 2; Biggerstaff Comments at 8; and Roylance Comments at 1-3.

59    *See e.g.* Cross-Industry Group Reply Comments at 7-9, Attachment 1 and Ohio Comments at 2.

60    *2008 TSR*, 73 Fed. Reg. at 51166.

61    *Id.* at 51116 n.15.

62    *See supra* n.2.

63    *See* 137 Cong. Rec. H11307 (Daily Ed. Nov. 26, 1991). Notwithstanding its findings, Congress, in the TCPA, provided the Commission the authority to exempt certain calls from the TCPA requirements. *See* 47 U.S.C. §§ 227(b)(2)(B) and 227(b)(2)(C).

64    *See supra* para. 22.

65    According to the Commission's CMRS Reports on Competition, wireless phone service exploded from 7,557,148 wireless users in 1991, when the TCPA was enacted, to 274,300,000 wireless users in 2009. *See Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993 and Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services,* WT Docket No. 10-133, Fifteenth Annual Report on Mobile Wireless Competition, 26 FCC Rcd 9664, 9761, para. 161 (2011) (*CMRS Report 2011*); *see also Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993 and Annual Report and Analysis of Competitive Market Conditions With Respect to Commercial Mobile Services,* First Report, 10 FCC Rcd 8844, 8874, Table 1 (1995).

66    *See 2003 TCPA Order,* 18 FCC Rcd at 14115, para. 165 (stating that such calls to wireless numbers can be costly and inconvenient and that wireless subscribers who purchase a large bucket of minutes at a fixed rate nevertheless are charged for those minutes, and for any minutes that exceed the "bucket" allowance).

67    USAA Comments at 3.

68    We note, however, that in any case where a consumer asserts that he or she has not provided written consent to receive robocalls, the telemarketer must demonstrate that the consumer actually provided such consent to avoid liability.

69    47 U.S.C. § 227(b)(2)(C).

70    T-Mobile Reply Comments at 4.

71    *See supra* para. 10.

72    *See 1992 TCPA Order,* 7 FCC Rcd at 8774, para. 43. As for the applicability of the rule to text messages, the Commission concluded that text messages would be subject to the TCPA. *See supra* para. 4.

73    The TCPA's consent and other requirements are not imposed when autodialed or prerecorded calls are placed for emergency purposes. 47 U.S.C. §§ 227(b)(1)(A), 227(b)(1)(B).

74    NCTA Comments at 1-2.

75    NCHELP Comments at 1-2.

76    *See, e.g.,* ACA Comments at 9-10; ATA Reply Comments at 2-3; Cargo Airline Association at 2; Financial Services Roundtable Comments at 4, 19-20; MetroPCS Comments at 3-4; MRA Comments at 4; NSBA Comments at 1-2; SmartReply Comments at 2; SLSA Comments at 5, 10. This list of non-telemarketing calls is only illustrative and by no means captures all of the calls that would be considered non-telemarketing calls.

77    *See 47 C.F.R. § 64.1200(a)(1); see also* 47 U.S.C. § 227(b)(1)(A).

78    *See, e.g.,* AFSA Comments at 4-5; Arbitron Comments at 10; Wells Fargo Comments at 5.

79    *See e.g.* Cross-Industry Group Reply Comments at 8-9 and Attachment A (asserting that requiring prior written consent for autodialed or prerecorded calls concerning travel itinerary changes, energy consumption, and fraud prevention will prevent these communications from being made); National School Board Association Comments at 1-2 (stating that if prior written consent is applied to communications to parents, students, and staff, school districts across the county, which are already understaffed and facing financial difficulties, could be faced with yet another unnecessary administrative burden as they would have to ascertain the type of communication device used by parents, track down written permission slips to use such a device, and document and maintain records); and Protocol Global Solutions Comments at 1-2 (stating that applying prior written consent to informational calls, such as fraud alerts, payment reminders, flight status notifications, utility outage notifications, and appointment reminders, could result in the elimination of communications that consumers want, need, and have become accustomed to expect).

80    137 Cong. Rec. S18781, 18784 (Daily Ed. Nov. 27, 1991).

81    47 U.S.C. § 227(b)(1)(A).

82    *See supra* para. 28.

83    *See, e.g.,* Financial Services Roundtable Comments at 5-10; BofA Comments at 7-8; MBA Comments at 2, 7-8. Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009. *See generally* 12 U.S.C.A. § 5201 *et seq* (allocating up to $700 billion to the U.S. Department of Treasury for the Trouble Asset Relief Program and requiring the Secretary of Treasury to implement a plan that seeks to maximize assistance for homeowners and permitting the Secretary of Treasury to use credit enhancement and loan guarantees to facilitate loan modifications to prevent avoidable foreclosures.); *see also* http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi? dbname=111_cong_bills&docid=f:h1enr.pdf and http:// makinghomeaffordable.gov/about.html.

84    *2003 TCPA Order,* 18 FCC Rcd at 14098, para. 142; *see also* 47 U.S.C. § 227(a)(5) (providing that the term "unsolicited advertisement means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise").

APPENDIX 3

85     Some of the examples provided include calls from mortgage brokers to their clients notifying them of lower interest rates and calls from credit card companies offering overdraft protection. *2003 TCPA Order*, 18 FCC Rcd at 14098, para. 142.

86     *Id.* at 14098, para. 141; *see also* 42 U.S.C. § 227(a)(4) (providing that telephone solicitation means the initiation of a telephone call for the purpose of encouraging the purchase or rental or, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship or (C) by a tax exempt nonprofit organization).

87     Nothing in the record indicates that a Recovery Act call should include a solicitation to submit a credit card application or to invest in mutual funds.

88     *See* 47 U.S.C § 227(b)(1)(A).

89     *2003 TCPA Order*, 18 FCC Rcd at 14043-44, para. 44 n.158.

90     16 C.F.R. § 310.4(b)(v)(A) (safe harbor requirements). We note that the FTC's TSR provisions do not cover autodialed calls. The TCPA, however, provides that autodialed and prerecorded calls are subject to its restrictions. 47 U.S.C. § 227(b)(1).

91     16 C.F.R. § 310.4(b)(v)(A)(i), (iii), (iv).

92     16 C.F.R. § 310.4(b)(v)(A)(ii).

93     Congress enacted the Electronic Signatures in Global and National Commerce Act (E-SIGN Act) to "facilitate the use of electronic records and signatures in interstate or foreign commerce" by granting legal effect, validity, and enforceability to electronic signatures, contracts, or other records relating to transactions in or affecting interstate or foreign commerce. 15 U.S.C. § 7001 *et seq.* (preamble); *see* 15 U.S.C. § 7001(a). The E-SIGN Act defines an "electronic signature" as "an electronic sound, symbol, or process attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record." 15 U.S.C. § 7006(5). It further defines an "electronic record" as "a contract or other record created, generated, sent, communicated, received, or stored by electronic means." 15 U.S.C. § 7006(4).

94     16 C.F.R. § 310.4(b)(v)(A).

95     *Compare* 16 C.F.R. § 310.4(b)(v)(A)(i), (iii), (iv).

96     *Compare* 16 C.F.R. § 310.4(b)(v)(A)(ii).

97     *Compare* 16 C.F.R. § 310.4(b)(v)(A).

98     *See 2010 TCPA NPRM*, 25 FCC Rcd at 1509, 1511, paras. 18, 23 (describing options available under E-SIGN Act to obtain written consent).

99     *2008 TSR*, 73 Fed. Reg. at 51181, 51184.

100     Two commenters specifically request that we find voice recordings an acceptable form of written consent. *See* American Teleservices Association Reply Comments at 3-4; Michigan Public Service Commission at 4.

101     *See, e.g.,* AFSA Comments at 12 (E-SIGN Act allows written consent to be conveniently obtained for autodialed or prerecorded telemarketing calls); National Consumer Law Center Comments at 4. One commenter asserts that obtaining written consent will be too burdensome even if obtained pursuant to the E-SIGN Act. *See* Financial Services Roundtable Comments at 4-10, 15 (summarizing the types of non-telemarketing calls that would be affected by a written consent requirement and concluding that E-SIGN would not alleviate retroactive compliance efforts to secure prior express written consent for autodialed, or artificial or prerecorded, non-telemarketing calls). We note, however, that Financial Services' view appear to be focused on the number of customers who would receive autodialed or prerecorded *non-telemarketing* calls, which is not covered by the written consent requirement we adopt. *See supra* para. 28. Thus, our written consent requirement, as adopted, appears to address the concerns expressed by the Financial Services Roundtable.

102     *2010 TCPA NPRM*, 25 FCC Rcd at 1513-14, paras. 28-32. We reiterate that the EBR exemption under our current rules only applies to prerecorded calls to residential lines. *See* 47 C.F.R. § 64.1200 (a)(2)(iv); *see also* 47 U.S.C. § 227(b)(2)(B). The EBR exemption does not apply to autodialed or prerecorded calls to wireless numbers. *See* 47 U.S.C. § 227(b)(2)(C).

103     *See* DNCIA, 117 Stat. 557 § 3.

104     *1992 TCPA Order*, 7 FCC Rcd at 8770-71, para. 34.

105     *Id.*

106     *Id.*

107     *Id.*

108     *See* 47 C.F.R. § 64.1200(a)(2)(iv). For such calls to residential lines, the Commission has also codified exemptions for non-commercial calls; commercial calls that do not include an unsolicited advertisement or constitute a telephone solicitation; and calls for or on behalf of tax-exempt nonprofit organizations. 47 C.F.R. §§ 64.1200(a)(2)(ii), (iii) and (v).

**APPENDIX 3**

Case 3:16-cv-01320-NJB-SCW Document 20-3 Filed 10/03/17 Page 40 of 45 Page ID #337

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

| 109 | In 2006, it declined, however, to adopt an EBR exemption to its general rule prohibiting prerecorded telemarketing calls without prior consent. *See 2008 TSR*, 73 Fed. Reg. at 51165 (citing previous FTC TSR action at 71 Fed. Reg. 65762 (Nov. 9, 2006)). In view of the denial of the proposed amendment to create a safe harbor for EBR-based prerecorded telemarketing calls, the notice also announced that the FTC would terminate its policy of forbearing from bringing enforcement actions against sellers and telemarketers using prerecorded telemarketing calls ("forbearance policy") effective January 2, 2007. In response to four petitions seeking an extension of the forbearance policy, however, the FTC announced in a Federal Register notice published on December 27, 2006, that in order to preserve the status quo, it would extend its forbearance policy at least until the conclusion of the rulemaking proceeding. *See 2008 TSR*, 73 Fed. Reg. at 51165 (citing 71 Fed. Reg. 77634 (Dec. 27, 2006)). |
|---|---|
| 110 | *2008 TSR*, 73 Fed. Reg. at 51164. |
| 111 | *2008 TSR*, 73 Fed. Reg. at 51166-68. |
| 112 | *See* 47 U.S.C. § 227(b)(2)(B) (the Commission "may" create exemptions to the requirements of section 227(b)(1)(B) for non-commercial calls and for commercial calls that will not adversely affect consumer privacy and do not include an unsolicited advertisement). By contrast, Congress did enact a mandatory EBR exemption when it addressed unsolicited fax advertising in the TCPA. *See* 47 U.S.C. § 227(b)(1)(C)(i) (EBR exemption to unsolicited fax advertisement prohibition). |
| 113 | *See* 47 U.S.C. § 227(b)(2)(B) (allowing Commission to adopt such exemptions only where they "will not adversely affect the privacy rights that this section is intended to protect"). |
| 114 | *See, e.g.*, NASUCA Comments at 4; National Consumer Law Center Comments at 4-5. |
| 115 | Roylance Comments at 2, 4; Roylance Reply Comments at 17-18. |
| 116 | Shields Comments at 1-2. |
| 117 | Biggerstaff Comments at 4-5; Michigan PSC Comments at 7-8. |
| 118 | *See, e.g.*, Bill Me Later Comments at 3; IBA Comments at 3; MBA Comments at 6. |
| 119 | *See* NAA Comments at 8-10. |
| 120 | *2008 TSR*, 73 Fed. Reg. at 51165. |
| 121 | *Id.* |
| 122 | *See id.* at 51179. |
| 123 | *See 1992 TCPA Order*, 7 FCC Rcd at 8770-71, para. 34; *see also* 137 Cong. Rec. S18781, 18785 (Daily Ed. Nov. 27, 1991). |
| 124 | *See supra* para. 32. |
| 125 | To the extent that some commenters ask that the EBR exemption be retained for non-telemarketing calls to wireless numbers and/or residential lines, we note that this exemption only applied to prerecorded telemarketing calls placed to residential lines. |
| 126 | *2003 TCPA Order*, 18 FCC Rcd at 14078-79, para. 112. |
| 127 | *See 2010 TCPA NPRM*, 25 FCC Rcd at 1517-18, paras. 39-43. |
| 128 | 47 C.F.R. § 64.1200(b)(1). |
| 129 | 47 C.F.R. § 64.1200(b)(2) ("All artificial or prerecorded telephone messages shall: . . . [d]uring or after the message, state clearly the telephone number (other than that of the artificial or prerecorded message player that placed the call) of such business, other entity, or individual. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges. For telemarketing messages to residential telephone subscribers, such telephone number must permit any individual to make a do-not-call request during regular business hours for the duration of the telemarketing calling campaign."). |
| 130 | *2008 TSR*, 73 Fed. Reg. at 51185; *see also id.* at 51166 (stating that health care-related calls subject to HIPAA will be exempt from its amendment). |
| 131 | *Id.* at 51185. |
| 132 | *Id.*; *see also* 16 C.F.R. § 310.4(b)(1)(v)(B)(i)-(iii). |
| 133 | Telemarketers can program their equipment to handle calls differently depending on whether a live person or a machine answers. *See generally 2003 TCPA Order*, 18 FCC Rcd at 14106-07, para. 154 (discussing, in relevant part, answering machine detection software). |
| 134 | 47 U.S.C. § 227(d)(3). |
| 135 | We note that the presence of an automated opt-out mechanism, by itself, does not change the status of a call that otherwise violates our rules. |
| 136 | *2008 TSR*, 73 Fed. Reg. at 51778-79: "The SmartReply study reporting that consumers are 300 percent less likely to call a toll-free number to opt out in response to an answering machine message than to use an interactive opt-out mechanism suggests that consumers are quite averse to noninteractive opt-out mechanisms" (citing SmartReply, Inc., "Measuring and |

**APPENDIX 3**

Case 3:16-cv-01320-NJB-SCW Document 20-3 Filed 10/03/17 Page 41 of 45 Page ID #338

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

Deducing Consumer Acceptance of Live Pre-recorded Calls with Prompt Opt-Out Mechanisms Across Ten Companies over Eight Months," No. 106, at 3).

137    *Id.*

138    *See, e.g.*, Michigan PSC Comments at 10; NASUCA Comments at 4; National Consumer Law Center Comments at 6-7); Newspaper Association of America Comments at 15-16; Roylance Comments at 2, 6; Shields Comments at 2.

139    National Consumer Law Center Comments at 7.

140    *See, e.g.*, Biggerstaff Supplemental Reply Comments at 3; Roylance Supplemental Reply Comments at 2; Shields Comments at 2.

141    *See* 47 U.S.C. § 227(d)(3); *see also* 47 C.F.R. § 64.1200(b).

142    *See 2010 TCPA NPRM*, 25 FCC Rcd at 1520, para. 47.

143    *See 2003 TCPA Order*, 18 FCC Rcd at 14101-03, paras. 146-47.

144    47 C.F.R. § 64.1200(a)(6). *See supra* n.31 for a full description of predictive dialers.

145    47 C.F.R. § 64.1200(a)(6).

146    *Id.* (prohibiting abandonment of "more than three percent of all telemarketing calls that are answered live by a person, or [as] measured over a 30-day period"). The three percent permissible call abandonment rate allows this small percentage of abandoned calls so that the telemarketing industry may benefit from the cost savings made possible by the use of predictive dialers, as opposed to the manual dialing of telephone numbers.

147    *Id.*

148    16 C.F.R. § 310.4(b)(1)(iv).

149    16 C.F.R. § 310.4(b)(4)(i).

150    *Robocalls NPRM*, 25 FCC Rcd at 1519-20, paras. 46-47. Redlining is a pattern of discrimination by which financial institutions refuse to make mortgage loans, regardless of credit record of the applicant, on properties in specified areas because of alleged deteriorating conditions. At one time, lenders actually outlined these areas with a red pencil. *See* BLACK'S LAW DICTIONARY 1150 (5th ed. 1979).

151    Michigan PSC Comments at 10; NASUCA Comments at 4; SmartReply Comments at 2-3.

152    BofA Comments at 8.

153    NAA Comments at 16-17.

154    Roylance Comments at 15-16; Roylance Reply Comments at 21.

155    *See* BofA Comments at 8.

156    *2008 TSR*, 73 Fed. Reg. at 51197.

157    Roylance Comments at 15.

158    *2008 TSR*, 73 Fed. Reg. at 51197-98.

159    *See 2003 TCPA Order*, 18 FCC Rcd at 14105-06, para 152.

160    *2003 TCPA Order*, 18 FCC Rcd at 14105-06, para. 152. In addition, the Commission noted that an abandonment rate measured over a 30-day period would allow telemarketers to more easily comply with the recordkeeping requirements associated with the use of predictive dialers. *Id.*

161    *2008 TSR*, 73 Fed. Reg. at 51200.

162    Pub. L. No. 104-191, 110 Stat. 1936 (1996), *codified*, as amended, at 42 U.S.C.A. §1320 *et seq.* Pursuant to authority vested in the Secretary of Health and Human Services (HHS) in Section 264 of HIPAA, HHS prescribed standards, requirements, and implementation specifications for HIPAA. *See* 42 U.S.C.A. § 264; *see also* 45 C.F.R. §§ 160, 162, and 164.

163    *See 2010 TCPA NPRM*, 25 FCC Rcd at 1515-16, para. 35.

164    *Id.* Moreover, according to HHS, a major goal of HIPAA is to assure that individuals' health information is properly protected while allowing the flow of health information needed to provide and promote high quality health care and to protect the public's health and well being. *See* http:// www.hhs.gov/ocr/privacy/hipaa/understanding/summary/.

165    45 C.F.R. § 164.508.

166    45 C.F.R. §§ 164.508(a)(3) (explaining that authorization is required) and 45 C.F.R. § 164.508 (c)(1) and (2) (describing what elements are needed to substantiate a valid authorization).

167    47 U.S.C. § 227(b)(2)(B) (emphasis added).

168    *2008 TSR*, 73 Fed. Reg. at 51191-92.

169    *Id.* at 51192. In adopting the final rule exempting health care-related prerecorded calls subject to HIPAA, the FTC notes that HIPAA regulations, among other things, apply to not only calls by medical providers and their third-party telemarketers,

but also to calls by DME (durable medical equipment) suppliers and by Medicare Part D providers and their third-party telemarketers. *Id.* at 51189. Additionally, the FTC acknowledges the breadth of the HIPAA marketing restrictions by reiterating that this [marketing] prohibition covers not only written communications, but "any form of telephonic communication, whether through a live call or a prerecorded message, regardless of whether there is a pre-existing business relationship," and in this regard, "is far broader than" the prerecorded call amendment. *Id.* at 51190.

170    *Id.* at 51192.

171    *Id.*

172    *Id.*

173    *Id.*

174    *Id.*

175    *Id.*

176    *See, e.g.,* America's Health Insurance Plains Comments at 1-2 (supporting an exemption because the exemption would allow the continuation of important communications by health care providers and health insurance plans such as prescription refills, immunization reminders, and post-hospital discharge follow-up); DMAA: The Care Continuum Alliance Comments at 2 (stating that the exemption will improve the overall quality of health care received while providing HIPAA privacy protections; National Consumer Law Center Comments at 6 (noting the importance of harmonizing the Commission's TCPA rules with the FTC's TSR).

177    47 U.S.C. § 227(b)(2)(B).

178    *See, e.g.,* Silverlink Comments at 8; America's Health Insurance Plans Comments at 1.

179    *See* 42 U.S.C.A. § 1320d-2; *see also* http:// www.hhs.gov/ocr/privacy/hipaa/understanding/summary/index.html. This information includes information that identifies the individual, such as name, address, birth date, social security number. *Id.*

180    *See* 42 U.S.C.A. § 1320d-2; *see also* http:// www.hhs.gov/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

181    *See* 42 U.S.C.A. § 1320d-2; http://www.hhs.gov/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

182    *See* 42 U.S.C.A. § 1320d-2; http://www.hhs.gov/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

183    42 U.S.C.A. § 1320d-5. Section 1320d-5(a) states, "Except as provided in subsection (b) of this section, the Secretary shall impose on any person who violates a provision of this part a penalty of not more than $100 for each such violation . . . ." 42 U.S.C.A. § 1320d-5(a)(1). Subsection (b) provides for three exceptions. First, a civil "penalty may not be imposed . . . with respect to an act if the act constitutes an offense punishable under" the criminal enforcement provision. 42 U.S.C.A. § 1320d-5(b)(1). Second, a civil "penalty may not be imposed . . . with respect to a provision of this part if it is established to the satisfaction of the Secretary that the person liable for the penalty did not know, and by exercising reasonable diligence would not have known, that such person violated the provision." 42 U.S.C.A. § 1320d-5(b)(2). Third, a civil "penalty may not be imposed . . . if the failure to comply was due to reasonable cause and not to willful neglect; and the failure to comply is corrected" within a specified period of time. 42 U.S.C.A. § 1320d-5(b)(3).

184    42 U.S.C.A. § 1320d-6. Section 1320d-6(a) provides:

A person who knowingly and in violation of this part--

(1) uses or causes to be used a unique health identifier;

(2) obtains individually identifiable health information relating to an individual; or

(3) discloses individually identifiable health information to another person, shall be punished as provided in subsection (b) of this section.

42 U.S.C.A. § 1320d-6(a). Subsection (b) sets forth a tiered penalty scheme. A violation of subsection (a) is punishable generally as a misdemeanor by a fine of not more than $50,000 and/or imprisonment for not more than one year. 42 U.S.C.A. § 1320d-6(b)(1). Certain aggravating circumstances may make the offense a felony. Subsection (b)(2) provides for a maximum penalty of a $100,000 fine and/or five-year imprisonment for violations committed under false pretenses. 42 U.S.C.A. § 1320d-6(b)(2). And subsection (b)(3) reserves the statute's highest penalties--a fine of not more than $250,000 and/ or imprisonment of not more than ten years--for those offenses committed "with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C.A. § 1320d-6(b)(3). The Department of Justice is responsible for criminal prosecutions under HIPAA.

185    *See, e.g.,* AHIP Comments at 1-2; DMAA Comments at 2; Medco Comments at 3-4; National Association of Chain Drug Stores Comments at 3; Silverlink Comments at 1-4.

186    Michigan PSC Comments at 9.

187    For example, without reaching the merits, a prerecorded, health care-related call notifying a family that a student reaching the age of majority on a parental policy will lose coverage and then offering continuation coverage may be considered an

APPENDIX 3

Case 3:16-cv-01320-NJR-SCW  Document 20-3  Filed 10/03/17  Page 43 of 45  Page ID #340

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

unsolicited advertisement under the TCPA. This communication is not considered "marketing" under HIPAA and would be allowed. *See* http://www.hhs.gov/ocr/privacy/hipaa/faq/marketing/283.html.

188   Biggerstaff Reply Comments at 3-4 (stating that it is difficult to come up with an example of a robocall that would be permitted by the FTC's rules incorporating the HIPAA exemption and that would not also be allowed under the Commission's existing rules).

189   *2008 TSR*, 73 Fed. Reg. at 51189.

190   Biggerstaff Comments at 7. HIPAA defines the limited groups that would be permitted to make such calls, *i.e.* health care plans, health care clearinghouses, and health care providers. *See* 42 U.S.C.A. 1320d-1; *see also* 45 C.F.R. § 160.102.

191   47 U.S.C. § 227(b)(2)(B)(ii)(I).

192   *See, e.g.,* America's Health Insurance Plans Comments at 1-2 (noting that an exemption would promote important communications by health care providers and health insurance plans with patients such as prescription refills and immunization reminders and that these communications promote health and streamline health care administration).

193   As noted herein, HIPAA requires the consumer's written consent for protected information to be used for marketing and provides civil and criminal penalties for HIPAA violations. *See supra* para. 61.

194   47 U.S.C. § 227(b)(2)(B)(ii)(II).

195   *2003 TCPA Order*, 18 FCC Rcd at 14098-99, para. 142 (explaining that if the call is intended to offer property, goods, or services for sale, either during the call or in the future (such as in response to a message that provides a toll-free number) that call is an advertisement). Because these health care-related calls' intent and purpose concern consumers' health, not the purchase of a good or service, as required by the definition of advertisement, we believe that these calls are not advertisements. *Id.* For these same reasons, we believe that these calls are not telephone solicitations. *Id.* at 14098, para. 141 (explaining that the Commission agrees that application of the prerecorded message rule turns, not on the caller's characterization of the call, but on the purpose of the message).

196   Roylance Reply Comments at 14-15.

197   *See* 42 USCA §§ 1320d-5, 1320d-6; *see supra* nn. 183-84.

198   Shields Comments at 1.

199   *See supra* para. 63.

200   *See* 42 USCA §§ 1320d-5, 1320d-6; *see supra* nn. 183-84.

201   *See 2010 TCPA NPRM*, 25 FCC Rcd at 1520, para. 48.

202   *2008 TSR*, 73 Fed. Reg. at 51166.

203   *See, e.g.*, Citigroup Comments at 5; Cross-Industry Group Reply Comments at 6-7; JPMorgan Reply Comments at 8-9; Wells Fargo Comments at 18-19.

204   Biggerstaff Reply Comments at 11.

205   *2008 TSR*, 73 Fed. Reg. at 51185.

206   *See 2010 TCPA NPRM*, 25 FCC Rcd at 1511, para 23 ("We seek information and data on the specific compliance costs and burdens associated with various written consent options under the E-SIGN Act and on the extent to which sellers and telemarketers are already utilizing these methods for obtaining consumer consent, either pursuant to the FTC's amended Telemarketing Sales Rule or pursuant to Commission rules when a called party's number is listed on the national do-not-call registry. Finally, to the extent that the Commission currently requires sellers and telemarketers placing prerecorded telemarketing calls to be prepared to provide 'clear and convincing evidence' of the receipt of prior express consent from the called party, even when consent has been obtained orally, we seek comment on the extent to which our adoption of a written consent requirement would add to the compliance burden associated with this existing requirement.").

207   *See supra* para. 40.

208   *See* 5 U.S.C. § 604.

209   *See* 47 C.F.R. § 1.1206 (discussing *ex parte* filings in permit-but-disclose proceedings).

1   *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (*SBREFA*), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

2   *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Notice of Proposed Rulemaking, 25 FCC Rcd 15012 (2010) (*2010 TCPA NPRM*).

3   *See* 5 U.S.C. § 604.

4   Do-Not-Call Implementation Act, Public Law No. 108-10, 117 Stat. 557 (2003), *codified at* 15 U.S.C. § 6101 (stating in Section 3, in relevant part, that the Federal Communications Commission shall consult and coordinate with the Federal Trade Commission to maximize consistency with the rule promulgated by the Federal Trade Commission. (16 C.F.R. § 310.4(b)).

APPENDIX 3

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

5  *Telemarketing Sales Rule*, Final Rule Amendments, 73 Fed. Reg. 51164 (2008) (*2008 TSR*).

6  *See* 47 U.S.C. § 227; 47 C.F.R. 64.1200.

7  We note that this exemption only applied to prerecorded telemarketing calls to residential lines.

8  *See supra* para. 47.

9  *Id.*

10  *Id.*

11  *See supra* para. 53.

12  *See supra* para. 56. So long as a telemarketer is offering the same good or service for the same seller, we will regard the offer as part of a single campaign, irrespective of whether telemarketing scripts used to convey the offer use or contain different wording. *Id.*

13  *See* Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001 (2000).

14  *See* 15 U.S.C. § 7001 (preamble). The E-SIGN Act defines an "electronic signature" as "an electronic sound, symbol, or process attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record." 15 U.S.C. § 7006(5). It further defines an "electronic record" as "a contract or other record created, generated, sent, communicated, received, or stored by electronic means." 15 U.S.C. § 7006(4).

15  AFSA Comments at 6-8.

16  *Id.* at 10.

17  BofA Comments at 6-8.

18  *Id.* at 7.

19  Cross-Industry Reply Comments at 6-9.

20  *See supra* paras. 20, 27-31.

21  MRA Comments at 4.

22  MDS Comments at 2, 5.

23  PRA Comments at 4; PRA Reply Comments at 1-2.

24  Schwartz Comments at 2.

25  *See supra* para. 34.

26  *Id.*

27  *See supra* para. 56.

28  NAA Comments at 16-17.

29  *Id.*

30  *Id.* at 17.

31  5 U.S.C. § 604(a)(3).

32  5 U.S.C. § 601(6). Generally, the Small Business Administration, Office of Advocacy, defines a small business as an independent business having fewer than 500 employees. *See* http://www.sba.gov/sites/default/files/sbfaq.pdf.

33  5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comments, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

34  15 U.S.C. § 632.

35  47 C.F.R. § 64.1200.

36  *2010 TCPA NPRM*, 25 FCC Rcd 1501, 1529, App. B, para. 9. In its TSR Final Rule, the FTC also concludes that a precise estimate of the number of small entities that would be subject to the prerecorded call amendment is not currently feasible. 73 FR at 51202.

37  13 C.F.R. § 121.201, NAICS code 522110; *see also* http:// factfinder2.census.gov/faces/tableservices/jsf/pages/ productview.xhtml?pid=ECN_ 2007_US_52SSSZ4&prodType=table.

38  13 C.F.R. § 121.201, NAICS code 52231.

39  *See* http:// factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_ 2007_US_52SSSZ4&prodType=table.

40  13 C.F.R. § 121.201, NAICS code 44611.

APPENDIX 3

Case 3:16-cv-01320-NJR-SCW   Document 20-3   Filed 10/03/17   Page 45 of 45   Page ID #342

In the Matter of Rules and Regulations Implementing the..., 27 FCC Rcd. 1830...

41    *See*                http://              factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_
       2007_US_44SSSZ4&prodType=table.

42    13 C.F.R. § 121.201, NAICS codes 481112 and 481212.

43    *See*                http://              factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_
       2007_US_48SSSZ5&prodType=table

44    13 C.F.R. § 121.201, NAICS codes 221111, 221112, 221113, 221119, 221121, 221122, 221210, 221310, 221320, and 221330.

45    13 C.F.R. § 121.201, NAICS codes 221111, 221112, 221113, 221119, 221121, and 221122.

46    13 C.F.R. § 121.201, NAICS code 561422.

47    *See*                http://              factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_
       2007_US_56SSSZ4&prodType=table.

48    *2003 TCPA Order*, 18 FCC Rcd at 14079-80, para. 113.

49    47 C.F.R. § 64.1200(a)(6).

50    5 U.S.C. § 603(c)(1)-(c)(4).

51    *Robocalls NPRM*, 25 FCC Rcd at 1508-1511, paras. 17-23.

52    *See supra* para. 20.

53    *See supra* para. 34.

54    *See supra* para. 35.

55    *See supra* para. 34.

56    *See supra* nn. 102, 125.

57    *See* 5 U.S.C. § 801(a)(1)(A).

58    *See* 5 U.S.C. § 604(b).

1     15 U.S.C. § 1001, *et seq.*

       27 FCC Rcd. 1830 (F.C.C.), 27 F.C.C.R. 1830, 55 Communications Reg. (P&F) 356, 2012 WL 507959

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**APPENDIX 3**